# UNITED STATES BANKRUPTCY COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | |
|---|---|
| **In re:** | Case No. 20-71187 |
| **ROBERT W. EGIZII**, | Chapter 11 |
| Debtor. | Honorable Mary P. Gorman |
| | |
| **CSMC 2007-C4 Egizii Portfolio LLC**, a Delaware limited liability company | Adversary Proceeding |
| and | No. _____ |
| **U.S. Bank National Association, as Trustee for the Registered Holders of the Mezz Cap Commercial Mortgage Trust 2007-C5, Commercial Mortgage Pass-Through Certificates, Series 2007-C5**, | |
| Plaintiffs, | |
| v. | |
| **ROBERT W. EGIZII**, | |
| Defendant. | |

## COMPLAINT OF
## CSMC 2007-C4 EGIZII PORTFOLIO, LLC AND U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF MEZZ CAP COMMERCIAL MORTGAGE TRUST 2007-C5, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-C5 FOR DETERMINATION OF DISCHARGEABILITY OF DEBTS PURSUANT TO 11 U.S.C. § 523(A)(2)

CSMC 2007-C4 Egizii Portfolio LLC (the "*A Note Holder*") and U.S. Bank National

Association, as Trustee for the Registered Holders of the Mezz Cap Commercial Mortgage Trust

2007-C5, Commercial Mortgage Pass-Through Certificates, Series 2007-C5 (the "*B Note*

*Holder*," and together with the A Note Holder, "*Holders*"), each creditors and parties-in-interest

in the above-captioned chapter 11 bankruptcy case (the "***Chapter 11 Case***") of debtor Robert Egizii (the "***Debtor***" or "***Egizii***"), by and through the undersigned counsel, hereby bring this complaint pursuant to 11 U.S.C. § 523, and in support thereof, allege as follows:

### INTRODUCTION

1.     Holders are the victim of a complex fraud perpetrated by Egizii. This scheme has mired Holders in six years of litigation with Egizii and his associates. *See CSMC 2007-C4 Egizii Portfolio LLC, et al. v.  Springfield Prairie Properties, LLC, et al*., pending in the United States District Court for the Central District of Illinois as Case No. 15-cv-03195 (consolidated) (the "***Fraud Lawsuit***"). The Fraud Lawsuit culminated into several weeks of trial ending in June 2019.

2.     So far, the Court in the Fraud Lawsuit determined that Egizii was personally liable under his guaranty contract as set forth in the Opinion (Case No. 15-cv-03195, ECF #173) (the "***Opinion***," attached as EXHIBIT 1). This totals $31,891,415.58 as of the petition date. *See* (Claim 5, Addendum). The remainder of Trial focused on the multifaceted fraud executed by Egizii to deprive Holders of assets that had been pledged to Holders as security. These funds were instead used to enrich Egizii, his family, and his companies, and funded their defense against Holders' claims for years to come.

3.     Holders' claims against Egizii are not dischargeable because of his actual fraud.

### JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and CDIL-LR Bankr. 4.1.

5.     On October 29, 2020, Debtor filed a voluntary petition for relief in this Court (the "***Court***") under chapter 11 of Title 11 of the United States Code §§ 101 *et seq.* (the "***Bankruptcy Code***").

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409 as this adversary proceeding arises in or relates to the Chapter 11 Case, which is pending before the Court.

7.     The relief requested in this complaint is sought pursuant to section 523 of the Bankruptcy Code and Rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

8.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (I), and (J).

9.     Holders consent to the entry of final orders and judgments by the Court in this adversary proceeding.

## PARTIES

10.    The A Note Holder is organized under the laws of the State of Delaware. U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor-in-interest to Wells Fargo Bank, N.A., as Trustee, for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C4, a real estate mortgage investment conduit (REMIC) trust, is the sole member of the A Note Holder. The A Note Holder has a claim against Debtor that the Court should determine is nondischargeable, based on the facts set forth in this adversary proceeding.

11.    The B Note Holder is a real estate mortgage investment conduit (REMIC) trust. The B Note Holder has a claim against Debtor that the Court should determine is nondischargeable, based on the facts set forth in this adversary proceeding.

12.    Robert W. Egizii is a citizen and resident of Sangamon County, Illinois.

## GENERAL FACTUAL ALLEGATIONS

13.    The A and B Note Holders are the holders of certain loans made to Springfield Prairie Properties, LLC ("***Borrower***") in the original principal amounts of $21,920,000 and $1,420,000, respectively (together, the "***Loans***").

14.    At all relevant times, Egizii is Borrower's sole decision-maker and is the majority beneficial owner (directly or indirectly owning an aggregate of 53.75% of Borrower).

3

15.     To evidence and secure its payment obligations under the Loans, Borrower executed and delivered certain loan documents including, without limitation, (1) a mortgage over certain property located in Christian County, Illinois; and (2) a mortgage over certain property located in Sangamon County, Illinois. In total, these mortgages encumbered seven parcels of commercial real estate (together, the "*Real Estate*").

16.     Both mortgages included an assignment of rents, by which Borrower affirmatively agreed that the holder of the Loans would be entitled to all rents derived by the Real Estate following a default under the Loans.

17.     Egizii Property Managers, LLC ("*Egizii Property Managers*") operated and managed the Real Estate during the period that Borrower controlled it.

18.     At all relevant times, Egizii is the majority owner (85%) and sole decision-maker of Egizii Property Managers.

19.     During the period that Borrower controlled the Real Estate and for some period thereafter, EEI Holding Corporation ("*EEI*") occupied the largest leased building that comprised the Real Estate.

20.     At all relevant times, Egizii was the President, CEO and primary stockholder (92.43%) of EEI.

21.     At all relevant times, Egizii Electric, Inc. and BRH Builders were divisions of EEI.

22.     Borrower defaulted under the Loans in October 2012.

23.     Based on uncontroverted testimony during Trial, Borrower was insolvent at least as of December 31, 2012, and at all times thereafter.

24.     Following the default of the Loans, the Holders filed an *in rem* foreclosure action in state court as Sangamon County Circuit Court Case No. 14 CH 00456 (the "*Foreclosure Lawsuit*"). The court entered a judgment of foreclosure, the sheriff sold the Real Estate, and court confirmed the sales on April 27, 2018. The deficiency as of the date of sale was $28,794,067.14.

25.     Contemporaneously, Holders filed the above described Fraud Lawsuit. The Fraud Lawsuit arose out of Borrower's, Egizii's, and their associates' actions in 2012, 2013, and 2014 which continued during the pendency of the Fraud Lawsuit.

26.     On February 28, 2019, the Court in the Fraud Lawsuit entered the Opinion determining, among other things, that (i) the transactions described in the balance of this complaint constitute "transfers," and (ii) Egizii is personally liable for the entire balance of the Loans as a consequence of those transfers. *See* Ex. 1.

## THE FRAUD

27.     Broadly, between October 2012 and December 2014, Egizii drained Borrower of assets by transferring substantially all of its liquid funds, on a continuing basis, to the law firms Scott & Scott P.C. ("*Scott & Scott*") and Londrigan, Potter & Randle, P.C. ("*Londrigan*").[1]

28.     Egizii then directed those attorneys to divert these funds to himself, his friends and family, lawyers representing him and his associates, and his other companies. At his direction, Egizii's attorneys – notwithstanding their knowledge of Holders' good-faith claim to the funds – acted in accordance with his direction by not only disbursing and using those very funds, including to pay themselves, but also using their position as lawyers to assert priority positions in the funds.

29.     On March 28, 2013, Holders sent formal notice of default to Borrower and Egizii, copying Scott & Scott, demanding payment of the Loans in full. This letter informed Borrower and Egizii that all rents of the Real Estate were Lender's collateral and could not be used to pay attorneys' fees associated with Borrower's default, among other matters.

30.     Egizii knew that the Loans were in default and that Holders claimed an interest in the Real Estate's rents and the Trust Funds.

---

[1] Scott & Scott, and particularly R. Stephen Scott, Esq., representing the Debtor here, acted as lead counsel for Borrower throughout the Fraud Lawsuit. Scott & Scott was also a named Defendant in the Fraud Lawsuit consolidated Case No. 15-cv-3199, based on his role in the transactions described in this complaint. The Court in the Fraud Lawsuit dismissed Holders' claims against Scott & Scott and declined Holders' request to make that dismissal final and immediately appealable.

31.   Between June 20, 2013 and December 23, 2014, Borrower delivered more than $3.1 million in rents to Scott & Scott and Londrigan to hold in their attorney trust accounts (the "*Trust Funds*").

32.   Borrower delivered so much cash to Scott & Scott and Londrigan that, on numerous occasions in 2013 and 2014, the firms had to return some of the Trust Funds to Borrower so that it would have enough money to pay operating and capital expenses associated with the Real Estate.

33.   At Egizii's direction, the majority of Trust Funds were paid or distributed to (i) Egizii, his children Michael Egizii, Rodney Egizii, and Jodi Baptist, his cousin Thomas Egizii, and his friends Clyde Beimfohr and John Pruitt, who together were the ultimate beneficial interest holders in Borrower (together, the "*Constructive Members*"), in an amount exceeding $700,000; (ii) Scott & Scott, Londrigan, and two other law firms, Sgro, Hanrahan, Durr & Rabin, LLP ("*Sgro*") and Perkins Coie, LLP ("*Perkins*"), to the tune of $1,200,000; (iii) to Holders in the amount of $625,000. The rest was returned to Borrower to pay operating expenses or used to pay and settle obligations on behalf of non-Borrower entities in which Egizii held an interest.

34.   As part of the payments or distributions to the Constructive Members described in the above paragraph, Egizii personally received $415,037.21.

35.   The payments to Scott & Scott, Londrigan, Sgro, and Perkins Coie were principally used to fund discussions with Holders and defenses against Holders' claims in the Foreclosure Lawsuit and the Fraud Lawsuit.

36.   In those actions, Scott & Scott represented Borrower; Londrigan represented Egizii and the other Constructive Members; and Sgro represented EEI and Egizii Property Managers.

37.   Holders were not informed of EEI's failure to pay rent, or of any of the foregoing distributions, until June 2014 or later.

38.   Egizii and others continued to withhold and conceal information concerning some of the distributions and payments after that date and engaged in further distributions and payments.

6

39.     After Holders learned that Scott & Scott and Londrigan were holding the Trust Funds, but before Holders knew that those firms had been paid retainers, Holders sent a letter claiming an interest in the Trust Funds and demanding that the Trust Funds not be expended.

40.     In response, Scott & Scott and Londrigan each responded that "Defendant paid its counsel advance payment retainers, which thereafter became the sole property of Defendant's counsel," and Holders therefore had no right to the funds.

41.     At the time, Scott & Scott and Londrigan together held approximately $850,000 in Trust Funds and had received $350,000 in retainers and over $110,000 in separate payments from Borrower for their periodically-billed legal services in 2013 and 2014.[2]

42.     Scott & Scott and Londrigan each continued to distribute the Trust Funds they held as directed by Egizii, including to pay retainers to themselves.

43.     When Holders learned that Scott & Scott, Londrigan, Sgro, and Perkins Coie had been paid retainers, Holders sent a letter again claiming an interest in those funds and demanding that they not be expended.

44.     In response, Scott & Scott and Londrigan reiterated their prior positions, and Sgro and Perkins stated that "SPP paid the Retainer as an advance payment retainer, which thereafter became the sole property of" the relevant firm, and Holders therefore had no right to the funds.

45.     At the time, Scott & Scott and Londrigan together held approximately $850,000 in Trust Funds, and the four firms together had received $630,000 in retainers and over $160,000 in separate payments from Borrower for their periodically-billed services in 2013 and 2014.

46.     Egizii's sworn testimony is that these firms acted at his direction.

47.     Lawyers from Scott & Scott, Londrigan, and Sgro also testified at Trial that they acted at his direction.

---

[2] At the time of these letters, Londrigan had received $100,000 that was meant to be deposited as Trust Funds, but was mistakenly deposited into a retainer account instead. This paragraph characterizes that $100,000 as Trust Funds, as intended by Egizii and Londrigan, and not as an additional retainer. Londrigan moved these funds from its retainer account and recharacterized them as Trust Funds on January 15, 2015, before Londrigan sent its subsequent letter described in paragraph 44 of this complaint.

48.     Egizii continued to direct and approve payment of further retainers to each of these firms, using the Trust Funds, through approximately March 2018.

49.     During the Fraud Lawsuit Trial, Egizii and the other defendants abandoned their position that the retainers paid to Scott & Scott and Londrigan were advance payment retainers, instead asserting that they were mere security retainers.

50.     At the same time Egizii was draining Borrower of its liquid assets, he was ensuring that EEI kept its cash by failing to pay Borrower.

51.     Specifically, EEI occupied Borrower's largest leased building until August 2015. Despite this, EEI paid no rent beginning effective as of January 1, 2013.

52.     Neither Borrower nor Egizii Property Managers ever demanded payment or sought to evict EEI.

53.     By August 2015, EEI's rent delinquency exceeded $1,000,000. This deprived Borrower of assets, to the benefit of Egizii, as EEI's CEO and primary stockholder.

54.     Between October 11, 2012 and December 2014, and despite EEI paying zero rent, Borrower paid EEI (by its divisions Egizii Electric, Inc. and BRH Builders) more than $380,000, without protest or offset.

55.     In 2013 and 2014, Egizii continued to enrich himself using EEI through.an approximately $395,000 annual salary.

56.     Egizii testified that Egizii Electric's income was $90,000,000 per year before 2009, $25,000,000 per year in 2009, and $16,000,000 per year in 2018. Egizii Dep. Tr. 3/27/18, 46:13-19. Excerpts of this transcript are attached as EXHIBIT 2.

57.     On or about November 21, 2019, EEI sold some or all of the assets of Egizii Electric, Inc. for $500,000; the purchaser assumed $1,340,440 in accounts payable as part of the transaction; and all proceeds were paid to Bank of Springfield.

58.     EEI did not transfer its liabilities arising out of the Fraud Lawsuit to the purchaser.

59.     Upon information and belief, Egizii values his interest in the remaining assets of EEI (now known as or acquired by EWR Corporation) at $0.

8

60.     Despite Egizii Property Managers not enforcing EEI's lease and otherwise failing to discharge its duties under its management agreement with Borrower, Borrower continued to pay Egizii Property Manager's management fee. Between October 11, 2012 and December 2014, Borrower paid Egizii Property Managers more than $330,000. This exceeded the management fee permitted under the management agreement.

61.     In addition to the management fee, Egizii Property Manager's contractor who performed all management services separately billed Borrower for all his work on an hourly basis. The management agreement does not contemplate additional billing, on an hourly basis or otherwise, for performing the duties required under the management agreement.

62.     In 2012, 2013, and 2014, Egizii continued to enrich himself using Egizii Property Managers by receiving $211,546, $314,914, and $277,641, respectively, in "Contract Labor" expenses on its tax returns. These amounts are all within 10% of Egizii Property Manager's reported gross receipts for those same years.

## COUNT I
### NONDISCHARGEABILITY OF DEBT
### PURSUANT TO 11 U.S.C. § 523(A)(2)(A)

63.     Pursuant to 11 U.S.C. § 523(a)(2)(A), a discharge granted to a debtor pursuant to sections 727 or 1141 of the Bankruptcy Code will not discharge an individual from any debt for money, property, services or an extension, renewal or refinancing of credit, to the extent obtained by false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

64.     A debtor who drains a company he controls of assets with the intention of impairing a creditor's ability to collect a debt owed by the debtor's company has committed actual fraud under § 523(a)(2)(A), and the creditor's claims against the debtor are nondischargeable. *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016).

65.     Holders asserted claims in the Fraud Lawsuit against Egizii for, without limitation, actual fraud under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a)(1).

9

66.     The financial transactions at issue have already been determined to be "transfers" in the Fraud Lawsuit. *See* Opinion, Ex. 1.

67.     At trial, Borrower's designated corporate witness – who was also the designated corporate witness for Egizii Property Managers and EEI – stated that "Egizii made the decision to stop paying the mortgage interest rent because he was trying to negotiation [sic.] with the lender[.]" Trial Tr. Vol. 4, 637:19-23. That same witness further stated that "Egizii transferred over $3.5 million to four different law firms because he was worried about the lender seizing the account[.]" Trial Tr. Vol. 5, 675:10-16. Excerpts of this transcript are attached as EXHIBIT 3.

68.     These statements by the Borrower's corporate witness, which were not contradicted, show that Egizii actually intended to impair Holders' ability to collect by depriving Borrower of the funds necessary to pay Holders, so that payments could preferentially be made to others as determined by Egizii.

69.     Absent admissions of actual fraudulent intent, courts typically consider "badges of fraud" set forth in 740 ILCS 160/5(b) when considering whether actual fraud occurred.

70.     The evidence in the Fraud Lawsuit is replete with badges of fraud demonstrating Egizii's actual fraudulent intent. For example, but without limitation, Egizii caused Borrower to transfer substantially all of its liquid assets to law firms, retained control over the Trust Funds at all times, directed the payment of substantial retainers from the Trust Funds (totaling $1,200,000) long before any lawsuit had been filed, concealed information concerning the Trust Funds and their uses from Holders until discovery in the Fraud Lawsuit (and not until Holders filed motions to compel production, in certain instances), caused a substantial portion of the Trust Funds to be delivered to the Constructive Members (including Egizii), and received no consideration or less than reasonably equivalent value for many of the transfers, all while Borrower was insolvent and after the Loans had been accelerated.

71.     Holders were harmed as a result of these transfers in that significant assets were transferred from Borrower to other persons and entities, thereby depriving Holders of access to

those assets to satisfy the indebtedness under the Loans while unjustly benefiting and enriching the Borrower's various insiders (including Egizii).

WHEREFORE, Holders demand judgment in their favor:

A.     Deeming Debtor's debt to Holders to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A); and

B.     Granting Holders such other and further relief as the Court deems just and proper under the circumstances.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By:    */s/Cara M. Houck*
One of its attorneys

Cara M. Houck (06239153)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
225 West Washington Street
Suite 2600
Chicago, Illinois 60606
(312) 460-4200
37206918.7/131316.00063

11

# EXHIBIT 1

3:15-cv-03195-RM-TSH  # 28   Page 1 of 71

E-FILED
Monday, 15 August, 2016  04:41:05 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor-in-interest to Wells Fargo, N.A., as Trustee, for the Registered Holders of Credit Suisse First Boston Mortgage  Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C4, | ) ) ) ) ) ) ) ) ) | |
| and | ) ) | |
| U.S. BANK NATIONAL ASSOCIATION, as Trustee for the Registered Holders of the Mezz cap Commercial Mortgage Trust 2007-C5, Commercial Mortgage Pass-Through Certificates, Series 2007-C5, | ) ) ) ) ) | NOS.  15-3195<br>15-3199 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| LONDRIGAN, POTTER & RANDLE, P.C., an Illinois corporation; PERKINS COIE, a Washington limited liability partnership; SCOTT & SCOTT, P.C., and Illinois corporation; and SGRO, HANRAHAN, DURR & RABIN, LLP, an Illinois limited liability partnership; and SPRINGFIELD PRAIRIE PROPERTIES, LLC, an Illinois limited liability company; ROBERT W. EGIZII, an individual; THOMAS EGIZII, an individual; MICHAEL EGIZII, an individual; RODNEY EGIZII, an individual; JODI BAPTIST, an individual; JOHN PRUITT, an individual; CLYDE BEIMFOHR, an individual; EEI HOLDING CORPORATION, an Illinois corporation; and EGIZII PROPERTY MANAGERS, LLC, an Illinois limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

OPINION

RICHARD MILLS, U.S. District Judge:

This is a consolidated action.

In the lead case, the Plaintiffs have sued four law firms who represent the Defendants in the other case and/or in a pending state court case.

In the second case, the Plaintiffs have sued the Borrower (who they allege has defaulted), its members/partners and other entities.

Pending are motions to dismiss in both cases.

One is allowed–the other is denied.

## I. FACTUAL BACKGROUND

### A. Introduction

The Plaintiffs in both cases are Trustees for real estate mortgage investment conduits.   Both Complaints allege the Trustees possess customary powers to hold, manage and dispose of assets for the benefit of the A Note Holder's beneficiaries.

The Defendants in the first case, Number 3:15-cv-03195, include the following law firms: Londrigan, Potter & Randle, P.C., ("Londrigan");

2

Perkins Coie ("Perkins"); Scott & Scott, P.C. ("Scott") and Sgro, Hanrahan, Durr & Rabin ("Sgro") (collectively, "Defendants" or "Law Firms").

The Plaintiffs also filed a Verified Complaint against the Borrower and its individual Members/Partners, Indemnitor/Guarantor and other entities. *See U.S. Bank National Association, et al., v. Springfield Prairie Properties, LLC; Robert W. Egizii; Thomas Egizii; Michael Egizii; Rodney Egizii; Jodi Baptist; John Pruitt; Clyde Beimfohr; EEI Holding Corporation; and Egizii Property Managers, LLC*, Case Number 3:15-cv-03199 ("Borrower Complaint").[1] That case has been consolidated with Case Number 3:15-cv-03195.

Prior to the filing of the two federal court actions, the Plaintiffs filed a mortgage foreclosure complaint in the Circuit Court for the Seventh Judicial Circuit, Sangamon County, Illinois, to obtain title to certain real estate located in Springfield, Illinois. *See U.S. Bank Association, et al. v.*

---

[1]Springfield Prairie Properties, LLC will generally be referred to as "the Borrower." Robert W. Egizii will be referred to as "Egizii." The other individual Defendants, along with Egizii, are referred to as "the Members."

3

*Springfield Prairie Properties, LLC, et al.*, Case Number 14 CH 00456. In addition to Springfield Prairie Properties ("Borrower"), the defendants in that case include Egizii Property Claimants and Unknown Owners.

The foreclosure complaint alleges that on or about June 4, 2007, the Borrower entered into a commercial mortgage loan agreement in the principal amount of $21,920,000 (the "A Loan") with Column Financial, Inc. ("Column"), for the acquisition of multiple parcels of real property located in the City of Pana, Christian County, Illinois, and the City of Springfield, Sangamon County, Illinois. Plaintiff U.S. Bank National Association, as successor Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C4, by and through its special server Torchlight Loan Services, LLC ("Plaintiff CSFB") is the current loan holder of the A Loan.

Under the Mortgages, the Borrower granted a lien on various parcels of real estate that include, without limitation, real estate having a common address of 700 North MacArthur Blvd., Springfield, Illinois.

4

Contemporaneously, the Borrower entered into a second commercial mortgage loan agreement with the same lender, Column, in the principal amount of $1,420,000 (the "B Loan," and together with the A Loan, the "Loans"), which is also evidenced by a Promissory Note and secured by Loan Documents. The current holder of the B Loan is Plaintiff U.S. Bank National Association, as Trustee for the Registered Holders of the Mezz Cap Commercial Mortgage Trust 2007-C5, Commercial Mortgage Pass-Through Certificates, Series 2007-C5 ("Plaintiff Mezz" and, collectively with Plaintiff CSFB, the "Plaintiffs").

B. Allegations in Case Number 15-3199 (Borrower Complaint)

Regarding the Borrower Complaint, the Plaintiffs state that the A Note Holder and B Note Holder (collectively "Lender") are real estate mortgage investment conduit trusts whose trustee, U.S. Bank National Association ("Trustee"), possesses customary powers to hold, manage and dispose of assets for the benefits of the A and B Note Holders' beneficiaries.

The Borrower Complaint alleges several violations under the Loan Documents. The Borrower has defaulted under the Loan and Loan

5

Documents.  The defaults include the Borrower's failure to make payments due under the terms of the Loan from October 11, 2012 to the present. The Lender sent formal notice of default to the Borrower and Egizii on March 28, 2013 ("the Demand Letter"), and demanded payment in full.

The Demand Letter informed the Borrower and Egizii that the maturity of the Loan had been accelerated and confirmed that all Rents and Cash Collateral (as defined in the Default Letter) were the Lender's collateral and could not be used to pay the attorney's fees associated with the Borrower's defaults.

The Plaintiffs allege that, as of June 11, 2015, the estimated payoff amount for the A-Loan was $30,528,652.04.  At that time, the estimated payoff amount for the B-Loan was $2,401,793.90.

According to the Complaint in Case Number 15-3199, the Borrower has not paid the accelerated Loan balance and has not turned over to the Lender all the Rents and Cash Collateral, as demanded in the Demand Letter.  The Borrower has stated that it did not and would not own any assets other than the collateral secured by the Mortgages, the fair value of

which is substantially less than the Borrower's liabilities. The Plaintiffs allege the Borrower has been insolvent since at least the date the Loan was accelerated. The Borrower has failed to repay the Loan and is unable to pay its full liability.

The Plaintiffs allege that Egizii operates a number of corporate entities as alter egos of himself. Egizii is believed by the Plaintiffs to own 35.54% of the Borrower and 18.2% of the Egizii Family Limited Partnership, which is a 23% owner of the Borrower. The Plaintiffs assert the Members own 16% of the Borrower. Moreover, Egizii acted as the Manager of 700 North MacArthur, LLC, and the Borrower and other entities failed to observe corporate formalities with respect to the North MacArthur Property.

The Plaintiffs assert none of the Egizii Lease Transactions were arm's length business transactions. Egizii retained control of both the lessor (in his individual capacity, and as representative of 700 North MacArthur, LLC and the Borrower) and the lessee (as President and CEO of Egizii Electric, a division of EEI Holding Corporation) at all times.

7

In the Demand Letter, the Lender demanded that Borrower deliver all Rents and Cash Collateral to the Lender and confirmed that the Rents and Cash Collateral could not be used to pay attorney's fees associated with the Borrower's defaults. However, the Borrower directly or indirectly delivered proceeds of Rents and Cash Collateral to four separate law firms to hold in trust accounts and as retainers for legals services.

The Plaintiffs assert the violations under the Loan Documents include a breach of the Note, a judgment on the Indemnity and Guaranty Agreement and a breach of the Illinois Limited Liability Act. The Plaintiffs also assert a claim pursuant to the Uniform Fraudulent Transfer Act, in addition to claims for civil conspiracy and tortious interference with contractual rights.

In the Borrower Complaint, the Plaintiffs are seeking a judgment against the Borrower and against the Indemnitor of the Loans in the amount of the net rents, income and profits of the Real Estate collected by the Borrower post-default.

C. Allegations in Case Number 15-3195 (Law Firm Case)

In the lead case, the Plaintiffs allege that since October 11, 2012, the Borrower failed to make payments due, as required, under the Loan Documents.  On March 28, 2013, the Plaintiffs sent a formal notice of default to the Borrower and certain other persons, demanding payment in accordance with their rights under the Loans and Loan Documents.  The Borrower was directed to deliver all Rents and Cash Collateral (each as defined in the notice) to the Plaintiffs and cautioned the Borrower against utilizing Rents for legal or professional services in connection with Borrower defaults under the Loans.  Despite the Plaintiffs' admonition, the Borrower directly or indirectly delivered proceeds of Rents and Cash Collateral to the Law Firm Defendants to hold in trust accounts and as retainers for legal services.

The Plaintiffs allege that, at present, the sale of the property would result in a shortfall of approximately ten million dollars.

The Plaintiffs allege that, beginning in July 2013 and continuing until at least December 2014, the Borrower transferred more than $1 million to a client trust account with Londrigan.  The balance held in this account as

9

of January 28, 2015 was $450,755.00.

Additionally, from June 2013 and continuing until at least November 2014, the Borrower transferred more than $2 million to a client trust account with Scott. The balance held in this account as of January 28, 2015 was $400,831.17.

The Plaintiffs allege the Borrower has withdrawn or directed disbursement of more than $2.3 million from the Trust Accounts between October 2013 and the present. As an example, over $700,000 was withdrawn from the Scott client trust account and distributed to the Borrower's members in 2014 to pay their 2013 and 2014 personal taxes.

The Plaintiffs allege that, along with the Trust Funds, Londrigan was paid $150,000 on or about December 19, 2014 ("the Londrigan Retainer"). Moreover, in addition to the Trust Funds, Scott was paid $150,000 on or about September 22, 2014 ("the Scott Retainer").

The Complaint states that other Law Firm Defendants were also paid significant retainers in late 2014. Perkins was paid $100,000 on or about September 24, 2014 (the "Perkins Retainer"). Likewise, Sgro was paid

10

$150,000 on or about October 8, 2014 (the "Sgro Retainer," and together with the Londrigan Retainer, the Scott Retainer and the Perkins Retainer, the "Retainer Funds").

The Plaintiffs further allege that, by comparison, the Borrower's financial statements indicate that Borrower paid $5,577.60 in legal fees in the aggregate in 2011, $0.00 in legal fees in the aggregate in 2012, and $143,464.43 in legal fees in the aggregate in 2013 (the year after the Borrower's default under the Loans).

The first Complaint states that the Borrower represented and warranted that it did not and would not own any assets other than the Real Estate and other collateral for the Loans. The Real Estate is worth substantially less than the amount owing to the Plaintiffs on the Loans. A receiver has been appointed over the Real Estate and other associated personal property, and is currently collecting rents from the Real Estate, as part of the 2014 Lawsuit.

The Plaintiffs allege that because the Borrower has no remaining assets under its control, the Borrower is not an operating business and has

11

no reasonable expectation of future business activity. Moreover the Borrower has been, and remains, insolvent at all times relevant to this action.

### D. Claims for relief in Case No. 15-3195

In Count I, the Plaintiffs assert a violation of the Illinois Fraudulent Transfer Act pursuant to 740 ILCS 160/6(A). The Plaintiffs allege they possess an equitable lien in all rents, income and profits from the Real Estate, which constitutes a "claim" under the Illinois Fraudulent Transfer Act ("UFTA"), 740 ILCS 160/1 *et seq.*, which the Plaintiffs state is broadly defined to include any "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 740 ILCS 160/2(c).

The Plaintiffs further assert that, as "creditors" under UFTA, they are entitled to recover the amount of funds transferred by or on behalf of the Borrower and possess a claim under UFTA. They contend their legal and equitable claims are superior to that of the Law Firms.

12

Additionally, the Plaintiffs allege the Borrower became a "debtor" under UFTA because the Borrower is liable on a claim created by the Plaintiffs' equitable lien in all rents, income and profits from the Real Estate. *See* 740 ILCS 160/2(f).

In total, the Borrower paid $2 million in Trust Funds and at least $550,000 in retainers after defaulting on the loans and Plaintiffs' acceleration, as of January 28, 2015. Although a receiver was eventually appointed to enforce the assignment of rents from the Real Estate going forward, this did not resolve the Plaintiffs' equitable lien over the previously collected rent proceeds and cash collateral. The Plaintiffs further assert that because a receiver has been appointed over the Borrower's sole assets, the Retainer Funds are grossly disproportionate to the legal expenses that Borrower can reasonably expect to incur in the normal course of business.

The Plaintiffs next allege that the transfer of the Trust Funds and Retainer Funds by the Borrower to the Defendants constitutes fraudulent transfers under Section 6(a) of UFTA. The Plaintiffs claim they are entitled to a constructive trust over all the Trust Funds and Retainer Funds.

13

Accordingly, the Plaintiffs ask the Court to order the Law Firms to provide them with a complete accounting of all Trust Funds and Retainer Funds paid to the Defendants, from June 2013 to the present.

In Count II, the Plaintiffs assert a violation of the Illinois Fraudulent Transfer Act pursuant to 740 ILCS 160/5(A)(1). The Plaintiffs allege the Borrower made the transfers of the Trust Funds and Retainer Funds with the actual intent to hinder, delay or defraud the Plaintiffs, and to otherwise deprive the Plaintiffs of their claim to all rents, income and profits from the Real Estate. The Plaintiffs contend that, for a number of reasons, the Borrower's transfers of the assets comprising the Trust Funds and Retainer Funds constitute a pattern of fraudulent conveyances under UFTA. Accordingly, the Plaintiffs seek the same relief as in Count I.

In Count III, the Plaintiffs assert a claim for aiding and abetting. They assert that by accepting the Trust Funds and the Retainer Funds from the Borrower, the Defendant Law Firms: (1) helped the Borrower breach its obligations under the Loan Documents to pay all rents, income and profits from the Real Estate to the Plaintiffs; and (2) assisted the Borrower to

14

commit fraudulent transfers under Sections 5(a) and 6 of UFTA.

The Plaintiffs further allege the Law Firms aided the Borrower to perform a wrongful act when they transferred a portion of the Trust Funds back to the Borrower's members. As the Borrower's legal counsel, moreover, the Defendants were regularly aware of their role as part of the overall tortious activity at the time that they provided their assistance to the Borrower.

Additionally, the Plaintiffs contend that certain Defendants knowingly and substantially assisted the Borrower to breach the Loan Documents and to violate UFTA because the Defendants accepted millions of dollars of transfers concerning the Trust Funds and the Retainer Funds. Certain Defendants then allowed over $700,000 of the Trust Funds to be transferred back to the members of the Borrower. It is further contended that certain Defendants also accepted Retainer Funds that are grossly disproportionate to the legal expenses that Borrower can reasonably be expected to incur.

The Plaintiffs further allege that because of the disparity between the

15

Retainer Funds and the legal expenses the Borrower could reasonably incur, the Defendant Law Firms knowingly and substantially assisted the Borrower by mischaracterizing the Retainer Funds as "advance payment retainers," thereby abusing the use of such retainers.

The Plaintiffs seek the same relief as in Counts I and II.

In Count IV, the Plaintiffs assert claims for civil conspiracy. They allege that by entering into agreements with the Borrower to accept the Trust Funds and Retainer Funds, the Law Firms assisted the Borrower to commit tortious acts. The Plaintiffs contend that each of the Law Firms accepted the Trust Funds and Retainer Funds so that the Borrower could accomplish transfers of those assets that violate Sections 5(a) and 6 of UFTA.

The Plaintiffs further allege that Defendants Londrigan and Scott further aided the Borrower by transferring, including but not limited to, $700,000 of the Trust Funds to members of the Borrower. The Defendants also mischaracterized the Retainer Funds as "advance payment retainers," even though the Retainer Funds are grossly disproportionate to the legal

16

expenses that the Borrower can reasonably expect to incur.

The Plaintiffs seek the same relief as in the prior counts.

E. Claims for relief in Case Number 15-3199

(1)

In Count I, the Plaintiffs assert a claim for Judgment on Note (in Personam) (Full Recourse) against the Borrower, EEI Holding Company/Egizii Electric[2] and Egizii Property Managers.  This is based on the Borrower's failure to make payments and default and the Lender's acceleration of the Loan and demand for payment of the entire Loan Balance.  The Borrower agreed it would be fully and personally liable for the entire Loan balance if the Borrower failed to obtain the Lender's prior written consent to any transfer of the "Property."  The Plaintiffs allege the Borrower transferred the Rents, by delivering a portion to the Law Firms to hold in the Trust Accounts and the Retainers.

According to the Complaint, the Borrower, EEI Holding Corporation,

---

[2]The Plaintiffs allege that Egizii Electric is a division and/or alternate name of EEI Holding Company.  Moreover, Egizii is the President and CEO of both entities.

17

Egizii Electric and Egizii Property Managers each function as a mere instrumentality, alter ego and agent of Egizii in connection with the North MacArthur Property. The maintaining of separate corporate entities of EEI Holding Corporation/Egizii Electric and Egizii Property Managers will result in injustice to the Lender because of the Plaintiffs' belief that assets were transferred from the Borrower to these entities or were not transferred to the Borrower from these entities when they should have been, to prevent the Lender from recovering on the Note.

The Plaintiffs seek the entry of judgment against the Borrower and in favor of the Lender. They also request the piercing of the corporate veil of the Borrower and entry of judgment against EEI Holding Corporation/Egizii Electric and Egizii Property Managers in the full amount.

In Count II, the Plaintiffs seek Judgment on Note (In Personam) (Partial Recourse) against the Borrower, EEI Holding Company/Egizii Electric and Egizii Property Managers. They allege that under the Note, the Borrower is liable for the amount of, without limitation, (i) all net rents, issues, profits, and revenues of all or any portion of the property subject to

18

the Mortgages received or applicable since October 11, 2012, plus (ii) all attorney's fees and costs incurred by the Lender. The Plaintiffs make the same allegations regarding the alter ego status of EEI Holding Corporation/Egizii Electric and Egizii Property Managers.

The Plaintiffs seek the same relief as in Count I.

In Count III, the Plaintiffs seek the entry of Judgment on Guaranty (Partial Recourse) against Egizii. The Plaintiffs allege that pursuant to the Guaranty, Egizii guaranteed payment of all losses suffered by the Lender as a result of the Borrower's failure to deliver all Rents to the Lender. Moreover, Egizii agreed that the Guaranty is "a guaranty of payment and performance and not of collection," that Egizii's liability "shall be absolute, direct and immediate and not conditional or contingent," and that the Lender's recovery is not contingent upon its recovery "against the Collateral for the Loan." The Plaintiffs allege this provision is not an assignment of rents but rather an agreement by Egizii to be liable for the amount of any post-default Rents not delivered to Lender.

In the Complaint, the Plaintiffs allege that because the Borrower and

19

Egizii have failed to deliver any Rents to Lender, Egizii is liable to the Lender for these amounts.   The Plaintiffs make the same allegations regarding the alter ego status of EEI Holding Corporation/Egizii Electric and Egizii Property Managers.  The Plaintiffs seek the entry of judgment against Egizii and in favor of the Lender in the full amount provided by the terms of the Guaranty.  They also request that the corporate veil be pierced and that judgment be entered against EEI Holding Corporation/Egizii Electric and Egizii Property Managers.

In Count IV, the Plaintiffs seek the entry of Judgment on Guaranty (Full Recourse) against Egizii.  Pursuant to the Guaranty, Egizii agreed that he would be liable for the entire Loan indebtedness under the same circumstances that trigger liability for the Borrower.  Under Phase Y of Section 1.5 of the Note, moreover, the Borrower agreed that it would be fully and personally liable for the entire Loan balance if the Borrower failed to obtain the Lender's prior written consent to any transfer of the "Property."  Under the Note, "Property" includes "the security [for the indebtedness], the same being all properties (whether real or personal),

rights, estates and interests now or at any time securing the payment of this Note and/or the other obligations of Borrower under the Loan Document[.]"  The security for the indebtedness includes, all "Rents."

The Plaintiffs allege that because the Borrower transferred the Rents by delivering a portion to the Law Firms to hold in the Trust Accounts and the Retainers, Egizii is liable.  EEI Holding Corporation/Egizii Electric and Egizii Property Managers are also liable as Egizii's alter ego and agent.  The Plaintiffs seek the same relief as in other counts.

In Count V, the Plaintiffs assert claims for Breach of the Illinois Limited Liability Company Act against the Borrower and Members.  Pursuant to the Illinois Limited Liability Company Act, limited liability companies may not make distributions while insolvent.

Accordingly, the Plaintiffs seek the entry of Judgment against the Members and in favor of the Lender.  They further request that the Members pay the funds received from the law Firms and/or the Trust Accounts to the Lender.

21

(2)

In Count VI, the Plaintiffs assert claims against the Borrower and Members under the Uniform Fraudulent Transfer Act, 740 ILCS 160/1 et seq. ("UFTA") for Constructive Fraud. UFTA provides that both actual and constructive fraudulent transfers are void.

A "transfer" under the UFTA means "every mode, direct, or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 740 ILCS 160/2(l). The Borrower "is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS 160/3(a). Moreover, the Borrower "is presumed to be insolvent" if it "is generally not paying his debts as they become due[.]" 740 ILCS 160/3(b). The Plaintiffs assert the Borrower became insolvent no later than the time of the Lender's acceleration of the Loan.

The Plaintiffs further asserts that the Members, including but not limited to Egizii, are "insiders" of the Borrower within the meaning of the

UFTA because they are directors, officers or persons in control of the Borrower and one or more of the Members may be relatives of Egizii, who is a director, officer or person in control of the Borrower. The Borrower engaged in Collateral Transfers. The transferees of the Collateral Transfers, including the Members, are not "good-faith transferees" under the UFTA. As a result, the Lender was harmed in that significant assets were transferred from the Borrower which unjustly benefitted and enriched the Members (including Egizii).

The Plaintiffs request that the Court void any and all transfers of Rents to the Law Firms, and from the Law Firms to the Members and any other persons and entities from and after March 28, 2013. The Plaintiffs request that the assets of the Members and any other recipients of distributions from the Trust Accounts be attached. They further request that the Trust Funds and the Retainer Funds be paid to the Lender.

Additionally, the Plaintiffs request the discovery of all assets of the Members, complete records regarding the Trust Accounts and Retainers, complete records regarding all Rents and other funds received from and

23

after October 11, 2012, and any other documents and information requested by the Lender in connection with the Egizii Lease Transactions, the Collateral Transfers and the Rents. The Plaintiffs further request that the Court Order any judgment entered be satisfied from property found through this discovery.

In Count VII, the Plaintiffs assert claims against the Borrower and Members under the Uniform Fraudulent Transfer Act for Actual Fraud. They note the Borrower is presumed to be insolvent under UFTA. The Members, including but not limited to Egizii, are "insiders" of the Borrower pursuant to UFTA.

The Plaintiffs contend that, as part of the Collateral Transfers, the Borrower transferred the Rents to the Law Firms and exercised continuous control over the Trust Funds and permitted direct distribution at least to the Members and back to the Borrower. It is argued that these actions were taken with the intent to hinder, delay or defraud creditors–particularly the A Note Holder and B Note Holder–and are thus void.

The Plaintiffs cite the following examples of fraud, in violation of 740

24

3:15-cv-03195 RM-TSH # 28 Page 25 of 71

ILCS 160/5(b): (1) the transfers out of the Trust Accounts were largely either back to the Borrower, or to the Borrower's Members, who are insiders; (2) the Borrower's transfers were to Trust Accounts over which it could exercise continuing dominion and control; (3) the Retainers contain funds over which the Borrower can exercise dominion and control as the Borrower can direct the activities of its attorneys and the Borrower does not need four separate law firms incurring redundant fees in connection with the defaults; (4) the Borrower's transfers to the Law Firms were concealed from the Lender until mid-2014 and additional information was not disclosed until January 2015; (5) the transfers out of the Trust Accounts to the Borrower's Members were concealed from the Lender until mid-2014; (6) the Borrower was threatened with suit in the Demand Letter in March 2013, before any funds were deposited in the Trust Accounts and before any of the Retainers were paid; (7) the Borrower transferred almost all of its liquid assets (cash) to the Law Firms to hold in the Trust Accounts and Retainers; (8) the Borrower removed assets from its own accounts and concealed them in the various Trust Accounts and Retainers; (9) the

25

Borrower's assets were removed from the Trust Accounts and delivered to the Borrower's Members; (10) the Borrower received no consideration for the funds delivered to the Law Firms or for the funds disbursed from the Trust Accounts to the Members and others; (11) the Borrower was insolvent when the transfers to the Law Firms occurred, and when funds were disbursed from the Trust Accounts; (12) the transfers occurred shortly after the Loan was accelerated in March 2013; and (13) the Borrower transferred the essential assets of its business (net cash flow) to lienors (Londrigan and Scott), who transferred those assets to insiders of the Borrower (the Members).

The Plaintiffs further assert that the Borrower's payment of the Retainers, and the distributions from the Trust Accounts (including but not limited to the Borrower's Members), were transfers made to insiders (the Members) for an antecedent debt, at a time when the Borrower was insolvent and when the insiders (Members) had reasonable cause to believe that the Borrower was insolvent. The transferees of the Collateral transfers are not "good-faith transferees" under the UFTA.

The Plaintiffs allege that the Lender was harmed because of the Collateral Transfers given that significant assets were transferred from the Borrower to other persons or entities, thereby depriving the Lender of access to those assets to satisfy the indebtedness under the Loan while unjustly benefitting and enriching the Members (including Egizii).

The Plaintiffs seek the same relief as in Count VI.

In Count VIII, the Plaintiffs assert civil conspiracy claims against all Defendants.

The Plaintiffs allege two or more of the Defendants knowingly conspired in a common scheme or plan to place the assets of the Borrower, Egizii or both outside the reach of their creditors, including the Lender. More than one Defendant engaged in the Collateral Transfers and Lease Transactions in furtherance of this common scheme or plan. Two or more Defendants executed the Collateral Transfers and Lease Transactions for unlawful purposes, at least one of which was to avoid the Borrower's and Egizii's obligations to their creditors, including the Lender. The Plaintiffs contend that two or more Defendants sought to accomplish this by

27

breaching contractual obligations and engaging in fraudulent transfers.

The Plaintiffs contend the Lender has suffered damages and seeks judgment for the full amount for which the Borrower is liable under the terms of the Note.

In Count IX, the Plaintiffs assert claims for tortious interference with contractual rights against EEI Holding Corporation/Egizii Electric. The Plaintiffs allege that EEI Holding Corporation/Egizii Electric and Egizii were aware of the Note, Loan Documents and the Lease, which obligated the Borrower to make periodic payments to the Lender. EEI Holding Corporation/Egizii Electric failed to pay the full rental rate required under the terms of the Lease, at least from September 1, 2011 to October 1, 2012, which directly caused the Borrower to have fewer funds available to satisfy the terms of its contracts with the Lender.

The Plaintiffs further allege that EEI Holding Corporation/Egizii Electric failed to make any payments due under the terms of the Lease beginning with the payment due on November 1, 2012. This failure caused the Borrower to have fewer funds available to satisfy the terms of its

contracts with the Lender.    The Plaintiffs contend the breaches were intentional and unjustified.

The Complaint states that the Borrower defaulted under the Loan and Loan Documents which was caused in part by the failure of EEI Holding Corporation/Egizii Electric to pay the full rental payments due and then to pay the amounts due, pursuant to the Lease.   As a result, the Lender has suffered damages.

For these reasons, the Plaintiffs seek judgment against EEI Holding Corporation/Egizii Electric for the full amount for which the Borrower is liable.

(3)

The Defendants have filed a number of motions to dismiss.  The Law Firm Defendants–Londrigan, Perkins, Scott and Sgro–have moved to dismiss all claims.

EEI Holding Corporation and Egizii Property Managers, LLC have moved to dismiss Counts I, II, VIII and IX of the Plaintiffs' Complaint.

The Borrower, Springfield Prairie Properties, LLC has moved to

29

dismiss Counts I, II, V, VI, VII and VIII of the Plaintiffs' Complaint.

The Members, which include Robert W. Egizii, Thomas Egizii, Michael Egizii, Rodney Egizii, Jodi Baptist, John Pruitt and Clyde Beimfohr, have moved to dismiss Counts III–VIII of the Plaintiffs' Complaint.

## II. LEGAL DISCUSSION

The Defendants offer several reasons why they believe this case should be dismissed pursuant to Rule 12(b)(6). They assert that Plaintiffs are attempting an end run around the state court foreclosure action in an effort to disgorge the Defendants' retainers. The Defendants further contend that Plaintiffs cannot allege each of the elements to any of their claims and, further, they are not entitled to a constructive trust or an accounting. As to certain claims, the Plaintiffs allege that venue is improper and dismissal is appropriate under Rule 12(b)(3).

### A. Legal standard

In reviewing a motion to dismiss, the Court accepts the truth of the factual allegations of the complaint. *Vinson v. Vermilion County, Illinois,*

30

776 F.3d 924, 925 (7th Cir. 2015). In order to avoid dismissal under Rule

12(b)(6), "the complaint must state a claim that is plausible on its face."

*Id.* at 928. Under Federal Rule of Civil Procedure 8(a)(2), a plaintiff must

provide "a short and plain statement of the claim showing that the pleader

is entitled to relief." "Specific facts are not necessary; the statement need

only give the defendant fair notice of what the . . . claim is and the grounds

upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal

quotation marks and citation omitted).

"Rule 12(b)(3) allow[s] dismissal only when venue is 'wrong' or

'improper.'" *Atlantic Marine Const. Co. v. U.S. Dist. Court for Western*

*Dist. of Texas*, 134 S. Ct. 568, 577 (2013). This depends "on whether the

court in which the case was brought satisfies the requirements of federal

venue laws." *Id.*

The Court will first address those portions of the motions to dismiss

which relate to jurisdictional issues.

B. Dismissal based on jurisdictional issues

(1) Forum shopping and venue

31

In their Motion to Dismiss in Case Number 15-3199, EEI Holding Corporation and Egizii Property Managers allege that Plaintiffs are engaging in improper forum shopping because these allegations could have been brought in the foreclosure case filed in Sangamon County Circuit Court.

Egizii and the Members contend that dismissal is appropriate under Rule 12(b)(1) because subject matter jurisdiction is lacking pursuant to *Princess Lida v. Thompson*, 305 U.S. 456 (1939) and/or based on the abstention doctrine, as articulated in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). Egizii and the Members also contend that Counts III through VIII fail to state a claim upon which relief should be granted and are subject to dismissal on that basis.

In the foreclosure case, the Plaintiffs initially requested a deficiency judgment against the Borrower and Guarantor, before amending the complaint. The amended complaint in the state court action removes the request for a deficiency judgment. In the complaint in this case, the Plaintiffs state they did not seek a deficiency judgment in the state court

32

action.  EEI Holding Corporation and Egizii Property Managers claim that assertion is disingenuous, given that they did seek a deficiency judgment against the Borrower and Guarantor.  Because the Plaintiffs are now seeking the same relief in federal court, the Defendants allege they are attempting to present the same issue in two different forums.

A fair reading of the foreclosure complaint is that Plaintiffs intended that action to deal with the Property while the Plaintiffs here are seeking a monetary judgment for the loan amount and additional relief based on the Defendants alleged misconduct.  The Borrower and Egizii Property Managers are the only Defendants in both cases.  In this case, the Guarantor, the other Members and EEI are also Defendants.

As the Plaintiffs allege, "upon default, the mortgagee is allowed to choose whether to proceed on the note or guaranty or to foreclose upon the mortgage." *Turczak v. First American Bank*, 2013 IL App (1st Dist. 2013), 997 N.E.2d 996, 1001 (2013).  The mortgagee may pursue those remedies consecutively or concurrently.  *See id.*

Based on the foregoing, the Court is unable to conclude that Plaintiffs

33

have engaged in improper forum shopping and that venue is inappropriate as a result. The Plaintiffs were entitled to file separate actions in different forums, given the nature of relief sought in the two complaints. Accordingly, the motion of EEI Holding Corporation and Egizii Property Managers to dismiss for improper venue will be denied. Additionally, the Borrower's motion on that basis will also be denied.

(2) Subject matter jurisdiction

In Case Number 15-3199, the Borrower seeks dismissal of Counts I and II for lack of subject matter jurisdiction. Pursuant to the *Rooker-Feldman* doctrine, "lower federal courts do not have subject matter jurisdiction over claims seeking review of state court judgments." *Long v. Shorebank Development Corp.*, 182 F.3d 548, 554 (7th Cir. 1999) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482-86 (1983)). Because the Court is not reviewing a state court judgment, however, *Rooker-Feldman* does not apply and the Borrower's request for dismissal on that basis is premature.

In their motion, Egizii and the Members contend dismissal is appropriate for lack of jurisdiction pursuant to the *Princess Lida* doctrine. "The principle illustrated by *Princess Lida* is that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other." *Norton v. Bridges*, 712 F.2d 1156, 1165 (7th Cir. 1983) (internal quotation marks and citation omitted). The Defendants allege that the administration of pre-receivership rents and post receivership rents are a major portion of Count III in this case, which seeks the entry of Judgment on Guaranty (Partial Recourse) against Egizii. The same applies to Counts IV through VIII because each of those counts pertain to Egizii's and/or the Members' alleged misuse and misapplication of the pre-receivership rents of the property.

The Court has reviewed Counts III through VIII. Each of those claims seek relief against individuals and/or corporate entities. The Plaintiffs are not asking the Court to exercise jurisdiction over the mortgaged real estate at issue in the Foreclosure Lawsuit. Although the claims may relate to property, the Court is not exercising jurisdiction over

35

any alleged res or property. Because the claims are in personam and not in rem or quasi in rem, the Court concludes that the *Princess Lida* doctrine does not divest the Court of subject matter jurisdiction.

Accordingly, the Borrower's motion to dismiss Counts I and II pursuant to the *Rooker-Feldman* doctrine will be denied. Egizii and the Members's motion to dismiss Counts III through VIII based on the *Princess Lida* doctrine will be denied.

### (3) Abstention

Alternatively, if the Court does not dismiss Counts I and II, the Borrower contends that, pursuant to *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), the abstention doctrine should be followed and the counts dismissed to avoid duplicative litigation. The Court must engage in a two-part inquiry to determine whether *Colorado River* abstention is appropriate. *See Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 498 (7th Cir. 2011). "First, the court must determine whether the concurrent state and federal actions are actually parallel." *Id.* (citations omitted). If the cases are "actually parallel," the Court must consider

36

whether "exceptional circumstances" justify abstention. *Id.*

Egizii and the Members allege that Counts III through VIII should be dismissed pursuant to the *Colorado River* doctrine. They contend the Plaintiffs in both cases seek recovery of deficiency judgments against Egizii or entities in which he has a major interest and recovery of pre-receivership, post-default rents from the mortgaged Property.

There is a presumption against abstention, which is appropriate only in "exceptional circumstances." *See AAR Int'l, Inc. v. Niemlias Enterprises S.A.*, 250 F.3d 510, 517 (7th Cir. 2001). Because the claims asserted against the Borrower are not duplicative and there is not a substantial likelihood that the state litigation will dispose of all claims in the federal case, the Court declines to dismiss or stay Counts I and II under the *Colorado River* doctrine.

The same is true of Counts III through VIII which are asserted against Egizii and the Members. The causes of action in this case are different than those asserted in the foreclosure action. Because the cases are not parallel, the Court concludes there is no basis to abstain from jurisdiction.

37

Accordingly, the motions to dismiss Counts III through V pursuant to the

*Colorado River* doctrine will also be denied.

<u>C. Dismissal for failure to state a claim (pre-receivership rents)</u>

On November 26, 2014, the Plaintiffs filed the complaint in the

Sangamon County Circuit Court to foreclose on their mortgages and seek

the appointment of a receiver for the Property, which was pledged as

collateral for the loans. On December 19, 2014, Sangamon County Circuit

Judge John M. Madonia granted the Plaintiffs' request for a receiver but

denied their request for turnover of any income generated from the

Property prior to the appointment of the receiver, except for $80,000 that

the Borrower offered to turn over to the receiver. The Order appointing a

receiver was entered on December 23, 2014.

In both Case Number 15-3195 and 15-3199, the Defendants argue

that Plaintiffs' claims must be dismissed because the Plaintiffs are not

entitled to pre-receivership rents. Most of the amounts sought by the

Plaintiffs are alleged to have been incurred prior to the appointment of a

receiver.

38

The Law Firm Defendants contend that Plaintiffs are not entitled to the Trust Funds or the Retainer Funds for the same reason that Judge Madonia denied their request for the turnover of any income generated from the Property prior to the appointment of a receiver. "The mortgagor is entitled to his rents until a receiver is actually appointed, and the receiver cannot collect rents already paid to the mortgagor." *Rohrer v. Deatherage*, 336 Ill. 450, 454 (1929).

The Defendants also rely on *Comerica Bank-Illinois v. Harris Bank Hinsdale*, 284 Ill. App.3d 1030 (1st Dist. 1996), wherein the appellate court considered whether the mortgagor or one of its lenders was entitled to rents which were generated after the mortgagee declared a default but prior to the appointment of a receiver. *See id.* at 1031. The appellate court emphasized that the trustee must take some type of "affirmative action," stating that the "mortgagee still needs to obtain a court's authorization before he may collect rents without taking possession." *Id.* at 1034. The court further stated, "Because Comerica's assignment of rents permitted Comerica to collect rents in contravention of Illinois public policy, we

39

refuse to recognize that provision of the agreement." *Id.* Given that the

disputed rents "were collected during the time that the mortgagor was in

possession of the property but before the receiver was appointed," the court

concluded that the trial court correctly determined that the rents properly

belonged to the mortgagor. *Id.* at 1035.

The Defendants further note that federal courts also follow this

general rule, as the United States Court of Appeals for the Seventh Circuit

has stated. *In re Wheaton Oaks Office Partners Ltd. Partnership*, 27 F.3d

1234 (7th Cir. 1994) provides as follows:

> Illinois adheres to the general rule that rents are an
> incident of possession. Thus, a mortgagor, as the party in
> possession and owner of statutory right of redemption, is
> entitled to any rents generated from the property as long as he
> retains possession, without having to account for them to the
> mortgagee. This general rule, however, can cause problems for
> the lender should the debtor default on the underlying note. In
> these circumstances, the mortgagee would like to start collecting
> the rents generated from the property and apply them towards
> any deficiencies under the note. But as stated above, the only
> way he can get at these rents is if he actually obtains possession
> of the property. It is unlikely that he will get a consensual
> relinquishment of possession from the mortgagor, who may
> have it in mind to collect the rents during the pendency of
> foreclosure and not make his mortgage payments . . . so the
> mortgagee will usually have to obtain pre-foreclosure possession

40

through the courts, either by being placed in actual possession
or having possession taken on his behalf through a receiver.

. . .

Illinois allows mortgagees to include in their mortgages
assignment of rents clauses, giving them a sufficient interest in
the rents to authorize the appointment of a receiver through
whom the mortgagee can begin collecting rents. Such
assignments do not grant the mortgagee a lien on specific rents
in the hands of the mortgagor, for this would violate the general
rule that a mortgagor does not have to account to the mortgagee
for rents while he remains rightfully in possession. Instead, an
assignment of rents provision allows the mortgagee to take
certain steps after default, but before the completion of
foreclosure proceedings, to obtain possession of the property
and start collecting the rents; but until he takes such steps the
mortgagor is entitled to keep the rents.

*Id.* at 1241-42. *See also Fidelity Mut. Life Ins. Co. v. Harris Trust and Sav.
Bank*, 71 F.3d 1306, 1308 (7th Cir. 1995) (observing that "the 'rents and
profits rule' . . . forbids a mortgagee to enforce a provision of the mortgage
assigning the rents or other income of the mortgaged property to him until
the mortgagee takes possession of the property . . . or a receiver is
appointed to operate the property.").

The Plaintiffs contend that the Defendants are extending these legal
principles to an unwarranted extreme. In *Fidelity Mut.,* the lender held

41

both a secured interest in the rents under an assignment of rents and a

separate indemnity and guaranty agreement that assigned liability based on

the amount of rents not paid to the lender.  71 F.3d at 1307-08.  The

Seventh Circuit explained why a lender may obtain a judgment against a

guarantor based on the amount of rents diverted and how this is consistent

with Illinois public policy:

> Nevertheless, the appeal must succeed and for a simple reason.  The indemnity agreement was not an assignment of rents.  There *was* an assignment of rents, which was to take effect upon default.  It was executed by the bank and by [the borrower], and appears in the loan papers.  It was unenforceable prior to the appointment of the receiver. [The lender] is not seeking to enforce it.  It is seeking to enforce a separate agreement, the indemnity agreement, which provided that the rents collected by [the borrower] after a default occurred were to be paid over to the lender, Fidelity.  An assignment would have required the tenants to pay [the lender] directly.  The assignment provision in the mortgage, the provision that Fidelity is *not* seeking to enforce in this suit, is explicit in transferring "all right, title and interest" in the rents to Fidelity, permitting [the borrower] to "receive, *collect* and enjoy" the rents (emphasis added) only until [the borrower] defaults.  The indemnity agreement required the landlord to remit to Fidelity the rents (more precisely, the dollar equivalent of the rents, for the agreement did not require [the borrower] to hand the checks and cash that it received from the tenants over to Fidelity) *after* the landlord had collected them from the tenants.  The agreement was explicit about this; [the borrower] is to pay

over the rents to Fidelity "upon receipt" of the rents by [the borrower].

*Id.* at 1309. The Seventh Circuit went on to explain the significance of the indemnity's role as a guaranty:

> The nonrecourse feature of the mortgage has a dual significance in this case. First it shows the importance and evidences the commercial reasonableness of the indemnity agreement. Fidelity could not look to the assets of [the borrower] or its partners (other than the mortgaged property itself) for repayment of the loan, and this made the rents an important potential source of repayment should [the borrower's] equity in the property prove to be worth less than the unpaid balance of the loan. Second, it shows that the indemnity agreement was in the nature of a guaranty, and there is no law against guaranteeing the repayment of a note secured by a mortgage.

*Id.* at 1311 (citations omitted). Accordingly, nothing prohibits a lender from obtaining a judgment against an obligor for the amount of rents diverted if the applicable contract so provides. *See id.*

Based on the foregoing, the Court concludes that a lender may obtain a judgment for the full amount of a debt if that full liability is triggered by the borrower's failure to pay rents to the lender, given that such obligations are enforceable and the lender is not seeking to collect rents directly from

43

the tenants.  Moreover, nothing prevents a lender from pursuing other causes of action against the borrower or other non-borrower entities who had no role in maintaining the property.

Because the Plaintiffs are seeking to obtain a judgment pursuant to the loan documents and the Defendants' alleged misconduct and because the lender is not seeking to collect rents directly from the tenants, the date on which the receiver was appointed does not insulate EEI Holding Corporation and Egizii Property Managers from liability.  For the same reason the Borrower, Springfield Prairie Properties, is not entitled to dismissal to the extent it alleges that Plaintiffs are not entitled to pre-receivership rents.  As in *Fidelity Mut.*, the Plaintiffs are seeking to enforce a separate agreement.

The Court concludes that the result is different as to the claims against the law firms.  There was no separate agreement or contract between the lender and the Law Firms that the lender may now enforce. Based on the Illinois Supreme Court's holding in *Rohrer* and the reasoning of the Illinois Appellate Court in *Comerica Bank* and, as applied by the

44

Seventh Circuit in *Wheaton Oaks*, the Plaintiffs are not entitled to any pre-receivership income from the law firms. The order appointing a receiver was entered on December 23, 2014. Accordingly, the Plaintiffs have no right under Illinois law to Trust Funds and Retainer Funds paid to the Law Firms before that date. It appears that the Londrigan Retainer was paid on December 19, 2014. All of the other income generated by the Property was prior to the appointment of a receiver. Accordingly, the Plaintiffs have no right to pre-receivership income to the extent it is sought from the Law Firms.

Because the Defendants in the two cases are not similarly situated with respect to the pre-receivership rents, the Court concludes that different results are warranted. The Motion of EEI Holding Corporation and Egizii Property Managers and the Motion of the Borrower to dismiss based on the appointment date of the receiver will be denied. The Motion of the Law Firms to dismiss on this basis will be allowed.

D. Motion to Dismiss in Case Number 15-3195

(1) Fraudulent transfer claims

45

In Counts I and II, the Plaintiffs allege that the Borrower made fraudulent transfers of the Trust Funds and the Retainer Funds to the Defendants–constructive fraudulent transfers under 740 ILCS 160/6(a) and actual fraudulent transfers under 740 ILCS 160/5(a)(1). The Defendants contend the Plaintiffs' claims fail because: (1) the Retainer Funds consisting of security retainers and the Trust Funds were not "transferred" and remain the Borrower's property; (2) the Plaintiffs fail to plead a lack of reasonably equivalent value with particularity; and (3) their claim that Borrower made the alleged transfers with an actual intent to hinder, delay or defraud the Plaintiffs is belied by the fact that Plaintiffs have no right to the Property's pre-receivership income.

The statute governing constructive fraudulent transfers provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6(a). The statute pertaining to actual fraudulent transfers

46

provides as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation.

740 ILCS 160/5(a).

The Defendant Law Firms contend that Plaintiffs' fraudulent transfer claims fail because the Plaintiffs did not plead with particularity that Borrower received less than reasonably equivalent value in exchange for the Trust Funds and the Retainer Funds. Rule 9(b) of the Federal Rules of Civil Procedure requires the circumstances alleged to be fraud to be stated with particularity. *See In re Grube*, 500 B.R. 764 (C.D. Ill. 2013).

The Court concludes that Plaintiffs have not met this heightened pleading standard. In alleging fraudulent transfer, the Plaintiffs have done little more than track the statutory language. The Law Firm Defendants have asserted that Plaintiffs have not pled with particularity that the

47

Borrower received less than reasonably equivalent value for the Trust Funds

and Retainer Funds. Moreover, the Law Firm Defendants provided an

accounting, which is attached to the Plaintiffs' amended complaint, which

provides that the funds in question were used only for these purposes: (1)

retainers for the Defendants; (2) other operational funds related to the

Property; and (3) payments totaling $625,000 to the Plaintiffs.

The Defendants state that they are aware of no Illinois state or federal

cases that have held that the payment of a security retainer or an advance

payment retainer for future legal services lacks reasonably equivalent value

or that the payment of a retainer constituted a fraudulent conveyance. The

Court also is not aware of any such case and the Plaintiffs have not cited

any cases for that proposition. *Dowling v. Chicago Options Assoc., Inc.,*

875 N.E.2d 1012 (Ill. 2007), while addressing issues relating to advance

payment retainers, does not discuss fraud.[3] The Court concludes that

Plaintiffs are unable to meet the heightened pleading standard necessary to

---

[3]The Plaintiffs cite articles in legal publications which suggest that UFTA may be an appropriate remedy for abusive advance payment retainers. However, the Court is not persuaded by this authority.

assert fraud claims against the Law Firms.

Additionally, to the extent that Plaintiffs allege the Borrower made the alleged transfers to the Law Firms "with an actual intent to hinder, delay, or defraud Plaintiffs," the Court notes that Plaintiffs have no right to the Property's pre-receiver income against those Defendants, as previously discussed. Because the Plaintiffs had no right to the income prior to the appointment of a receiver on December 23, 2014, the Borrower could not have intended to defraud the Plaintiffs by transferring property to the Law Firms.

For all of these reasons, the Court concludes that dismissal of Counts I and II is appropriate.

## (2) Aiding and abetting claims

In Count III, the Plaintiffs allege the Defendant Law Firms aided the Borrower to perform wrongful acts and they were aware of their role as part of the overall tortious activity. The Plaintiffs claim the Defendants assisted the Borrower to breach the Loan Documents and violated UFTA by either allowing or accepting millions of dollars of transfers constituting the Trust

Funds and the Retainer Funds.

"In Illinois, to properly plead the tort of aiding and abetting, one must allege the following elements: (1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Grimes v. Saikley*, 388 Ill. App.3d 802, 819 (4th Dist. 2009) (internal quotation marks and citation omitted).

The Defendants contend the Plaintiffs' claim for aiding and abetting must fail because the Plaintiffs have not asserted a viable claim for any wrongful act that Defendants have aided. The Plaintiffs allege the Defendants aided the Borrower to violate UFTA by accepting transfers of the Trust Funds and the Retainer Funds, thereby allowing those assets to dissipate and be transferred to the Borrower's individual members.

The Court earlier determined that Plaintiffs were unable to state a claim against the Law Firms for actual or constructive fraudulent transfer

of the Trust Funds and the Retainer Funds. Accordingly, the aiding and abetting claims also fail.

The Defendants further contend that even if the Plaintiffs could assert a claim for fraudulent transfer, the Law Firms are aware of no Illinois state or federal cases that have held that an attorney's receipt of a retainer or holding funds in a client trust account constitutes aiding and abetting a fraudulent transfer. The Plaintiffs cite no cases in support of that proposition.[4]

The Plaintiffs' claim also fails because they have no right to the Property's pre-receivership income, to the extent they seek that relief from the Law Firms.

For all of these reasons, the Court concludes that Plaintiffs are unable to state a claim for aiding and abetting. Accordingly, the Law Firm Defendants' motion to dismiss Count III will be allowed.

---

[4]This is not to say that such a claim will always fail. *See Thornwood, Inc. v. Jenner & Block*, 344 Ill. App.3d 15, 28 (1st Dist. 2003) ("Although Illinois courts have never found an attorney liable for aiding and abetting his client in the commission of a tort, the courts have not prohibited such actions."). The Plaintiffs' claim fails here because they have not asserted a valid tort claim.

51

(3) Civil Conspiracy claim

In Count IV, the Plaintiffs allege civil conspiracy claims against the Law Firm Defendants. The Plaintiffs assert that the Law Firms' agreement to accept the Trust Funds and Retainer Funds resulted in Borrower's violation of UFTA provisions. Londrigan and Scott further aided the Borrower by transferring $700,000 of the Trust Funds to Members of the Borrower. The Plaintiffs further contend the Defendants mischaracterized the Retainer Funds as "advance payment retainers," even though those funds are grossly disproportionate to the legal expenses the Borrower could be expected to incur.

"Illinois courts recognize that claims for conspiracy may be maintained against attorneys where there is evidence that the attorneys participated in a conspiracy with their clients." *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App.3d 15, 28 (1st Dist. 2003). A plaintiff alleging conspiracy must assert "a combination of two or more persons to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means." *Bosak v. McDonough*, 192 Ill. App.3d 799, 803 (1st

52

Dist. 1989). The plaintiff must establish that an "overt fraudulent act in furtherance of the conspiracy" was committed by at least one of the conspirators. *Id.* at 804.

The Plaintiffs' civil conspiracy claims against the Law Firms fail because the Plaintiffs have neither asserted a viable claim that Defendants performed any unlawful acts nor have they properly alleged a claim for fraudulent transfer.

Accordingly, the motion to dismiss Count IV will be allowed.

Having determined that each of the counts in Case Number 15-3195 will be dismissed, the Court will deny the Plaintiffs' requests for a constructive trust and an accounting.

E. Motion to Dismiss in Case Number 15-3199

(1) Judgment on Note/Guaranty claims (Counts I-IV)

In Case Number 15-3199, the Borrower, Springfield Prairie Properties, contends that Count I, which seeks the full amount provided under the terms of the notes, must be dismissed. It alleges that the non-recourse promissory notes include a section entitled "Exculpation," which

provides for liability only to the extent of the value of the security for the loan, unless specific limited liability is applicable for certain identified actions.

The Plaintiffs respond by stating that the Borrower agreed under the Note that it would be fully and personally liable for the entire Loan balance if the Borrower failed to obtain the Lender's prior written consent on any transfer of the "Property":

> Notwithstanding anything to the contrary in this Note or any of the other Loan Documents . . . (Y) all such indebtedness evidenced by the Note and the other obligations of Borrower under the Loan Documents shall be deemed fully recourse to Borrower in the event that . . . (iii) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage[.]

The Plaintiffs further assert that under the Loan Documents, "Property" includes Rents and, by delivering a portion of the Rents to the Law Firms to hold in the Trust Accounts and the Retainers, the Borrower violated the Mortgages.

The Court concludes that Plaintiffs' allegations in Count I and II are sufficient to assert claims against the Borrower.

The Defendants move to dismiss Count III, which seeks the entry of Judgment on Guaranty (Partial Recourse) against Egizii. The Complaint requests that Egizii "be liable for the *amount* of any post-default Rents not delivered to Lender." However, Egizii contends that the terms of the Indemnity and Guaranty Agreement attached to the Complaint have no such provisions. Rather, the Indemnity Agreement indicates only that Egizii will be liable for post-default rents that are "NOT either applied to the ordinary and necessary expenses of owning and operating the property or paid to Lender." Because Count III contains no allegations stating that any of the post-default rents were not applied by either the Borrower or Egizii to the ordinary and necessary expenses of owning and operating the property, the Defendants allege there can be no claim Egizii is in default of the provisions of the guaranty.

The Defendants also seek dismissal of Count IV, wherein the Plaintiffs seek the entry of Judgment on Guaranty (Full Recourse) against Egizii. According to Egizii, Count IV suffers from the same deficiencies as Count III and, further, the allegations duplicate Count I of the Complaint.

55

Like the Borrower in Count I, Egizii alleges that "Plaintiffs do not point to any provision of the Mortgages which require the lender's prior written consent to use rents for ordinary and necessary expenses of owning and operating the property, nor can it."

The fact that the Complaint does not contain certain allegations about a particular point does not render the Plaintiffs' allegations facially impossible. *See Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 698 (7th Cir. 2012). The Plaintiffs allege that the plain language of the Guaranty allows them to seek post-default rents, as well as other amounts, including "issues, profits and revenues." Moreover, post-default rents are only one component of the damages sought by the Plaintiffs. The Court concludes that Plaintiffs allegations are sufficient to state a claim as to Count III. Egizii's and the Members's motion to dismiss Count III will be denied.

The Plaintiffs allege the Borrower transferred the rents by delivering a portion of the rents to the Law Firms to hold in the Trust Accounts. Because the Complaint alleges Egizii agreed that he would be liable for the entire Loan indebtedness under the same circumstances that trigger liability

56

for the Borrower, the Court concludes that the allegations are sufficient at this stage to allege that Egizii is liable to the Lender for the indebtedness evidenced by the Note and otherwise due under the terms of the Loan Documents. The motion to dismiss Count IV will be denied.

(2) Breach of Illinois Limited Liability Act (Count V)

In Count V, the Plaintiffs assert claims for Breach of the Illinois Limited Liability Company Act against the Borrower and Members. Those Defendants contend Count V must be dismissed because it seeks the same relief requested in Count III of the foreclosure complaint.

The Borrower and Members also assert that the Illinois Limited Liability Act, 805 ILCS 180/25-30, does not create a private cause of action. Pursuant to 805 ILCS 180/25-35, any cause of action belongs only to the members of the applicable limited liability company.

The Borrower and Members correctly allege that the portion of the statute entitled "Liability for unlawful distributions" addresses only personal liability to the company. Because it does not authorize a private cause of action for creditors, the Court will dismiss Count V. The Motion

57

of the Borrower and Members to dismiss Count V will be allowed.

(3) Fraudulent transfer claims (Count VI and VII)

The Borrower next alleges that Counts VI and VII, which assert claims for constructive fraudulent transfer and actual fraudulent transfer under the Illinois Uniform Fraudulent Transfer Act, should be dismissed for failure to state a claim. The counts are also directed at the Members, who have adopted the Borrower's arguments. The Borrower contends the retainer funds consisting of security retainers and their trust funds were not transferred and remain the property of Springfield Prairie Properties, the Plaintiffs fail to allege lack of reasonably equivalent value with particularity and, further, because their claim that Springfield Prairie Properties made their alleged transfers with an actual intent to hinder, delay or defraud the Plaintiffs is defeated by the fact that the Plaintiffs have no right to the pre-receivership rents.

The Members also allege that Plaintiffs do not qualify as a "creditor" under the UFTA and, thus, have no right to payment under Illinois law. Upon reviewing UFTA's definition of "creditor," the Court concludes the

58

Plaintiffs' allegations at this stage are sufficient to create an equitable lien upon the rents.

Both constructive fraudulent transfers and actual fraudulent transfers require a "transfer" of some type. *See* 740 ILCS 160/6; 740 ILCS 160/5(a)(1). The Borrower owns and has complete control over the trust funds. Accordingly, they have not been transferred. Pursuant to 740 ILCS 160/2(l), "Transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing with or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." The trust funds are located in certain client trust accounts and remain the property of Springfield Prairie Properties. *See In re Johnson*, 133 Ill.2d 516, 531 (1989); Illinois Rules of Professional Conduct 1.15(a). The Plaintiffs dispute this and allege that the Borrower paid "advance payment retainers," and not security retainers.

Given how broadly "transfer" is defined, the Court concludes that trust funds and retainer funds can fit within the definition under UFTA.

As the Plaintiffs allege, if the Borrower "parted with" its assets in a manner that made them unavailable to a creditor such as the Plaintiffs, then it could be said that the Borrower "transferred" those assets under UFTA even though, technically, the Borrower continues to own them.  Moreover, fraudulent transfers have been broadly defined, as the Seventh Circuit has recognized:

> [F]raudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights.

*Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) (citation omitted).

At this stage, the Court concludes that the Plaintiffs have sufficiently alleged that a "transfer" occurred under UFTA.

The Borrower next contends that the Plaintiffs have failed to plead with particularity that they received less than reasonably equivalent value in exchange for the trust funds and the retainer funds.  Under Rule 9(b), a claimant must allege "with particularity" any "circumstances concerning fraud," which "means the who, what, where and how: the first paragraph of

60

any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The Borrower alleges the Plaintiffs' assertions regarding whether Springfield Prairie Properties received reasonably equivalent value are conclusory. Moreover, it is aware of no applicable case law which holds that the payment of a security retainer or an advance payment retainer for future legal services lacks reasonably equivalent value or that payment of a retainer constituted a fraudulent transfer.

In response, the Plaintiffs note the Complaint provides that Springfield Prairie Properties transferred more than $1 million of the Trust Funds to Londrigan and, as of January 2015, only $450,755 remains. Moreover, the Borrower transferred approximately $2 million of the Trust Funds to Scott and only $400,831.17 remains, as of the last accounting. The Plaintiffs allege that the Borrower did not receive legal services or other services from the law firms for the full amount of the Trust Funds and Retainer Funds. The Complaint provides that although the Borrower paid $500,000 in advance payment retainers to various law firms, the Defendant's total legal expenses paid to all law firms between July 2013 and

61

the time of the transfers, December 2014, was $149,042.03.  The Plaintiffs

further assert that the Borrower has not explained any legitimate basis why

four law firms were retained and how the value received for this

"duplicative representation" was "reasonable" under the circumstances,

when the Guarantor, Egizii, and other Members and EEI Holding

Corporation were not named by the Plaintiffs as Defendants in any lawsuit

until this one.

The Plaintiffs state that Counts VI and VII allege that the Borrower

was insolvent at the time the transfer were made.   The Borrower

represented that it did not, and would not, own any asset other than the

Real Estate and Collateral.  In the Complaint, the Plaintiffs allege that the

Borrower failed to make payments due, as required, under the Loan

Documents and the Plaintiffs notified the Defendant of its default.

Moreover, the Real Estate is worth substantially less than the amount

owing to the Plaintiffs on the Loans.  The Borrower has no remaining assets

under its control, it is not an operating business and it has no reasonable

expectation of future business activity.  Additionally, the Borrower has been

insolvent at all times relevant to the Plaintiffs' claims.  The sale of the Real

Estate would result in a shortfall of approximately $10 million.

Count VII also alleges that over the same time period, the Borrower

transferred the Trust Funds to the Members with the actual intent to

hinder delay or defraud the Plaintiffs, or to otherwise deprive the Plaintiffs

of their claim to all rents and other proceeds from the Real Estate.  The

Plaintiffs allege that the transfer of funds to the Members constitute a

pattern of intentional fraudulent conveyances under 740 ILCS 160/5(a)(1).

Paragraph 217 of the Complaint alleges thirteen (13) badges of fraud to

establish intent–a number of which are directed at the Members.

The Court concludes that Plaintiffs' allegations are sufficiently

particular to meet the requirements of Rule 9(b).  Accordingly, the Motions

of the Borrower and Members to dismiss Counts VI and VII will be denied.

### (4) Alter ego claims

Egizii Property Managers and EEI Holding Corporation allege the

Plaintiffs cannot establish that those Defendants are alter egos of Robert

W. Egizii and any claims based on an alter ego theory must be dismissed.

63

The Plaintiffs contend that the Complaint sufficiently alleges that the Egizii Entities are alter egos of the Guarantor and committed unlawful acts in furtherance of a civil conspiracy.

"A corporation is a legal entity that exists separate and apart from its shareholders, directors, and officers, who are not as a general rule liable for the corporation's debts and obligations." *Bank of America v. WS Management, Inc.,* 2015 IL App (1st Dist.), 33 N.E.3d 696, 727 (2015). Individuals often choose the corporate form "to insulate stockholders from unlimited liability for corporate activity." *Id.* In certain circumstances, a shareholder, director or officer may be found by a court to be personally responsible for corporate obligations pursuant to the remedy of piercing the corporate veil. *See id.* "To pierce the corporate veil, a plaintiff must demonstrate that: (1) there is such unity of interest and ownership that the separate personalities of the corporation and individual no longer exist, and (2) the circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequitable consequences." *Id.*

64

The Plaintiffs allege that the Guarantor has owned the North MacArthur Property through various entities continuously for 20 years. Moreover, the Guarantor, his family members and his family's limited partnership together own a majority of the Borrower. The Guarantor is also the President, CEO and primary stockholder of movant EEI Holding Corporation, the President and CEO of EEI's division known as Egizii Electric, Inc., and acted as the manager of the prior owner of the North MacArthur Property, 700 North MacArthur, LLC. The Plaintiffs contend each of these entities failed to observe corporate formalities as to the North MacArthur Property and any members of the Borrower and EEI other than the Guarantor did not play a meaningful role in the management or operation of those entities with respect to the Property. The Complaint includes a number of allegations relating to the Guarantor's operations in connection with the Property. Moreover, there are allegations that EEI and Egizii Property Managers serve as mere instrumentalities, alter egos and agents of the Guarantor.

The Court concludes that the complaint includes more than legal

conclusions and is sufficiently specific to place the Defendants on notice of the claims based on alter ego.

To the extent that Defendants dispute the amount of the share that the Guarantor owns of EEI or other entities and the extent to which he controls those interests, those are not matters that can be resolved on a motion to dismiss, given that the Court must credit the Plaintiffs' plausible allegations.

### (5) Civil conspiracy and tortious interference claims

Count VIII asserts civil conspiracy claims against all Defendants. The Borrower and Members move separately to dismiss Count VIII. Egizii Property Managers and EEI Holding Corporation contend they cannot be liable for civil conspiracy (Count VIII) or tortious interference with contractual rights (Count IX) because the Plaintiffs are not entitled to pre-receivership rents and have not pled that the Defendants intentionally and unjustifiably induced a breach of the loan documents.

"The elements of civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted

66

Case 3:15-cv-03195-RM-TSH # 28 Page 67 of 71

action either an unlawful purpose or a lawful purpose by unlawful means,
(3) in the furtherance of which one of the conspirators committed an overt
tortious or unlawful act." *Fritz v. Johnston*, 209 Ill.2d 302, 317 (Ill. 2004).
Accordingly, a civil conspiracy may or may not involve a tortious act.

The tort of interference with contractual rights generally requires the
following: "(1) the existence of a valid and enforceable contract between the
plaintiff and another, (2) the defendant's awareness of this contractual
relation, (3) the defendant's intentional and unjustified inducement of a
breach of the contract, which causes a subsequent breach by the other, and
(4) damages." *Mannion v. Stallings & Co., Inc.*, 204 Ill. App.3d 179, 187-
88 (1st Dist. 1990).

In their complaint, the Plaintiffs allege that the collateral transfers
and lease transactions were undertaken in furtherance of the civil
conspiracy and that unlawful means, which included breaching contractual
obligations, breaching the Illinois Limited Liability Company Act and
engaging in fraudulent transfers, were involved in the collateral transfers
and lease transactions and were utilized to accomplish the goals of the civil

conspiracy.  The Plaintiffs discussed these allegations with some specificity throughout the complaint.  The Court concludes that the allegations are sufficient to state a claim for civil conspiracy against the Egizii Property Managers and EEI Holding Corporation.

The allegations are also sufficient to assert a claim that Springfield Prairie Properties conspired with other Defendants, including Egizii and the Members, to commit fraud by engaging in fraudulent transfers.  The Plaintiffs allege the Borrower and other Defendants agreed to commit tortious acts that violate UFTA by placing assets outside of the Plaintiffs' reach.  Accordingly, the Court concludes that Count VIII states a claim for civil conspiracy against the Defendants.

As for the tortious interference claim, the Plaintiffs allege that there was a valid and enforceable contract with the Borrower, of which the EEI Holding Corporation and Egizii Property Managers were aware.  Those Defendants were aware of the breach and contributed to it–EEI by failing to pay rent for three years and EPM by failing to enforce the terms of the lease.  The Plaintiffs allege this effectively and intentionally deprived the

68

Borrower of the funds necessary to satisfy the Borrower's obligations to the Plaintiffs. The Court concludes that the allegations are sufficient to assert a claim for tortious interference with contractual rights.

For the reasons stated herein, the Court declines to dismiss the alter ego, civil conspiracy and tortious interference claims which are directed against EEI Holding and Egizii Property Managers. The Defendants' motions to dismiss Counts VIII will be denied. The motion of Defendant EEI Holding Corporation/Egizii Electric to dismiss Count IX will be denied.

## III. CONCLUSION

For the reasons stated herein, the Motion of the Law Firm Defendants to Dismiss will be Allowed.

The Plaintiffs' Motion for leave to File Supplemental Authority in support of their Motion to Dismiss will be Denied.

The Motion to Dismiss filed by Defendants EEI Holding Corporation and Egizii Property Manager will be Denied.

The Motion to Dismiss of Springfield Prairie Properties will be Allowed in part and Denied in part. The motion will be allowed as to

Count V and denied in all other respects.

The Motion to Dismiss of Robert W. Egizii and other Members will be Allowed in part and Denied in part. The motion will be allowed as to Count V and denied in all other respects.

Ergo, the Motion to Dismiss of Defendants Londrigan, Potter & Randle, P.C., Perkins Coie, Scott & Scott, P.C. and Sgro, Hanrahan, Durr & Rabin, LLP [d/e 18] is ALLOWED.

The Plaintiffs' Motion for Leave to File Supplemental Authority in Support of the Plaintiffs' Response to the Motions to Dismiss [d/e 26] is DENIED.

The Motion to Dismiss of Defendants EEI Holding Corporation and Egizii Property Managers, LLC, as to Counts I, II, VIII and IX [d/e 32] is DENIED.

The Motion to Dismiss of Defendant Springfield Prairie Properties, LLC [d/e 35] is ALLOWED in Part and DENIED in Part. The Motion is ALLOWED as to Count V and DENIED as to Counts I, II, VI, VII and VIII.

70

The Motion to Dismiss of Defendants Robert W. Egizii, Thomas Egizii, Michael Egizii, Rodney Egizii, Jodi Baptist, John Pruitt and Clyde Beimfohr [d/e 42] is ALLOWED in Part and DENIED in Part. The Motion is Allowed as to Count V and Denied as to Counts III, IV, VI, VII and VIII.

ENTER: August 15, 2016

FOR THE COURT:

/s/ *Richard Mills*

Richard Mills
United States District Judge

# EXHIBIT 2

# Deposition of:
# **Robert Egizil**

**Date:** March 27, 2018

**Case:** U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.

**Reporter:** Robin L. Stranimeier, CSR

**Keefe Reporting Company**
618-277-0190
reporter@keefereporting.com

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

U.S. Bank National Association, as )
Trustee, successor-in-interest to )
Bank of America, N.A., as Trustee, ) Lead Case No. 15-cv-03195
successor-in-interest to Wells )
Fargo Bank, N.A., as Trustee, for ) Member Case No. 15-cv-3199
the Registered Holders of Credit )
Suisse First Boston Mortgage ) Honorable Richard Mills
Securities Corp., Commercial )
Mortgage Pass-Through Certificates,)
Series 2007-C4, )
and )
U.S. Bank National Association as )
Trustee for the Registered Holders )
of the Mezz Cap Commercial Mortgage)
Trust 2007-CS, Commercial Mortgage )
Pass-Through Certificates, )
Series 2007-C5, )
          Plaintiffs, )
vs. )
Springfield Prairie Properties, )
LLC, an Illinois limited liability )
company, Robert W. Egizii, an )

Page 2

individual; Thomas Egizii, an )
individual; Michael Egizii, an )
individual; Rodney Egizii, an )
individual; Jodi Baptist, an )
individual; John Pruitt, an )
individual; Clyde Beimfohr, an )
individual; EEI Holding )
Corporation, and Illinois )
corporation; Egizii Property )
Managers, LLC, an Illinois limited )
liability company, )
          Defendants. )

DEPOSITION OF ROBERT EGIZII

Taken on behalf of Plaintiffs

March 27, 2018

10:20 a.m.

Reported by Robin L. Stranimeier, R.P.R., C.S.R.

Page 3

A P P E A R A N C E S

PLAINTIFFS WERE REPRESENTED BY:

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

Cara M. Houck, Esq.

225 West Washington, Suite 2600

Chicago, IL  60606

(312)460-4239

Email:  houck@millercanfield.com

THE MEMBERS WERE REPRESENTED BY:

LONDRIGAN, POTTER & RANDLE, P.C.

Alexandra de Saint Phalle, Esq.

1227 South 7the Street

Springfield, IL  62705

(217)544-9823

Email:  alex@lprpc.com

SPRINGFIELD PRAIRIE PROPERTIES, LLC WERE REPRESENTED BY:

SCOTT & SCOTT, P.C.

Jason T.H. Germeraad, Esq.

R. Stephen Scott, Esq.

611 East Monroe Street, Suite 200

Springfield, IL  62701

(217)753-8200

Email:  jtg@scottnscottlaw.com

Page 4

EGIZII PROPERTY MANAGERS, LLC and EEI HOLDING CORPORATION WERE

REPRESENTED BY:

SGRO, HANRAHAN, DURR, RABIN & BRUCE, L.L.P.

Gregory P. Sgro, Esq.

1119 South 6th Street

Springfield, IL  62703

(217)789-1200

Email:  greg@casevista.com

PROFESSIONAL SHORTHAND REPORTER:

Robin L. Stranimeier

1 (Pages 1 to 4)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

---

Page 5

I N D E X

WITNESS:  ROBERT EGIZZI                    PAGE

Conducted by Ms. Houck                          8


EXHIBITS

  FOR PLAINTIFFS:

Group Exhibit No. 1          41

Exhibit No. 2          57

Group Exhibit No. 3          69

Exhibit No. 4          79

Exhibit No. 5          80

Exhibit No. 6          84

Exhibit No. 7          89

Group Exhibit No. 8          91

Exhibit No. 9          98

Exhibit No. 10          101

Exhibit No. 11          102

Group Exhibit No. 12          102

Group Exhibit No. 13          106

Group Exhibit No. 14          107

(All exhibits retained by Ms. Houck.  No exhibits attached.)

---

Page 6

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

U.S. Bank National Association, as )

Trustee, successor-in-interest to  )

Bank of America, N.A., as Trustee, ) Lead Case No. 15-cv-03195

successor-in-interest to Wells     )

Fargo Bank, N.A., as Trustee, for  ) Member Case No. 15-cv-3199

the Registered Holders of Credit   )

Suisse First Boston Mortgage       ) Honorable Richard Mills

Securities Corp., Commercial       )

Mortgage Pass-Through Certificates,)

Series 2007-C4,                    )

and                                )

U.S. Bank National Association as  )

Trustee for the Registered Holders )

of the Mezz Cap Commercial Mortgage)

Trust 2007-CS, Commercial Mortgage )

Pass-Through Certificates,         )

Series 2007-C5,                    )

          Plaintiffs,      )

vs.                                )

Springfield Prairie Properties,    )

LLC, an Illinois limited liability )

company, Robert W. Egizii, an      )

---

Page 7

individual; Thomas Egizii, an )

individual; Michael Egizii, an    )

individual; Rodney Egizii, an     )

individual; Jodi Baptist, an   )

individual; John Pruitt, an       )

individual; Clyde Beimfohr, an    )

individual; EEI Holding   )

Corporation, and Illinois         )

corporation; Egizii Property  )

Managers, LLC, an Illinois limited )

liability company,    )

      Defendants.        )

     IT IS STIPULATED AND AGREED by and between counsel that the deposition of ROBERT EGIZII, may be taken by and on behalf of the plaintiffs, pursuant Federal Rule of Civic Procedure 30 pertaining to such depositions on March 27, 2018, at Londrigan, Potter & Randle, 1227 South Seventh Street, Springfield, Illinois 62703, before Robin L. Stranimeier, Registered Professional Reporter and Certified Shorthand Reporter, within and for the State of Illinois; and that this deposition may be taken with the same force and effect as if all statutory requirements had been complied with; thereafter transcribed into typewriting, with signature of the witness expressly waived.

---

Page 8

     - - -

     ROBERT EGIZII,

having been produced, sworn and examined on the part of plaintiffs testified and deposed as follows:

     EXAMINATION

QUESTIONS BY MS. HOUCK:

     Q.  Let the record that this deposition is being taken pursuant to the Federal Rules of Civil Procedure and the applicable laws and Supreme Court Rules.

     Mr. Egizii, could you please state your full name for the record and spell your last.

     **A.  Robert William Egizii, E-g-i-z-i-i.**

     Q.  And have you ever given your deposition before?

     **A.  Yes.**

     Q.  Okay.  I'll ask you about those in a minute, but just to go over some ground rules just to remind you.  If I ask you a question that elicits a yes or no answer you need to say yes or no instead of uh-huh or uh-uh, because that won't come out correctly on the transcript.  If you need a break at any time just let me know.  If I ask you a question that you don't understand, please just ask me to rephrase it or let me know you don't understand the question so I can rephrase it myself.

     In the event that someone in the room makes an objection I will be quiet for a moment, let them finish their

2 (Pages 5 to 8)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 9

objection, but that does not mean you don't have to answer the question. Unless your attorney instructs you otherwise you still need to answer the question. Do you have any questions for me before we begin?

A. No, ma'am.

Q. Okay. Are you being represented by counsel today?

A. Yes, I am.

Q. And which counsel are you being represented by?

A. Alex.

Q. And are you still employed?

A. Yes, I am.

Q. Where so?

A. EEI Holding.

Q. And what address?

A. 3009 Singer Avenue, 62703.

Q. And what is your date of birth?

A. 9/28/38.

Q. And are you married?

A. Yes.

Q. One marriage?

A. Pardon me?

Q. Is this your only marriage?

A. No.

Q. And when were you first married?

Page 10

A. 1963.

Q. And how long were you married for?

A. Twenty-one years.

Q. And did you have children with your first wife?

A. Three.

Q. And what are their names?

A. Michael, Rodney, and Jodi.

Q. And did that marriage end in divorce?

A. Yes.

Q. And you got married again at some point?

A. Yes, I did.

Q. Okay. And when was that?

A. Nine years later.

Q. Okay. And what is your wife's name?

A. Jill.

Q. Is that the same person you married nine years later after your first divorce?

A. No, it was not.

Q. Okay. And who was your second wife?

A. Melanie.

Q. And how long were you married to Melanie?

A. Nine years.

Q. And did you have any children with Melanie?

A. No.

Page 11

Q. And did that marriage end in divorce?

A. Yes.

Q. Okay. And then you -- is that when you married Jill?

A. No. Eight years later.

Q. Okay. And who was your wife then after Melanie?

A. Jill is my wife.

Q. Jill. Okay. And is that who you're married to now?

A. Yes.

Q. Okay. You mentioned -- did you have any children with Jill?

A. No.

Q. You mentioned earlier that you had given your deposition before?

A. Yes, ma'am.

Q. Could you tell me what that was for?

A. I'm in the construction business and it happened maybe 50 times over 40 years.

Q. How about for personal reasons?

A. No.

Q. You never had to give a deposition for any of your divorces?

A. No.

Q. Okay. Did you review any documents in anticipation of your deposition today?

Page 12

A. I've been reading these documents for three and a half years. Yes.

Q. Did you read any in anticipation for today?

A. No, ma'am.

Q. Okay. Have you ever been convicted of a felony?

A. No, ma'am.

Q. Have you been a defendant or a plaintiff in a lawsuit?

A. My company has.

Q. Have you been named personally?

A. No, ma'am.

Q. Other than your attorneys who have you spoken to about this case?

A. Probably mostly the partners and my wife.

Q. When you say mostly the partners who are the partners?

A. Who are the partners in?

Q. That you were referring to.

A. John Pruitt, Tom Egizii, Clyde Beimfohr, who is now in a nursing home. Pretty bad.

Q. I'm sorry to hear that.

A. And my kids.

Q. And that would be Michael, Rodney, and Jodi?

A. Yes.

3 (Pages 9 to 12)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 13

Q. Have you ever filed for bankruptcy?

A. No, ma'am.

Q. Do you have any intentions on filing for bankruptcy --

A. No.

Q. -- at this time?

A. No.

Q. Do you own any other properties or interest in any other properties other than the ones that are at issue in this case?

A. Yes.

Q. And what would those be?

A. I own -- my company owns a piece of downtown properties, which is where the PNC Bank is located.

Q. Is there a name to that particular property?

A. Well, we call it the PNC Property, but there are multitude of tenants.

Q. You say your company owns a piece. What company?

A. Egizii Electric.

Q. And what is the address of the PNC Bank property?

A. 10 North -- 1 North Square.

Q. Okay. 1 North Square and that's downtown Springfield?

A. Downtown Springfield.

Page 14

Q. What percentage of ownership does Egizii own?

A. Fifty-six percent.

Q. Was it always Egizii Electric that owned the percentage or was it some other entity?

A. It could have been me at one point for a percentage of that.

Q. Okay. That was probably a bad question. I should have asked: How long has Egizii owned 56 percent of this building?

A. Most likely over 10 years.

Q. Okay. And are you in good standing with the bank with this building?

A. Yes.

Q. Okay. Any other ownership or interest ownership in any other properties other than the ones we just discussed?

A. The Illinois Building.

Q. Okay. And what is that?

A. That's a 15-story office building on the corner of Adams and 6th.

Q. Is there a name to that building?

A. The Illinois Building.

Q. And do you own it outright or does an entity that your affiliated with own the building?

A. It's a partnership.

Page 15

Q. Okay. What partnership owns it?

A. We call it the Illinois Partnership, LLC.

Q. And are you a member of that LLC then?

A. Yes, ma'am.

Q. What percentage of ownership do you have?

A. Sixteen percent or 22 percent.

Q. Has that always been the case?

A. Yes.

Q. Any other properties?

A. My home.

Q. Home in Springfield?

A. Yes.

Q. And what's the address?

A. 1645 West Laurel.

Q. Any other homes?

A. I have a condo in Florida.

Q. Okay. Where in Florida?

A. Fort Lauderdale. My wife and I own.

Q. Do you still have an ownership interest in the hotel downtown?

A. Yes, I do.

Q. Okay. And what is that now called?

A. The Wyndham.

Q. It's the Wyndham. Okay.

Page 16

And is that your ownership interest? Or is that an affiliation with a membership? Or with an entity?

A. Pinnacle Partnership, LLC.

Q. An equal partnership?

A. No.

Q. Is that what you said? I'm sorry.

A. Pinnacle.

Q. Pinnacle. Okay. And that's an LLC.

What percentage is your membership or ownership?

A. Now it's 89 percent. Was 33 and a third percent and both partners have since passed away.

Q. Okay. And are you in good standing with all the properties we've discussed so far?

A. No. I'm not in good standing with that one. It's a negotiable piece of property right now.

Q. Okay. I understand they filed for foreclosure because of some title name or something like that?

A. That's correct.

Q. Okay. And so you're negotiating some type of settlement?

A. We're negotiating that kind of settlement, yes.

Q. Okay. So the case is still pending then?

A. Yes, it is.

Q. And is it your expectation that it will be resolved

4 (Pages 13 to 16)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 17

through a settlement?

A. I hope so.

Q. Have I missed any other properties?

A. Not that I know of.

Q. Okay. If you think of something just let me know.

MR. SCOTT: Sorry to be late. The hearing carried over. Have you already started?

MS. HOUCK: Yes.

MR. SCOTT: Proceed ahead.

BY MS. HOUCK:

Q. I want to ask you about your education and job history. Can you tell me where you went to school, high school?

A. Cathedral Boys High School.

Q. And where is that located?

A. It was in Springfield, Illinois. Now it's combined with the girl's high school.

Q. And did you go to college?

A. Two and a half years.

Q. And where was that?

A. It was SJC to start with and then it turned into Benedictine. And they gave me an honorary degree years later.

Q. And what was that for?

A. You know, I looked it up and I can't remember.

Page 18

Q. I take it for your businesses?

A. That's correct.

Q. Okay. Have you received any other certifications or any post college?

A. In the industry I've pretty much done it all. I mean, I was president of the Illinois Chapter, governor. I was an international officer. I spent 13 years in arbitrations in Washington four weeks a year on a two-year appointment. So I've just about done everything in our business.

Q. And when you say our business what does that mean?

A. It means electrical construction.

Q. When you said 13 years in arbitration can you explain that?

A. We arbitrated all the cases in the United States. Between the IBW and NECA, which is National Electric Contractors Association. And we would have cases that ran just like yours, maybe 1, 2 o'clock in the morning and start the next morning. Four weeks a year.

Q. So would be like a sitting administrative type judge?

A. Pretty much. It's an agreement. It has to be 100 percent agreement.

Q. Okay. By both parties?

A. By both parties.

Q. And --

Page 19

A. The only trade in the United States that does that.

Q. Interesting. And you said you did that for 13 years. Would you be -- do it in conjunction with other people? Or would it just be you making the decisions?

A. No. Five on each side.

Q. Okay.

A. And then there's two chairmen, and the last four years I was a chairman.

Q. Okay. I understand we have a few law firms involved in this case. I just want to get some history with some of these firms. The firm we're at today, the Londrigan Firm, how long have you been working with the Londrigan firm? Or I should say has the Londrigan firm been representing you?

A. I would say all the firms have been over 20 years.

Q. Same for Scott & Scott, over 20 years?

A. (No verbal response.)

Q. How about Perkins Coie?

A. No. Perkins Coie did some work for me in California and then they were part of the SPP.

Q. When you say they were part of the SPP what does that mean?

A. Scott & Scott and Perkins Coie handled the Springfield Prairie Property problem that we have right now.

Q. And what did you hire Perkins Coie to do?

Page 20

A. To negotiate a settlement, which I thought they had done. I saw the 120 pages that he performed.

Q. The deed in move foreclosure that we discussed?

A. Yes, ma'am.

Q. Okay. Did you also hire a consultant to help facilitate a settlement?

A. Yes, we did. The guy by the name of Larry Sullivan. I've never met him, but we did.

Q. And how did you come across his name?

A. One of the members had heard of him. So I called him.

Q. Okay. And at some point you decided not to work with him?

A. I was married longer than he ever worked for us.

Q. Okay. You mentioned a California lawsuit, when was that?

A. Maybe six years ago.

Q. Okay. So you've been working with Perkins Coie on the California case and on the SPP case?

A. Well that was settled. So the SPP case, yes.

Q. Okay. And is it your understanding that Perkins Coie is still representing you in the SPP case?

A. Yes, ma'am.

Q. Okay. And the Sgro firm, you've worked with them for

5 (Pages 17 to 20)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 21

how long?

A. Over 20 years.

Q. Are any of the members of these four firms, the Londrigan, Scott, Sgro, or Perkins firm have any family relations to your family?

A. No, ma'am.

Q. How about membership interest in any of the properties you own?

A. One of the properties, one of the attorneys.

Q. What property and which attorney?

A. Downtown properties, Greg Sgro.

Q. And what is his membership interest?

A. I think it's either 15 or 20 percent.

Q. Looking at my notes trying to figure out which was the downtown property.

A. We call it the PNC building.

Q. Okay. The first one we discussed. All right.

And you understand there's a case pending in state court and a case pending in federal court, correct?

A. Yes, ma'am.

Q. Do you know the -- either of the judges personally in either case?

A. No, ma'am.

Q. Okay. And you said you are employed with EEI Holding

Page 22

currently?

A. Yes.

Q. And what is your title?

A. President and CEO.

Q. Have you always been the president and CEO?

A. Since 1968. Yes.

Q. Has it always been called EEI Holding?

A. No. It was Egizii Electric and then there was a Southern Communications, and over the years I acquired a plumbing company, a heating and ventilating company, a general contractor company. So we put it all under the head of EEI Holding.

Q. And what was the purpose for doing that?

A. I guess I thought it was better than it ended up being.

Q. Okay. So it's my understanding, and I don't want to put words in your mouth, so correct me if I'm wrong, but EEI Holding is the same as Egizii Electric and BRH Builders?

A. No. They're all part of EEI.

Q. Okay. When you say part of it, are they a division? A subsidiary?

A. Division.

Q. They're divisions. Okay. So what does the CEO and president of EEI Holding do?

Page 23

A. I think he does what a president and a CEO does.

Q. You run the show?

A. Yes, ma'am.

Q. Okay. And do you still go into the office everyday?

A. Yes, ma'am.

Q. And how many employees are currently working for EEI Holding?

A. I think 60.

Q. Okay. And then you say 60 does that include -- does that include Egizii Electric and BRH Builders?

A. No. BRH Builders is used for one serviceman and that's all. They're out of business basically, other than the name.

Q. Okay. When EEI Holding was at the 700 North MacArthur building it is my understanding that Egizii Electric and BRH Builders that all three were in the same facility?

A. Yes, ma'am. We had over 50 people in that facility in the office.

Q. Okay. And the -- when you say over 50 people, just office workers alone?

A. Just office workers and officers and people that estimate.

Q. Okay. I understand that Susan Vogler-West worked for you --

Page 24

A. Yes, she did.

Q. -- because I took her deposition.

A. Good lady.

Q. Yes, she is. And so we discussed how the layout of the building looked and she actually was nice enough to draw a picture of it for me. It's my understanding that the offices were upstairs. Does that sound right?

A. No.

Q. Okay. Could you describe what the layout was of the building?

A. Egizii Electric and EEI people were all on one level. If you were looking at a tri-level home then you have to go down one level and that's where the officers of the people -- because you had 500 electricians in six states. They were all spread out there. And then if you go down another level was all the estimators. If you go back to the middle level and go over all the way to the other end of the building, which would be the north end of the building, you had L&L which was a mechanical contract and then you have BRH and all their people, their office people.

And in between those two sets of groups were the accounting people.

Q. And who were the accounting people?

A. I have no idea. There was probably between 10 and 15

6 (Pages 21 to 24)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 25

all the time.

Q. And it's my understanding that the accounting people did the accounting for EEI Holding and Egizii and BRH Builders? Would that be correct?

A. And L&L.

Q. And L&L. Okay.

A. And Zek Power.

Q. What was it?

A. Zek Power.

Q. Zek?

A. Zek.

Q. How do you spell that?

A. Z-e-k.

Q. Okay. So you were the sole shareholder of EEI Holding. Who are the officers?

A. Of EEI Holding?

Q. Yes.

A. There was just one other officer and that was my son who owned 7 percent.

Q. And which son was that?

A. Rodney.

Q. And does he still own the 7 percent?

A. Yes, ma'am.

Q. And what was his title?

Page 26

A. He was the vice president.

Q. So you were the president and CEO and he was the vice president?

A. We had a multitude of vice presidents for different phases of the work, because we worked everywhere.

Q. Okay. And who were the main people in the office with you?

A. It would be a detriment to name 50 people. I can't do that.

Q. Did you have an assistant?

A. Well, I had a president of each company.

Q. Okay. And they would be in the same office as you?

A. They would be in the same complex as me.

Q. Okay. Would they be in the same -- well, strike that.

Did you have your own office?

A. Yes, I did.

Q. Okay. And then was there one main office apart from yours? Or did other people have their own offices?

A. They had their own offices.

Q. Okay. Who had their own offices?

A. All the presidents of each division.

Q. Okay. And you were the president?

A. Zek Power was one and since retired. I don't know

Page 27

where he is at.

Q. Who was that?

A. He was the head of plumbing.

Q. What was his name?

A. Zek Power.

Q. Oh. His actual name was Zek Power?

A. Yes.

Q. I'm sorry. I thought it was the name of a company. It actually sounds like a company name. Okay.

A. At L&L was Mike Husconich (spelled phonetically) and the general president. I went through three of them. The last guy was John Newbody. He passed away about three years ago.

MR. SCOTT: And that's BRH?

THE WITNESS: BRH Builders.

BY MS. HOUCK:

Q. Now, let's just narrow in on like 2012-2014 time period. That would have been about the time that you and I became acquainted.

A. We haven't yet.

Q. Right. We're getting there. We're getting there. So around that time who would have been in the office?

A. We would have been down to probably 15 to 18 people in the office.

Q. Okay. Do you recall who those folks were that worked

Page 28

for EEI Holding? Was it just you and your son?

A. That's all.

Q. Okay. And how did EEI Holding then make money?

A. With the divisions.

Q. So the divisions would fund EEI Holding?

A. Yes.

Q. What divisions?

A. We were down to BRH Builders, Egizii Electric. And I was washing BRH Builders out of business.

Q. Okay.

A. It cost me 13 million dollars to wash him out of business, and I'm sure you'll see that in your documents.

Q. No, actually I haven't seen that.

A. You will.

Q. Okay. So as the shareholder of EEI Holding did you pay yourself dividends?

A. When there was money I paid myself dividends, yes.

Q. And when was that?

A. Well, it was prior to finding out that BRH Builders had lost so much money.

Q. Did you have actual stock certificate?

A. Yes.

Q. And where is that stock certificate?

A. I have no idea.

7 (Pages 25 to 28)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 29

Q. Would it be with the EEI Holding documents somewhere?

A. Yes, it would.

Q. I'm asking because I have asked for those documents and I have not seen them.

MS. DE SAINT PHALLE: What document?

MS. HOUCK: Stock. A piece of stock.

MR. SCOTT: Stock certificate for EEI Holding?

MS. HOUCK: Correct.

MR. SCOTT: Okay.

BY MS. HOUCK:

Q. And who would make the determination on what dividends would be paid and when?

A. I would.

Q. You would. Okay.

Did you have any board of directors meetings or anything like that?

A. Yes, we did.

Q. Okay. And who would attend those meetings?

A. All the officers.

Q. And who would those officers have been? Again, I'm going back to 2012, 2013.

A. 2012 and 2013?

Q. That timeframe.

A. There would probably only be three of us.

Page 30

Q. And how often would you have meetings?

A. Maybe three times a week.

Q. Were these just general meetings?

A. Yes.

Q. So they weren't formal send-out-a-notice type board meetings?

A. No.

Q. So they were just general meetings.

Okay. Do you recall if you ever held any like formal annual meetings?

A. Once a year.

Q. One a year.

And who would attend that meeting?

A. Each time would be different if the officers changed, but that would have been Steve Tagge in the Sorling offices. They were our law firm for 40 years.

Q. For how many years?

A. Forty.

Q. Storling you said?

A. Sorling, S-o-r-l-i-n-g.

Q. And how come you're not working with the law firm anymore? I'm assuming you're not.

A. No, we're not.

Q. Okay. And how come?

Page 31

A. I had a change in heart.

Q. So you said that Steve Tagge would attend these annual meetings?

A. Yes.

Q. And is Steve still working for the company?

A. No. He's the attorney for Sorling.

Q. Would anyone else attend the meetings besides Steve and you, I take it?

A. Years ago a lot of people would if we go back in the '90s and the early 2000s, but after that no one really needed to be there but me and the attorney.

Q. So are you still having annual meetings for EEI Holding?

A. We have a minute meeting.

Q. And where are those corporate minutes kept?

A. Well, it's either at Mr. Potter's office or at Mr. Sgro's office.

Q. Again, I have asked for copies of minutes of meetings and I have not received any, and I will represent to you that Ms. Susan Vogler-West stated that she does not recall ever attending any formal meetings?

A. She may not have either.

Q. Okay. And she also stated that during the time she was there she doesn't recall there ever being any meetings.

Page 32

A. She wouldn't even have known about it.

Q. All right. Fair enough. So you will then produce if -- and I'm asking your attorneys I guess indirectly to produce the copies of the minutes of the meeting that we're discussing.

A. Yes, ma'am.

Q. Okay. And a copy of any stock certificates.

Do you know if Rodney had a stock certificate as well?

A. I'm sure he did. He's an airline pilot now. So he did change careers on me.

Q. But he still owns 7 percent, correct?

A. Yes.

Q. Okay. Do you recall if any special formal meetings were ever conducted? In other words, as the CEO did you ever send out a formal notice stating you wanted a meeting?

A. No. I think we were too busy.

Q. Do you ever recall having voted on any major decisions with anyone?

A. No, ma'am, I don't.

Q. Okay. Do you recall whether the minutes that we're discussing, that you believe might be at your lawyer's offices, were circulated among any of the officers or directors?

A. No, I don't recall.

Q. Do you know whether or not EEI Holding held any D&O

8 (Pages 29 to 32)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 33

insurance?

A. Yes.

Q. Okay. And what insurance would that be? If you recall?

A. Zurich. There are a number of agents, but I don't recall the insurance companies. Because as we opened a new office some place else they had insurance companies and sometimes we rode with those insurance companies as long as they matched ours.

Q. Do you know if you kept a corporate, an actual physical book with articles of incorporation or anything like that?

A. They would all be at Steve Tagge's office.

Q. And those documents were also requested in this case. Is there any way I can get a copy of those corporate minute books?

A. I assume so. You have a lot of power.

Q. Who did -- I'm just going to throw out some names here and just ask you who they work for. Linda Wells.

A. Works for me.

Q. And what company did she get her paycheck from?

A. Egizii Electric.

Q. And it's my understanding that she also did books for some of your other entities?

Page 34

A. I don't know that she did the books, but she overlooked a lot of stuff because I traveled a lot.

Q. And was she an administrative assistant then?

A. Yes.

Q. And what about Vince Toolin, what was his title?

A. Vince's title is the contract person.

Q. Was he always the contract person?

A. Off and on. But only for leases and that kind of thing. I would find the lease, he would solidify it.

Q. And what does that mean, you'd find a lease and he would solidify it?

A. Probably no one knows better than you, these properties were all full but one. And in Springfield the governor at the time, Blagojevich, decided we was going to empty Springfield and he did. But we were able to hang on to our leases. All but one.

Q. And what was the one?

A. Pana.

Q. You say that Vince Toolin was a contract person. Do you mean he was an independent contractor working for you?

A. Yes.

Q. Okay. Who paid him? What company paid him?

A. EPM paid him.

Q. Egizii Property Managers?

Page 35

A. Yes, ma'am.

Q. And who -- who would have wrote -- did Egizii Property Managers have a separate checking account then?

A. Sure.

Q. And who was in charge of that account?

A. It's been different people in the office.

Q. Who was the main person for Egizii Property Managers?

A. I would say I was.

Q. You ran the company?

A. Yes.

Q. Okay. So if Mr. Toolin was going to get paid it would have been you to direct how much and when?

A. I would sign, and still do today after all these years, his voucher.

Q. Is he still working for you?

A. Sure.

Q. I didn't know that.

How about Julie Harrington, is she still employed with you?

A. Yes.

Q. And what is her --

A. Her name is Julie Long now.

Q. Julie Long. Okay. And what is her position?

A. She is billing right now.

Page 36

Q. So she's an account --

A. Accountant.

Q. Accountant. Okay.

And what entities does Julie work for?

A. She works for Egizii Electric.

Q. Does she get her paycheck from Egizii Electric?

A. Yes, she does.

Q. Is it Egizii Electric or EEI Holding that she --

A. Egizii Electric.

Q. Okay. Does she do any work for any of the other entities besides Egizii Electric?

A. She does for the partners.

Q. And when you say the partners, are we talking about the members of SPP?

A. We're talking about the members of the two LLCs that I'm dealing with right now.

Q. And what two LLCs are those?

A. Downtown properties and the Illinois Building.

Q. And what does she do for them? Just the financials or --

A. That's all.

Q. -- pay the bills?

Okay. How about SPP?

A. I don't understand. What does that mean?

9 (Pages 33 to 36)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 37

Q. Does she also did work for -- or did she do work for Springfield Prairie Properties?

A. I'm not sure she came back by then. I don't remember the date she came back. She came back five years ago maybe.

Q. And you said -- how long was she gone?

A. I want to say 10 years.

Q. And was Springfield Prairie Properties around then when she first came to be employed by Egizii Electric?

A. I can't recall the dates.

Q. Who else kept the books for EEI Holding or Egizii Electric?

A. I can say to you that in the last week just having dinner two girls walked up and introduced themselves and said, "I used to work for you," and so I really don't know.

Q. Well, you have a terrific memory though.

Okay. Where was -- so EEI Holding and Egizii Electric, BRH Builders were all at 700 MacArthur, correct?

A. That's correct.

Q. Where was the office for Springfield Prairie Properties?

A. It was there too.

Q. Okay. And where -- did it have its own employees?

A. No. Egizii Property Managers were operated basically by me and whoever would do the books at the time.

Page 38

Q. Okay. And you say whomever would do the books, you mean who was in the office working on the computers?

A. Well, we used outside firms for everything.

Q. To pay the bills?

A. No. The bills were paid inside.

Q. Didn't someone have to prepare the financials in order to give Palmen & Dole something to use to --

A. Well, I think Palmen and Dole became a fixture in our place because I saw them all the time. So whatever Vince would print at the end of the month, they would check and see if it was okay.

Q. So you never had an actual employee for Springfield Prairie Properties other than Palmen & Dole?

A. They weren't an employee. Palmen & Dole were an accounting firm.

Q. Yeah. I stand -- I apologize. So the question was whether or not you -- Springfield Prairie Properties had any employees?

A. I'm sure we used Egizii Electric people to pay the daily bills.

Q. And I believe that's what Ms. Vogler-West stated.

And who wrote the checks to pay the bills for Springfield Prairie Properties?

A. They were different people.

Page 39

Q. And I've seen a lot of the checks in discovering this case, and it appears to me, and correct me if I'm wrong, did they have a rubber stamp with your name?

A. I hope not, but I'm sure they did.

Q. Okay. Did EEI Holding own any property?

A. No, ma'am.

Q. Did it own any -- like did it have any stock portfolio or lines of credit?

A. No, ma'am.

Q. No. Okay.

And who did EEI Holding use for their legal services?

A. When?

Q. Throughout the years.

A. Sorling did the bulk of our work and then each separate individual problem that I may have had would have been these gentlemen sitting here and lady.

Q. All right. So each firm and in this room has done some work for EEI Holding at some point? Would that be fair to say?

A. For Robert Egizi.

Q. How about EEI Holding?

A. Well, it could be EEI Holding or Egizii Electric or BRH Builders or Zek Power or L&L. And dependent on where the problem was and who they knew and who they didn't know.

Page 40

Q. I understand. So these are your go-to firms?

A. Yes.

Q. Okay. It's my understanding that EEI Holding did not have a lease but Egizii Electric did; is that correct?

A. That's correct.

Q. And did BRH Builders pay rent?

A. Yes.

Q. And how did that work?

A. Well, it didn't turn out too well.

Q. I know they cost you a lot of money.

A. Yes, they did.

Q. So did they pay for space that they used?

A. Yes, ma'am.

Q. Okay. And BRH Builders also from what I could see in the checks they did a lot of work for Egizii Electric?

A. No. Egizii Electric worked for BRH Builders. If they got a job like Bloomington Airport --

Q. Okay.

A. -- or the FBI building or the IRS building then Egizii Electric was one of their subcontractors. Now, if Egizii Electric needed concrete poured they would hire BRH.

Q. Did BRH Builders do any work for Springfield Prairie Properties?

A. If they did they got paid for it.

10 (Pages 37 to 40)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 41

Q. And what kind of work would they do? I'm asking because I saw some checks with their name on it and I was just curious.

A. Well, when you get a new tenant and they want walls changed they would change the walls. They had carpenters, laborers, painters.

Q. So they were just a basic construction company?

A. A true construction company, other than the fact that they didn't make any money.

Q. Why is that? Who was the running the show over there?

A. My mistake.

Q. Okay. All right. Your mistake of who you hired? Or your mistake for you having it, BRH Builders?

A. Both.

Q. Okay. I have copy of the leases. I'm going to have the court reporter mark the leases as Group Exhibit No. 1.

(Documents marked Group Exhibit No. 1.)

Q. The court reporter has just marked Group Exhibit Number 1. Do you recognize this document? Well, it looks like the top page may have been prepared by your counsel; is that right?

A. (No verbal response.)

Q. Okay. Let's go to page 2. Do you recognize this

Page 42

document?

A. Yes.

Q. And can you identify it for the record, please?

A. It looks like rent for Egizi Electric.

Q. And this is dated 1998?

A. Yes, it is.

Q. And I notice that the -- this lease is between you as the lessor and Egizii Electric; is that correct?

A. That's correct.

Q. And why was that -- why is this lease in your name personally as opposed to another company?

A. In 1998 I owned it.

Q. Okay. And is your signature on page 4 of the lease?

A. Yes, it is.

Q. Is that Linda Wells' signature as the notary?

A. Yes, it is.

Q. And you signed on behalf of the lessor or lessee, correct?

A. That's correct.

Q. And then the next document looks like an Amendment No. 1 to the lease agreement?

A. Yes.

Q. Do you recall who drafted this amendment? I'll really test your memory.

Page 43

A. I hate to say this but it could be me.

Q. Okay. And this is again between you as the lessor and Egizii Electric, correct?

A. That's correct. It has both buildings in it.

Q. And this one amends the first lease that we just discussed?

A. Yes, it does.

Q. How does this amend the first lease? If you know. I'll ask another question.

On the bottom of the first amendment it says monthly rent installment will change to 27,100 per month. Would that have been the amendment you think?

A. It may have been.

Q. Okay. Do you recall on this -- the first lease, I know you said you drafted the one, or the first amendment, did you also draft the first lease?

A. No.

Q. Okay.

A. That would been done by the attorneys.

Q. Okay. Do you know which one?

A. It would have been Sorling's office.

Q. All right. And I notice on the first page the 29,305 was crossed out. Would that have been crossed out after the amendment was made? Do you know? If you recall.

Page 44

A. I would assume so because it went down.

Q. Okay. And then the next document entitled "Amendment to Number 2 Lease Agreement," did you also draft this lease amendment?

A. I would say I did.

Q. Okay. I notice this one is between Egizii Electric and then 700 North MacArthur Avenue, LLC as lessor instead of you personally. Why the change?

A. I assume it became an LLC at that time.

Q. Do you recall whether there was any formal minutes created as a result of these lease agreement -- these lease amendments, rather?

A. No, ma'am. Because the LLC wouldn't have any formal --

Q. Minutes?

A. -- paperwork that I have.

Q. And this is your signature on the Amendment No. 2 for yourself and 700 North MacArthur, correct?

A. Correct.

Q. Were you the sole member for 700 North MacArthur then?

A. I think so.

Q. And the next document -- or let me back up a second. This second amendment to the lease says that the term will be

11 (Pages 41 to 44)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 45

extended from December 31, 2008 to December 2016 and that the monthly rent would be 27,100. Do you recall whether the lessor paid 27,100 in rent during that time, that entire time?

MR. SCOTT: The lessor or the lessee?

BY MS. HOUCK:

Q. I'm sorry. The lessee.

A. You're looking at amendment three?

Q. No. I'm sorry. Amendment No. 2. Where it states at the bottom the monthly rent installment.

A. Do I think we paid it?

Q. Correct.

A. Yes.

Q. During the entire lease term?

A. No.

Q. Okay. And when did you cease paying it?

A. As we got smaller and smaller and smaller we didn't use the property.

Q. All right. So do you recall when you stopped paying the 27,100 per month?

A. No. I really don't.

Q. Okay. And then the next document, Amendment No. 3 to the Lease Agreement, did you draft this amendment as well?

A. It's possible.

Q. And this lease amendment was between Springfield

Page 46

Prairie Properties, LLC and EEI Holding; is that correct?

A. Yes, ma'am.

Q. And this lease amendment also reduces the monthly rental to 22,000; is that correct?

A. Yes, ma'am.

Q. Do you recall whether payments of 22,000 were made during the time of this lease?

A. Not the full time.

Q. Okay. Do you know how many months where you paid 22,000?

A. I would assume to 2009.

Q. Until 2009 or started in 2009?

A. Until 2009. We went from 90 million dollars a year to basically 25 million dollars a year.

Q. And when you say we went from, you mean Egizii Electric?

A. Yes, ma'am.

Q. And is Egizii Electric still at 25 million a year?

A. We're at about 16 right now.

Q. Turn to Amendment No. 4 to the Lease Agreement. I notice this lease agreement is not signed. Do you know whether this lease amendment was ever implemented?

A. I don't know.

Q. Do you know whether any of the amendments were

Page 47

approved by the lender? And I say amendments I am now referring to all of the amendments we discussed.

A. By the lender --

Q. Correct.

A. -- from 2007 lender? Which lender?

Q. The time that these lease amendments were created, do you recall seeking any approval from the lender to reduce the rate of the rent?

A. Yes.

Q. Okay. And do you recall which amendment you did that for?

A. We just kept it up.

Q. Okay.

A. There was three or four of them.

Q. All right. And do you recall whether they were approved?

A. They were not approved.

Q. None of them?

A. Not in writing.

Q. Okay. In the last document attached to this Group Exhibit No. 1 is the Property Management Agreement, or at least that's the title of it. Do you recognize that document?

A. Yes.

Q. Do you know who drafted this document?

Page 48

A. Sorling's office.

Q. And is that your signature on page 7 of the document?

A. Yes, ma'am.

Q. And is this the -- this is the only property management agreement I have in my possession. Do you know if there were any others besides this one?

A. No, I don't.

Q. No, you don't know if there are? Or, no, there are no others?

A. No, I don't know of any others.

Q. Okay. You know whether or not this property agreement was ever terminated?

A. No, I don't.

Q. On page 2, paragraph 3 there's a description on how the property manager would be paid. Do you know whether or not these percentages where in fact paid during the time of this property management agreement?

A. You're looking at a different page than I am.

Q. I'm looking at page 2, paragraph 3.

MS. DE SAINT PHALLE: Go back one page.

BY MS. HOUCK:

Q. I'm looking at the property manager agreement. It's probably the next document.

MS. DE SAINT PHALLE: Let me see.

12 (Pages 45 to 48)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 49

MR. GERMERAAD: You want to repeat the question for him.

BY MS. HOUCK:

Q. Sure. I'm looking at page 2 of the property manager agreement, paragraph 3 and I was just -- it spells out how the management fee would be paid.

A. Yes.

Q. Do you know if those percentages were followed and whether or not the property manager was in fact paid?

A. Yes, he was.

Q. Okay. And on page 7 are those your signatures on behalf of Egizii Property Managers and Springfield Prairie Properties?

A. Yes, ma'am.

Q. I know I asked you a lot of questions about EEI Holding. Who was in charge of Egizii Electric? Would that also have been you?

A. Yes, ma'am.

Q. And I apologize if I already asked you that.

And I know we talked about Egizii Property Managers and I believe you said the office was located at 700 MacArthur?

A. That's correct.

Q. Is that where Vince Toolin would have worked out of?

A. Yes.

Page 50

Q. Okay. Do you know whether Egizii Property Managers has an operating agreement or bylaws or any corporate documents?

A. We have an operating agreement.

Q. How about any other corporate documents?

A. No.

Q. And again I apologize if I asked you this, who were the employees of Egizii Property Managers?

A. I was and Vince Toolin part time.

Q. And what exactly was the business of Egizii Property Managers? I think you said something about just handling the leasing?

A. Managing the buildings.

Q. So would Vince or whoever managed the -- worked for Egizii Property Managers, was he in charge of leasing out all the spaces?

A. No. I was in charge of leasing the spaces and then he put them together.

Q. And how would go about finding tenants?

A. Well, at one time we thought we had the best properties in Springfield. That was prior to what's happened in the last few years, but the properties pretty much sold theirselves. But we knew what was coming up, what was going to happen, how many feet they needed, and we bid everything in

Page 51

this town.

Q. So you didn't necessarily have to hire a broker to go out and find tenants for you?

A. No. We never did.

Q. Okay. Now, it's my understanding then at some point Egizii Electric ceased paying rent?

A. Yes, ma'am.

Q. Do you know whether or not any kind of default notice was sent to Egizii Electric?

A. Yes, there was.

Q. And where would that default notice be?

A. I don't know.

Q. I believe that document was requested of your counsel. So if you can locate that, that would be helpful. And who would the default notice have been served upon?

A. Me.

Q. And that would have been also created by you?

A. (No verbal response.)

Q. Who would have created the default notice?

A. By your bank.

Q. Oh. I'm sorry. I think we're talking about two different things. Egizii Electric leased space from Springfield Prairie Properties, correct?

A. Yes.

Page 52

Q. And at some point they ceased paying the rent, correct?

A. I don't think they ceased paying the rent. They lowered the rent and agreed upon between two parties, both being sitting here. And then from 2009, 2007 to 2011 I don't think there was any deduction in rents.

Q. I don't understand what you mean.

A. Well, whether it was 27,000 or 22,000 there was a time in my life that I didn't really care. I was too busy doing other things.

Q. I understand.

A. But in the first five years of the loan that we're here for today we had a lot of other problems. And one was moving out of most of the property, and as we moved out each time in another place we kept asking for reduction in rates. Could not get them.

Q. So it's your understanding that the lender never approved any of the rent reductions?

A. I understand that he verbally approved one and we paid it. And that is the only one, and even though they would get back to us but they didn't get back to us and there would be a new person involved.

Q. So I understand then you just reduced the rent on your own then?

13 (Pages 49 to 52)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 53

A.  We reduced the rent to, as we put it in writing, to what we could afford.

Q.  Did there ever come a time where you -- or not you -- Egizii Electric ceased paying rent altogether?

A.  Only at the end.  And that was followed up with a letter from us saying, we were told to get out and we did in a timely fashion.  But at the same time we paid and said we would pay all the work it took to keep the place in good condition, plus all the electric, all the gas, everything.  And we paid that all, $7500 a month.  The receiver didn't get that money but the servicers did.

Q.  When you say you got kicked out, you mean Egizii Electric?

A.  Egizii Electric.

Q.  And that was by the receiver, correct?

A.  No.  Well, I don't know.  It could have been.

Q.  Whoever was managing -- took over the management of the property?

A.  The one that froze the pipes, yeah.

Q.  Okay.  I didn't know that.

The question earlier, I just want to make sure that the record is clear.  My question earlier was whether or not Springfield Prairie Properties or Egizii Property Managers ever tried to throw Egizii out of the building for nonpayment of

Page 54

rent?  To use your terminology.

A.  I think I got a letter from you.  You first demanded 20 million dollars and then -- or otherwise get out.

Q.  Okay.  That letter that you're referring to I believe was for the loan on the property, not Egizii Electric as a tenant.

A.  Okay.

Q.  Okay.  I was referring to Egizii Electric being a tenant of the building.  We just went through the amendments, the leases.  And at some point, as we've now talked about, you stated that the rent was reduced, the lender didn't approve it.

A.  No.

Q.  Was there ever a time where Egizii Property Managers or Springfield Prairie Properties, the owner of the property, ever served a notice of default or something --

A.  Yes, there was.

Q.  -- like that?

Notice of default from Springfield Prairie Properties or Egizii Property Managers to Egizii Electric?  Not from the lender.

A.  No.

Q.  Okay.  I'm going to ask you some questions about Springfield Prairie Properties.  It's my understanding that you were the majority shareholder?

Page 55

A.  Yes, ma'am.

Q.  Was there any other person that was higher up than you in the company?

A.  No, ma'am.

Q.  I should ask you your title.  What was your title of Springfield Prairie Properties?

A.  General manager.

Q.  And who made the decisions at Springfield Prairie Properties, the major decisions?  Would that have been you?

A.  Yes, ma'am.

Q.  And what was the purpose of Springfield Prairie Properties?  If I were to fill out a form and say this is the business of Springfield Prairie Properties what would it say?

A.  It would say that seven property owners got together and created an entity called Springfield Prairie Properties.

Q.  Other than the property itself, the real property did Springfield Prairie Properties own anything else?

A.  No, ma'am.

Q.  And how did Springfield Prairie Properties make money?

A.  Through the leases.

Q.  And you may have already answered this question, Springfield Prairie Properties offices were located at the 700 North MacArthur Building, correct?

Page 56

A.  Yes, ma'am.

Q.  And who worked for Springfield Prairie Properties?

A.  No one worked for them.  Vince Toolin would have been the contract --

Q.  Yeah.  I think --

A.  -- labor.

Q.  -- we did talk about this earlier about the other gals helping out?

A.  Yes.

Q.  Okay.  And were you ever paid by Springfield Prairie Properties?

A.  No, ma'am.

Q.  And what would have been -- who would have paid your compensation?  What entity?

A.  Springfield Prairie Properties would have paid EPM.

Q.  Did you ever take any funds or get any bonuses or the like from Springfield Prairie Properties?

A.  No.

Q.  So your payment was from EEI Holding?

A.  My payment was from EPM.

Q.  Okay.

A.  For the leases.

Q.  You personally, did you take a salary?

A.  Oh.  Yes, ma'am.

14 (Pages 53 to 56)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 57

Q. Okay. And who paid --

A. Egizii Electric.

Q. -- your salary?

Egizii Electric paid your salary?

A. (No verbal response.)

Q. Okay. Were the checks from Egizii Electric or from EEI Holding?

A. It would have been Egizii Electric.

Q. Okay. Did EEI Holding have a checking account?

A. They may had to pay the Secretary of State and so forth, but other than that I'm not sure they had any checking account.

Q. Do you know whether Springfield Prairie Properties had any corporate documents?

A. No. They were an LLC.

Q. Do you know whether they had -- I believe they did have an operating agreement?

A. Yes, they did.

(Document marked Exhibit No. 2.)

Q. Do you recognize the document that's been marked Exhibit No. 2?

A. Yes.

Q. Earlier you mentioned that had were seven property owners got together, I believe was the way you phrased it, did

Page 58

--

A. Seven properties.

Q. Seven properties. And you said owners got together. Did the owners ever put in capital toward their ownership?

A. They put in their properties.

Q. The members of SPP, did they ever put in capital toward their ownership interest?

A. They weren't invited. No one was invited to belong unless they had a piece of property and it was done by a percentage. Or owned a piece of property.

Q. So they -- did -- would it be fair to say then that they owned the property before becoming a member of Springfield Prairie Properties?

A. That's correct. They owned either a property in whole or a property in part.

Q. And most of these individuals were your family members, correct?

A. No, ma'am. Tom Egizii is a cousin. John Pruitt is not. Clay Beimfohr is not. I sure am.

Q. And Mr. Pruitt how did -- I've seen his name on several documents as well. What's your relationship to him?

A. One of my best friends.

Q. And does Mr. Pruitt also own a business?

A. Yes.

Page 59

Q. And did he do work for Springfield Prairie Properties?

A. Yes, he did.

Q. What kind of work?

A. He's an HVAC company. In fact, he bought L&L from me at one point in time in the years.

Q. What was L&L again?

A. It was a heating and ventilating company. And they're the biggest in town. They're the biggest in Central Illinois.

Q. Maybe you shouldn't have sold it to him?

A. Pardon me?

Q. Maybe you shouldn't have sold it to him.

And Clyde --

A. -- BRH I guess.

Q. Yeah, right. And Clyde Beimfohr?

A. Clyde Beimfohr, B-e-i-m-f-o-h-r. He and I partnered. He was an electrical contractor from Granite City. He and I partnered in power house work in Missouri and a few other places. So we were good friends both there and nationally. He was a national officer at one time. So we became very good friends. And he and I owned a couple of pieces of property together. Ducarry (spelled phonetically) and Edwards.

Q. Okay. And that was part of the --

Page 60

A. Yes.

Q. -- Springfield Prairie Properties? Understood.

Okay. The operating agreement that you have in front of you, that was for Springfield Prairie Properties, LLC, correct?

A. Yes, ma'am.

Q. And it's dated April 11, 2007?

A. Yes, ma'am.

Q. Do you know whether there are any other corporate type documents other than this one?

A. No, I don't know.

Q. Okay. Did Springfield Prairie Properties ever hold any type of meetings or anything like that formally?

A. No formal meetings.

Q. Okay. And is that your signature on page 18 on behalf of 700 North MacArthur, it looks like? Are you on Page 18? The page before that?

A. Is that my signature?

Q. Correct.

A. Yes, ma'am.

Q. And your signature is on every line except for Mr. Pruitt's, correct?

A. Correct.

Q. Does that look like Mr. Pruitt's signature to you?

15 (Pages 57 to 60)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 61

A. Yes, it does.

Q. And then is your signature also on page 19?

A. Yes, ma'am.

Q. All right. And do you know whether or not this operating agreement was ever terminated?

A. It has not been that I know of.

Q. Okay. And do you know whether any of the members called a special meeting?

A. No, ma'am.

Q. Okay. If there were any other corporate type books or copies of notes would you know where those would be for Springfield Prairie Properties?

A. They would have been all in the beginning in 2007 for that loan.

Q. Okay. And who would have kept those records?

A. Well, it was all done in Sorling's offices.

Q. Since this case started and the plaintiffs have asked for documents have you ever contacted Sorling's office to ask for certain documents? Or do you know if your lawyer's have?

A. No. I would assume that documents I didn't have that they would have asked for those documents.

Q. Okay.

MR. SCOTT: Off the record here.

(Discussion held off the record.)

Page 62

(Back on the record.)

BY MS. HOUCK:

Q. We're back on the record. There was a discussion that the corporate records would be produced to the plaintiffs in accordance with the request for production of documents.

Mr. Egizii, who kept the checkbook for Springfield Prairie Properties? Who wrote all the checks I should say or the majority of them?

A. They were all done in my office.

Q. Okay. Who kept the books, if you will?

A. Every month Vince would print out the books. He'd print out profit and loss and a balance sheet.

Q. And who would input that information? Would that have been Linda?

A. Most likely it would have been Julie when she was there and then a multitude of people between, but not Linda. She'd be more doing my running and that.

Q. And as far as legal and accounting services would that have been the same four firms that are sitting with us today for --

A. Accounting?

Q. -- Springfield Prairie Properties?

No. Accounting I presume it was Palmen & Dole?

A. It was Palmen & Dole.

Page 63

Q. And for legal services for Springfield Prairie Properties?

A. This group.

Q. This group. Okay.

MR. SCOTT: They also had -- believe they also had Tagge and Sorling.

THE WITNESS: In the beginning.

MR. SCOTT: Yes.

MS. HOUCK: I think he said that, yeah.

MR. SCOTT: Okay.

BY MS. HOUCK:

Q. Going way back to when you entered into the loan for the Springfield -- for the properties that are under Springfield Prairie Properties, LLC, do you recall if you had legal counsel to help you with that loan?

A. Mr. Tagge was there the whole time.

Q. Okay. So Mr. Tagge would have been the person who advised you on the loan documents and the contents of the loan documents?

A. Yes, ma'am.

Q. And I know we didn't get into background very much as far as your work. I assume after college did you go into the construction business right away?

A. No. I took some time out for the Marine Corps. And

Page 64

then I became -- when I got back I had spent two years as an apprentice so I finished the other two years.

Q. Apprentice in the --

A. Electrical.

Q. -- construction?

Oh. Electrical apprentice?

A. Yes.

Q. Okay. Were you then a member of the union?

A. Oh, sure.

Q. What union was that?

A. 193.

Q. Is that still the same union today?

A. Still the same union.

Q. I figured. Are you still a member?

A. No.

Q. Okay. And how long were you a member of the union?

A. Eight years.

Q. So did you work as an apprentice then for eight years?

A. No.

Q. I'm sorry. I don't know what an apprentice is. So if I insulted you I didn't mean to.

A. Today it's five years.

Q. Okay.

16 (Pages 61 to 64)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 65

A. Then it was four years. And then you're a journeyman and then depending on your work ethic you become a foreman or a general foreman and on up.

Q. So did you climb the ranks then?

A. Yes.

Q. Okay. And then what did you -- what was your business then after that, after --

A. I just worked until we went in business in 1968.

Q. And who is that?

A. Who is --

Q. You said --

A. -- part of it?

Q. -- we went into business?

A. My dad and myself.

Q. And what was your business?

A. Electrical.

Q. Did your dad own an electrical company?

A. He owned a two-man electrical shop. He was an electrical engineer, but worked for CIPS.

Q. CIPS?

A. Central Illinois Public Service.

Q. Okay. And then at some point you started owning property. How did that -- how did your profession --

A. He moved to Arizona in '70. My whole family did.

Page 66

And then I stayed just with the electrical until 1978. I think I bought a piece of property then.

Q. So in '78 you bought your first property?

A. Outside of a home.

Q. Right. A commercial property?

A. Yes.

Q. And were you still running your dad's, or what your dad started, the electrical business?

A. Yes.

Q. Okay. And then was that property for the electrical business then?

A. No.

Q. Okay. So what was that property for?

A. It was just a lease property.

Q. Okay.

A. And I bought and sold a lot of these properties. I'm not a broker.

Q. So you got into the real estate business, if you will, in the early '70s, correct?

A. Well, it was a way to help my business too.

Q. Sure.

A. Because it gave me work in off season, which used to be called just a nine-month season and now it's 12 months.

Q. So were you still working then as an electrician?

Page 67

A. No. I had too many people.

Q. So you built this -- built up a company. And what was that company called then?

A. Egizii Electric.

Q. Okay. So Egizii Electric's been around for a long time?

A. Thanks.

Q. I was trying to compliment you by saying you've kept this company going for a long time. I wasn't saying anything but that.

MR. SCOTT: Are we getting near for a time for a break since it's about noon.

MS. HOUCK: If you would like to take a break we certainly can. Or do you want to finish your story about Egizii Electric?

THE WITNESS: Whatever.

MR. SCOTT: Why don't you finish that and then we'll take a break.

BY MS. HOUCK:

Q. Okay. So in 1970s Egizii Electric was born?

A. 1968.

Q. Okay. And then you bought your first property, and then did you continue buying properties?

A. Off and on I bought and sold property, but in '78 I

Page 68

did my first power plant. And that gave me a jumping stone to lock and dams and Martin Marietta and Cape Canaveral. Little things like that.

Q. And you say that power plants, Cape Canaveral were those big jobs that you got, your company got?

A. Yeah. Because the famous statement is, "You can't work here because you've never down one." So you got to get the first one.

Q. So you built your reputation?

A. Yes.

Q. Okay. And all the while you're buying and selling properties? Or just buying up properties?

A. No. I bought and sold.

Q. Okay.

A. And they weren't big properties. They were just -- you know more people and so you bought something and then you sell something.

Q. So how many commercial properties would you say you've owned in your career?

A. Not counting this, 12 or 15.

MS. HOUCK: Okay. All right. We can take a break if you want.

MR. SCOTT: Okay.

(Brief break taken.)

17 (Pages 65 to 68)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 69

(Back on the record.)

BY MS. HOUCK:

Q. Okay. Back on the record.

(Document marked Group Exhibit No. 3.)

Q. Mr. Egizii, I'll represent to you that the -- what's been marked as Group Exhibit No. 3 are the documents I received from Palmen & Dole.

MR. GERMERAAD: Do you have a copy?

BY MS. HOUCK:

Q. Unfortunately I don't. But I won't -- they're very general questions and it won't take long.

The very first page, is that your E-mail? Do you recognize that?

A. Yes.

Q. Did you write that E-mail?

A. Yes, ma'am.

Q. And is re@eeiholding.com your E-mail address?

A. Yes, it is.

Q. The employees that worked for you did they also have an eei.com address as well?

A. Yes, ma'am.

Q. Does Springfield Prairie Properties have any separate E-mail addressed?

A. No.

Page 70

Q. How about Egizii Electric? Or was it just all EEI Holding?

A. They're all EEI Holding.

Q. Okay. Have you been asked -- since this case started have you been asked to go back into your computers and look for E-mails at all?

A. No.

Q. So none of your counsel asked you to search for any E-mails with regard to this case?

A. No.

Q. Okay. And the second page is just a -- well, actually it looks like a different E-mail. Is that also from you?

A. Yes.

Q. And I think there's a name on here that I haven't -- we haven't talked about, Brenda Larson. Who is Brenda Larson?

MR. SCOTT: That's my legal assistant.

MS. HOUCK: Oh, okay. Well, don't bother answering then.

MR. SCOTT: She does all --

MS. HOUCK: Okay.

MR. SCOTT: -- my E-mail.

MS. HOUCK: As does mine.

A. This Julie is now Long.

Page 71

BY MS. HOUCK:

Q. Right. I think we talked about Julie.

A. Okay. This says Fairington.

Q. Yes, it does.

So if you could just page through and let me know if these are in fact true and accurate copies of your E-mails?

MR. SCOTT: His E-mails or E-mails to --

MS. HOUCK: Both.

MR. SCOTT: Okay.

BY MS. HOUCK:

Q. I see you're looking at the page with the handwritten numbers and names. Is that your handwriting by any chance?

A. No.

Q. Do you know whose handwriting that is?

A. It's either Julie or Linda.

Q. All right. And the next page looks like it has some typewritten numbers on it. Can you identify what that page is? If you know.

A. This is how the percentages were put together.

Q. For distributions to pay income taxes?

A. Yes, ma'am.

Q. And whose decision was that to make those payments?

A. Well, Tim at Palmen & Dole gave us the numbers and then I sent it to Steve because they had the money, and Steve

Page 72

Scott he told us what he thought we should pay from what Tim Cravens had told him.

Q. Okay.

A. And we got the checks, turned them around, got a form from Palmen & Dole, sent it to the IRS.

Q. Okay. I know I'm jumping ahead here. So what I'm -- what we're talking about now are the transfers made from Mr. Scott's office to the various members to pay their income taxes, correct?

A. That's correct.

Q. I don't think that's disputed.

MR. SCOTT: Transfers from the trust account. Not our office.

BY MS. HOUCK:

Q. Okay. Whose idea -- I understand that Palmen & Dole did the calculation. Whose idea was it to actually make the distributions with that money?

A. When you say that money?

Q. The distributions we're talking about, the transfers to pay the income taxes. Whose decision was that?

A. Well, I think it was a multitude of people sitting in a room saying this is what you're going to owe on taxes and I agreed. And I had Mr. Scott write a letter saying this is for income taxes.

18 (Pages 69 to 72)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 73

Q. Okay.

A. And he sent it to everybody along with the check.

Q. So would it be fair to say it was your decision to make the transfers?

A. Yes, it would.

Q. Okay. The rest of this is more about the calculations, and there's a letter here I think that you kind of just alluded to from Scott & Scott to the members of Springfield Prairie Properties?

A. Am I way past it? Oh. Here it is.

Q. Is that the letter?

A. Yes.

Q. Okay. Directing -- well, it looks like a letter just informing the members about their percentages; is that correct?

A. That's correct.

Q. Okay. And obviously more calculations. Are these typewritten calculations, do you know whether if they were made by someone at your office or EEI Holding?

A. Most likely that they were.

Q. Okay. Who would that have been? Do you know?

A. Well, I would think it would be either Linda or Julie.

Q. Okay.

A. Nobody else got involved in these things.

Page 74

Q. And these things you mean the finances?

A. In SPP.

Q. Okay. There's now a copy of what's called a "Refunding Bond."

A. Yes.

Q. Is that your signature on --

A. Yes, it is.

Q. Okay. And I believe there are several. Do these all contain your signature?

A. Yes, they do.

Q. And what was the purpose for the refunding bond?

A. Well, because they're all different amounts I would say it was to pay the taxes with.

Q. What was the actual reason for the refunding bond? I understand the money was used to pay the income taxes, but what was the purpose of refunding bond? If you know.

A. I don't know.

Q. Okay. And then who -- did someone tell you to do these refunding bonds or advise you to?

A. No. Between Palmen & Dole and the rest of us sat down and said this is the amount of taxes you're going to owe in '13, and you're going to owe this much taxes in the first two months -- first two quarters of '14. So as I always did I explained to all the partners what ought to happen. And then

Page 75

this came and checks were sent to them, and I assume they did the same thing I did.

Q. Pay your taxes?

A. That's right.

Q. The amount of money that was distributed, the total amount to all the partners where did that -- how did you derive at that total? Was it the amount -- the exact amount owed --

A. For the taxes.

Q. -- for the taxes?

A. It's the amount that Palmen & Dole told me I would owe.

Q. Okay.

A. And I really at the time and still today feel like none of us knew exactly how much it would be, but we knew this would cover it.

Q. All right. So maybe not exactly but close to it?

A. Yes.

Q. All right. And then you said there were two more distributions made in 2014?

A. It might have been one distribution but for two quarters.

Q. Okay. And then toward the end of the group exhibits there's a couple of documents that just say Springfield Prairie Properties profit and loss statement?

Page 76

A. Yes.

Q. Who would have created these?

A. Vince Toolin.

Q. Vince Toolin?

A. Yes.

Q. So who did the accounting for Springfield Prairie Properties, Linda, Julie and Vince then? Would that be correct?

A. It would be more Julie and Vince.

Q. Okay. I will represent to you that Ms. Fitzgerald, Larinda Fitzgerald had testified that she received an advance payment for services in the amount of $15,000. Do you recall sending Palmen & Dole that advance payment?

A. Yes, I did.

Q. What was the purpose of making an advance payment?

A. Well, I'm not sure and I didn't think at the time SPP would have any money left to even pay the Secretary of State or anybody else in the individual units. And those were dollars that were earned by the partnership to start with. And so I put the rest of it in two -- sent it to two law firms so that it would be out of my hands, and then I used Palmen & Dole to check everything out. And I didn't want bills that -- Egizii Electric was already paying enough bills to do what they had to do for the partnership. Their share anyway.

19 (Pages 73 to 76)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 77

So I paid them the $15,000, yes, I did.

Q. Okay.

A. I remember it. Because I don't like doing that.

Q. Right. Because she had mentioned that that was the first time that she --

A. Okay.

Q. -- had received that. So that's why I was asking.

And there were obviously several transfers to the four different law firms that we've talked about today?

MR. SCOTT: I object to the use of the term "transfer," but you go ahead and try to proceed.

BY MR. HOUCK:

Q. I don't think that it's disputed in this case that certain transfers of funds were made from Egizii Electric or EEI Holding, for that matter, to Londrigan to Sgro and Scott & Scott and Perkins Coie law firms. Would that be a fair statement, that certain transfers were made?

MS. DE SAINT PHALLE: You're saying transfers made from Egizii Electric to various law firms. I'm not sure that's accurate. I mean, obviously you can ask him.

MS. HOUCK: Well, we can go through each one of them.

MS. DE SAINT PHALLE: Okay.

MS. HOUCK: We'll go through them. That's fine.

MR. GERMERAAD: Do you mean SPP or do you mean Egizii

Page 78

Electric?

MR. SCOTT: You did say Egizii Electric.

MS. HOUCK: I did? Okay.

MS. DE SAINT PHALLE: That's what I was pointing out.

MS. HOUCK: Thank you.

MS. DE SAINT PHALLE: I didn't want that to happen.

MS. HOUCK: No, no. You're correct. So if I said before about the transfer made to Palmen & Dole if I said Egizii Electric I meant Springfield Prairie Properties.

MR. GERMERAAD: You did.

MS. HOUCK: So I apologize for that.

MR. SCOTT: And are you using transfers synonymously with payments or deposits with?

MS. HOUCK: I'm not calling it anything at this point?

MR. SCOTT: All right.

THE WITNESS: Go on.

BY MS. HOUCK:

Q. There's certain allegations made in this case that are outlined in the amended complaint, and I'm just going to ask you a couple of questions with regard to some of your answers if that's okay. There's a statement that the borrower, which is Springfield Prairie Properties, defaulted on its loans and there is a denial of the default. Are you denying that a

Page 79

default occurred as to the loan payments on the mortgage?

A. From 2007 to 2012 there was not a default of anything.

Q. After 2012 or during 2012 was there a default?

A. There wasn't a default until the state quit paying and they owed us a million-one. And along with the $300,000 that we were not getting from payment put us in a position where we couldn't pay the bill.

Q. I understand. I understand. I'm just asking you as a matter of fact, not making any judgments, on whether or not the loan defaulted?

MR. SCOTT: You're asking for his opinion not a legal opinion, correct? You can answer the best you can.

A. It was a default.

BY MS. HOUCK:

Q. Okay. And I believe the lender sent a couple of default letters, and I'm just going to have the court reporter mark one of them.

(Document marked Deposition Exhibit No. 4.)

Q. Mr. Egizii, the court reporter put in front of you what's been marked as Deposition Exhibit 4. Do you recognize that document?

A. No, I don't. But I would have seen it, yes.

Q. You might have received it you just don't recall?

Page 80

A. That's correct.

Q. Okay. And do you recognize the name Berkadia at all?

A. Yes.

Q. Okay. And what was your understanding of Berkadia, who that was?

A. They were a servicer.

Q. Okay. And this is the correct address to Springfield Prairie Properties, correct?

A. Correct.

(Document marked Deposition Exhibit No. 5.)

Q. All right. And the next document I'm going to hand you what has been marked Exhibit No. 5. Do you recognize that document?

A. I've seen it, yes.

Q. Do you recall receiving this letter?

A. No. I thought the one I saw said 20 million dollars. This says 21.

Q. On Page 3, is that what you were thinking in terms of the 20 million?

A. It could be.

Q. Okay. So you may have received it? Do you recall?

A. Yes.

Q. All right. Referring back to the complaint that was filed in this case. At Paragraph 113 there's an allegation

20 (Pages 77 to 80)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 81

that certain sums were disbursed -- strike that.

I was on the correct paragraph. All right. In paragraph 113 of the complaint has statements of several transfers that were made, disbursed from Springfield Prairie Properties to various law firms. To Scott & Scott, Perkins and the Londrigan trust and several calculations are listed here. My question is: Whose idea was it to transfer money from Springfield Prairie Properties to four different law firms?

A. Mine.

Q. Okay. And what was --

A. It was only --

Q. -- the purpose --

A. -- transferred to two.

Q. You only transferred funds to two law firms?

A. Two law firms for escrow accounts.

Q. Which two?

A. Scott & Scott and Potter.

Q. Londrigan Potter?

A. Yes.

Q. You didn't -- so you did not transfer any funds to Perkins Coie?

A. No. If I transferred any funds to them it would be an Egizii Electric check to them. The work they did for me. I wouldn't transfer funds. I didn't have any funds left.

Page 82

Q. One of the allegations is that a distribution of $150,000 was made to -- I suppose it could have been made from Scott & Scott?

MR. SCOTT: Maybe you should refer to them as retainers.

MS. HOUCK: Retainer. Well, there's a difference in retainers and advance payment retainers and trust funds. So I don't want to make any --

MR. SCOTT: Well, I think you're confusing the situation by using the term transfers out or if those came from trust accounts out.

Ms. HOUCK: In Paragraph 113(e) of the plaintiff's complaint there's a statement that Scott & Scott trust account transferred $20,000 on March 5, 2014, to pay legal fees to Perkins Coie?

MR. SCOTT: It -- actually it says these funds were dispersed, not transferred but I'll let you continue.

BY MS. HOUCK:

Q. Is that correct? Is that what you mean by that? You didn't direct it and that it came from Scott & Scott?

A. I would get a request to approve every one of them.

Q. So you had the final say in what --

A. Yes, ma'am.

Q. -- money was going where?

Page 83

A. Yes, ma'am.

Q. Okay. Do you recall making any retainer payments to Sgro Hanrahan?

A. Sure. If there was a request for the work he did --

Q. For $150,000?

A. -- I okayed it.

Q. Okay.

MR. SGRO: I'll interject. That amount's not correct. I think you interposed the two amounts.

MS. HOUCK: Did I?

MR. SGRO: Yeah. I think Perkins got the bigger one and I got the smaller one.

MR. SCOTT: They charge at the higher rates.

MS. HOUCK: So the $150,000 is incorrect?

MR. SGRO: I think Perkins got 150 and I got 100 and your complaint has --

MR. HOUCK: All right.

MR. SGRO: -- them reversed. Just, not that you have to know that but I thought I'd tell you.

MS. HOUCK: Well, you admitted the allegation so, but I'll make that change.

MR. SCOTT: I think the trust accounts themselves actually show the actual amount of --

MS. HOUCK: They do.

Page 84

(Overlapping conversations.)

MR. SCOTT: -- knows the balance.

MS. HOUCK: And the general question was whether or not Mr. Egizii made those decisions to --

MR. SCOTT: Yes.

MS. HOUCK: -- make the disbursements, and I think he said yes. So we can move on.

BY MS. HOUCK:

Q. Do you recall if any of the entities EEI Holding, Egizii Property Managers, Egizii Electric, and Springfield Prairie Properties ever transferred funds back and forth or made loans to one another?

A. EPM would have never done that and SPP would have never done that.

Q. So SPP never transferred funds to Egizii Electric or EEI Holding?

A. No.

Q. Okay.

(Document marked Deposition Exhibit No. 6.)

Q. I'm going to backtrack here a moment. Back to EEI Holding Corporation and ask you to identify what's been marked as Exhibit No. 6.

MR. SCOTT: Do you have a copy of that? Oh. The bylaws.

21 (Pages 81 to 84)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 85

BY MS. HOUCK:

Q. Do you recognize that document?

A. Yes.

Q. What was that?

A. It's EEI Holding bylaws.

Q. Is this a true and accurate copy of the bylaws for EEI Holding to your knowledge?

A. One of many.

Q. One of many copies? Or many of many different bylaws?

A. I suspect over the years it changed.

Q. So were there amendments to this particular set of bylaws? Do you recall?

A. No, there wasn't.

Q. Okay. And then on the back of this is a copy obviously of the -- it looks like a resolution. Is that your signature on the resolution? It says EPM EEI 46.

A. It is my signature.

Q. Okay. And are -- is this a true and accurate copy of the resolution to your knowledge?

A. It was at the time.

Q. Okay.

A. These people, three of them are retired. Two of them -- one of them lives in St. Louis.

Page 86

Q. Do you know if there were any other corporate resolutions other than this one?

A. There was -- there were previous ones to this, because you had officers in the other companies. For instance, we owned two offices in Florida. We owned one in Springfield, Missouri. We owned offices -- six offices. So those people aren't on here.

Q. When you say we who are you referring to? EEI Holding?

A. When I say we I mean EEI Holding and Egizii Electric.

Q. Okay. So you believe there's --

A. I refer them --

Q. -- other resolutions?

A. -- to we.

Q. Okay. You believe there's other resolutions out there?

A. Yeah. You had presidents of other companies.

Q. What other companies?

A. Olsen.

Q. Were owned by EEI Holding?

A. Sullivan. Yes.

Q. Okay.

A. There was a number of them.

Q. Okay.

Page 87

A. They were all divisions of EEI Holding.

Q. Okay. As to -- well, let me ask you about the whereabouts of the other resolutions?

A. You'd have to ask Sorling.

Q. Sorling again?

A. Yes.

Q. Okay. And Dorsey Taylor is he retired?

A. Yes, he is.

Q. And where is he now?

A. He's either in South Carolina or just south of Springfield where he lived.

Q. St. Louis?

A. No.

Q. Okay. Kerry Taft?

A. Kerry Taft works for E.L. Pruitt.

Q. She works for them now?

A. Yes.

Q. Did she used to work for EEI Holding?

A. Yes.

Q. And Linda Wells you said she's still with you? I don't recall.

A. A couple days a week.

Q. Okay. And Ken Warner?

A. No. Ken Warner retired a number of years ago. He

Page 88

was the vice president of the Decatur-Champaign area.

Q. And Jim West?

A. Jim West was -- to start out with was president of Sullivan Electric in Marion, Illinois, for 26 years, then he become an area -- just special projects for me and then retired.

Q. And Steve Nicholson?

A. Steve Nicholson went to work for a large company in St. Louis. He lived in Carlinville, Illinois.

Q. And Kevin Minor?

A. Kevin Minor was the best safety director we've ever had, and he eventually went to work for a manufacturing plant.

MS. HOUCK: All right. Alex, are you going to followup with the Sorling firm on some of these documents?

MS. DE SAINT PHALLE: Well, I'm not sure.

MS. HOUCK: Okay.

MS. DE SAINT PHALLE: Well, what you're asking for -- and so I understand, you're asking for the organizational documents say for EEI Holding Company?

MS. HOUCK: Yes. I guess that wouldn't be your problem then.

MS. DE SAINT PHALLE: Actually, Greg, you talked with Steve Tagge about getting those documents didn't you or tried? I know you tried.

22 (Pages 85 to 88)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 89

MR. SGRO: Everything he sent me I've produced.

MS. HOUCK: Okay. And this is the Sorling firm?

MS. DE SAINT PHALLE: Sorling. That's Steve Tagge.

MS. HOUCK: So you've asked them. At least we'll have it on the record. Okay.

MR. SGRO: And to add to the record, I believe I specifically told him prior to a date, it would have corresponded with your discovery. So there may be things preceding that date that I didn't ask him for.

MS. HOUCK: Sure. I think the judge limited the time the other day to --

MR. SGRO: Right.

MS. HOUCK: -- 2009 onward.

MR. SGRO: So to be fair to Steve Tagge I didn't say give me everything you have for EEI. I put a date with it.

MS. HOUCK: Understood. Okay.

(Document marked Deposition Exhibit No. 7.)

BY MS. HOUCK:

Q. Mr. Egizii, do you recognize the document that's been marked as Exhibit No. 7?

A. Yes, ma'am.

Q. And can you identify it, please?

A. It's a request to transfer to the Londrigan Potter the amount of $50,000 from the trust account.

Page 90

Q. And what is your understanding of the difference between a trust account and a retainer account?

A. A retainer account, I don't have any retainer accounts other than with Deranda (as heard) for 15,000. I don't have any other retainer accounts with anybody else that I know of.

MR. SCOTT: I think you're talking about -- she's asking about the attorney retainers.

THE WITNESS: Oh. The attorney retainers?

MR. SCOTT: Yeah.

BY MS. HOUCK:

Q. Yes. I'm referring to this E-mail that I believe you wrote to Alex.

A. Alex requested it and I told her -- she requested the 50,000 and I agreed to have her transfer 50,000 from their trust account to the their account.

Q. To?

A. Londrigan Potter's account.

Q. Okay. From where?

A. They have one of the two trust accounts.

Q. Okay. So you were asking her to -- or giving her direction to transfer 50,000 from their trust account into their retainer account?

A. That was their request, yes.

Page 91

Q. Okay.

(Document marked Group Deposition Exhibit No. 8.)

Q. Mr. Egizii, I put in front of you -- or the court reporter put in front of you three bound documents marked as Group Exhibit No. 8. The title to each is Springfield Prairie Properties vendor balance detail as one document as of 2012, the other is 2013, and the third would be 2014. Do you recall -- or can you tell me are these documents that Springfield Prairie Properties prepared?

A. No. I wouldn't think so. I think your -- Mr. Onion's group would have prepared these.

Q. The receiver?

A. The receiver.

Q. Okay.

A. In fact, 2012 has been redone by somebody. This doesn't come out of our machine this way.

MR. SCOTT: Off the record.

(Discussion held off the record.)

(Back on the record.)

BY MS. HOUCK:

Q. I'm looking at Page 28 of the document that says as of December 31, 2012.

A. Okay.

Q. On the bottom page 28.

Page 92

A. Okay.

Q. You see on the left side it says E.L. Pruitt Company?

A. Yes.

Q. And there were several checks written to E.L. Pruitt and I was just wondering what those checks might have been for?

A. He did the maintenance in all the buildings. He did ventilating and maintenance.

Q. What kind of maintenance?

A. Well, if we took the second floor of the PNC building and right now which is occupied by the law firm we've been talking about all day, Sorling, they have the whole second floor, 26,000 feet.

Q. Okay.

A. And if part of the people didn't have heat that day our maintenance guys couldn't take care of that. So a heating and ventilating person had to. So it would be E.L. Pruitt.

Q. Was that their -- was that the only reason why you would have used them for HVAC work? You said maintenance. So I'm not sure if I'm confusing the two.

A. They're the same. One in the same depending on what it is they were working on. I mean, if they had to take filters out of the steam boiler or something they would do the same thing.

Q. Okay. So only having to do with HVAC systems?

23 (Pages 89 to 92)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 93

A. That's it.

Q. Okay. All right. And then before -- on page 31 there are several, it looks like several checks written to Egizii Electric.

A. Good.

Q. Page 31. What? Good?

A. Yeah. Page 41?

Q. Thirty-one. I'm sorry. Do you recall what those payments would have been for?

A. No, I don't. The maintenance -- our service people, Egizii Electric service people would service anything and everything. If outlets were out. If they're lights that a maintenance can't take care of. Something goes dark it's our people that go there.

Q. Okay.

MR. GERMERAAD: Cara, do you want me to explain something?

MS. HOUCK: Sure. If you want.

MR. GERMERAAD: Bob, were you saying you don't recognizes those because they would look different if they were printed out at your office? Or you said something like that. I think I got those in Excel and what I did was when I printed them out I scaled it so that all the columns would fit on one sheet and I did it landscape.

Page 94

MS. HOUCK: Okay.

MR. GERMERAAD: And so I printed those out and then I scanned them and sent them to you. They could have printed them out it and it would have looked different. I don't know.

MS. HOUCK: Yeah, you're right. It does look --

MR. GERMERAAD: So I got them in Excel and then I printed them out how I wanted them and then I scanned them and sent them to you.

MS. HOUCK: Okay.

THE WITNESS: And he gave them to you and you got to confuse me.

MR. GERMERAAD: Yes, it's my fault. It's my fault. But I think that's the source of confusion.

BY MS. HOUCK:

Q. And on page 9 there are several checks to BRH Builders and I think you and I talked about that already?

A. Yes, ma'am.

Q. I noticed on page 33.

MR. SCOTT: What exhibit?

BY MS. HOUCK:

Q. I'm still on '12. I should say 34, 35. There are several checks to Egizii Property Managers. Can you tell me what those payments would have been for?

A. Egizii Property Managers unless I'm on the wrong page

Page 95

say zero, zero.

Q. Are you looking at 35?

A. Thirty-four.

Q. And then 35.

A. Thirty-five.

Q. Or we can switch to 2013 because I'll ask you the same thing, and it's easier to see. If you want to switch to 2013 document on Page 36. There's checks looks like written to Egizii Electric. Start with that.

A. Okay.

Q. So all throughout 2013 there's several checks written to Egizii Electric and I was wondering what that would have been for?

A. I think when if you get to the tenant improvements you'll find that we picked up. Between three of the buildings we picked up about 40,000 feet of space that had to be rehabbed.

Q. In 2013?

A. I don't know. That building could be 2012, billed in 2013.

Q. Okay. And the same for BRH Builders. So --

A. Would have worked together.

Q. They worked together?

A. Sure.

Page 96

Q. Okay. And same with E.L. Pruitt?

A. And you'll probably find Davis Painting in there too and then a carpet guy. Basically what all four of them did together when a new tenant would come in.

Q. They would -- and so there are several payments throughout these years. So they would do the maintenance and new tenant?

A. When you see this large together, all those trades, those are changes in tenant improvements.

Q. Okay. And then the payments to the Egizii Electric, again there's several throughout the year in 2013. And that work would have been for various tenants?

A. Sure. Various work that we have to do for tenants.

Q. For tenants. Okay.

And then Egizii Property Managers, what would those payments have been for?

A. The manager that was on the site, like Dick Swain or Danny Jackson. Somebody that was on-site.

Q. What do you mean by that?

A. A real maintenance guy. A guy that every day made sure the air-conditioning worked and served the floors.

Q. So Egizii Property Managers would pay them?

A. Yes.

Q. I'm sorry. Springfield Prairie Properties would pay

24 (Pages 93 to 96)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 97

Egizii Property Managers for that?

A. We paid them a percentage.

Q. To manage it?

A. That's right.

Q. Okay. So the payments made to Egizii Property Managers would those have on been only payments with regard to the percentages --

A. Yes.

Q. -- from management and nothing else?

A. No.

Q. Okay. And then on page 52 there is a, it looks like a payment to Londrigan Potter for 130,000. I think that's probably part of the transfer we've already discussed. Would that be a fair statement?

A. I'm sure it is.

Q. Okay. I've also handed you statements for 2014 and I would can ask you the same questions about the various entities. Would I get the same answers?

A. Yes, you would.

Q. Or did something change? Okay.

On page 68 of 2014, there is various checks made payable to Scott & Scott. Were checks written for certain invoices in addition to -- well, despite the fact that they were holding retainers?

Page 98

A. Well, these look like they wash each other out.

MR. SCOTT: It was before the retainer was paid.

MS. HOUCK: Okay.

MR. GERMERAAD: There might have been a couple months where sent out the bill, the bill was paid from the retainer and then we also got a check, and that was a double payment but it wasn't meant to be double.

MS. HOUCK: That would explain some things.

MR. SCOTT: So they got credit for it?

MR. GERMERAAD: Yeah. So that was -- they thought it wasn't paid, but it was paid from retainer. We just applied it. So you would see -- when you look at our billing statements you'll see two payments like in the same amount.

THE WITNESS: There's plus and minuses.

MR. GERMERAAD: I don't know how many times that happened. I think it happened at least maybe once or twice.

(Document marked Deposition Exhibit No. 9.)

BY MS. HOUCK:

Q. Mr. Egizii, I put in front of you what's been marked as Exhibit No. 9. Can you identify this document for me?

A. It's bills from Londrigan & Potter.

Q. And I notice that some of the entries on the first page say spec retainer account. Actually all the entries on the first page have that type of notation. Do you see that?

Page 99

A. Yes, ma'am.

Q. And I notice on the second page there are no notations like that, and then on the third page there are some. Do you know what the difference or who issued the check to pay these items?

A. The girls in my office are similar to stature to you. They're pretty tough. They don't pay out of SPP for something that isn't SPP. They don't pay out of Robert Egizii something that belongs to Egizii Electric. So they go over every one of these bills, split them up the way they ought to be and pay them out.

Q. So it this document made by someone in your office then?

A. No. It doesn't look like it.

Q. It was produced by the Londrigan firm so I wasn't sure whether it was produced --

MS. DE SAINT PHALLE: That's from our bookkeeping records.

BY MS. HOUCK:

Q. That's what I thought.

Do you -- so I'm not sure what the -- your other answer was for, but pardon me for confusing you. I certainly didn't mean to. I was just trying to figure out why some of these entries say SPP spec ret account and some don't, and if

Page 100

you knew what that was about?

MS. DE SAINT PHALLE: I think I can clarify.

MS. HOUCK: If he doesn't know he doesn't know.

MS. DE SAINT PHALLE: Okay. Well --

THE WITNESS: I don't know. This isn't ours.

MS. HOUCK: Okay.

MS. DE SAINT PHALLE: But let me clarify for the record just because obviously it makes sense to get all the information out. The spec retainer was when the specific retainer account was set up by our office. Before that time, and I can't recall, I think it was sometime -- well, obviously -- well, I think it was sometime in late 2015 that the specific retainer account was set up by our office. But before that time Londrigan, Potter & Randle's billing included some amounts that were for SPP. Some amounts that were for other Egizii matters.

And I think what Mr. Egizii just said is their office would make sure that they -- they sent us -- you know, they'd send us a check for SPP for SPP work and Egizii Electric would send a check for Egizii Electric work or whatever. The problem is, you know, this is really getting into answering your subpoena and I just want to make sure this is done, is that our office we would make a deposit slip. So if we received a check from SPP and a check from Egizii Electric for Egizii Electric

25 (Pages 97 to 100)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 101

our office bookkeeper would just add the amounts together and that's our deposit slip. That's what was furnished to you.

In your recent subpoena to our office to clarify that, that's why that is. And, you know, as I said we're working on a response, but that's -- you have that question. That's why it is.

MR. SCOTT: So their deposits would not match up to the charges on their billing to SPP.

MS. DE SAINT PHALLE: Right. Exactly.

MR. SCOTT: That's what would happen because your deposits included payments from other sources.

MS. DE SAINT PHALLE: Right. And Mr. Egizii, as you just testified, you know, their bookkeeping would make sure that they wouldn't put Egizii Electric bills under the SPP account, their SPP account.

(Document marked Deposition Exhibit No. 10.)

BY MS. HOUCK:

Q. Mr. Egizii, what was put in front of you as Exhibit No. 10 is a letter to me from Perkins Coie enclosing copies of checks that appeared to have been -- appeared to have been signed by you, but again it looks like that rubber stamp I was talking about earlier because all your signatures look the same. But it appears these checks came from either Egizii Electric or Springfield Prairie Properties? Would that be a

Page 102

fair statement?

A. Yes, ma'am.

Q. And my question is: Why were some of these paid by Egizii Electric and some paid by Springfield Prairie Properties?

A. They did some work for us and so EMT Electric would have paid them.

Q. So Egizii would have paid --

A. Perkins Coie.

Q. Okay. And same with the Springfield Prairie Properties checks?

A. Yes, ma'am.

Q. Okay.

(Document marked Deposition Exhibit No. 11.)

Q. The court reporter just put in front of you Exhibit No. 11, and that is three, four pages of copies of checks that appear to be written from Prairie State Bank and Trust, and my question is, on some of these the remitter is Springfield Prairie Properties on other ones the remitter is Londrigan Potter, do you know why that is?

A. No, I do not.

Q. Okay.

(Document marked Group Deposition Exhibit No. 12.)

MS. DE SAINT PHALLE: Would you want me to explain

Page 103

what that --

MS. HOUCK: No. I think it probably would be best if -- maybe if you just put it in writing to me.

MS. DE SAINT PHALLE: All right.

MR. SCOTT: Copy me so we know what --

MS. HOUCK: What?

MR. SCOTT: Copy us on the letter so we know as well so we can match it up, but I think I know what it is.

BY MS. HOUCK:

Q. Mr. Egizii, the court reporter just put in front of you Group Exhibit No. 12, and I will represent to you that this is an E-mail that I received from Larry Sullivan and I think we touched on Mr. Sullivan a bit earlier today. And on the bottom of the first page it looks like Susan West or Vogler-West, I guess she goes by now, sent Mr. Sullivan financial statements for Springfield Prairie Properties for 2012/'13. Does that appear to be correct?

A. That's our sheets it looks like.

Q. I'm sorry?

A. It our sheets.

Q. What did you call them?

A. I called them our sheets, but --

Q. Oh. Okay.

A. But he hasn't gotten his hand on them yet. So I'm

Page 104

not sure if Jason can change them around.

MR. GERMERAAD: It's called technology.

MR. SCOTT: This is would be the rough one I've seen.

BY MS. HOUCK:

Q. So it appears as though Susan West would have sent these Springfield Prairie Properties documents to Larry Sullivan?

A. Yes, ma'am.

Q. Would that have been under your direction to do so?

A. Yes, ma'am.

Q. Okay. And you had stated earlier that you hired Mr. Sullivan?

A. Yes, I did.

Q. Okay. Do you recall what you paid him?

A. No, I don't.

Q. And you hired him to be a consultant for Springfield Prairie Properties?

A. To deal with the banker, I can't remember his name, that he knew.

MR. SCOTT: Clarkson. Bill Clarkson.

BY MS. HOUCK:

Q. Oh. Bill Clarkson. And I'm sorry did you say that Mr. Sullivan said he knew Bill Clarkson?

A. Yes, he did.

26 (Pages 101 to 104)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 105

Q. Okay. In looking at the balance sheets, looking at the one that says as of December 31 2012, and then the balance sheet has, let's say, September 20, 2013, and where it says assets on December 31, 2012, there appears to be one checking account. And then I noticed as of the sheet -- the balance sheet that has the date as of September 20, 2013, has two checking accounts. Can you tell me why a second checking account would have been opened for Springfield Prairie Properties?

A. You're looking at the balance sheet and it shows two checking accounts?

Q. I am.

A. On December 31, 2012.

Q. That one only shows one. And then when I look at the one that says as after September 20, 2013, underneath it where it says current assets, checking/savings it says Londrigan Potter, which it didn't say on 2012, Scott & Scott trust account, which it was not on 2012, and then also added Bank of Springfield two, which was not on 2012.

I think we've discussed ad nauseam the Londrigan, Scott & Scott trust accounts, but I did not ask earlier about the second checking account that was opened, or appears to have been opened. My question is why that was?

A. I don't know.

Page 106

Q. Okay.

MR. SCOTT: You're referring to Londrigan's Bank of Springfield, Roman Numeral II?

BY MS. HOUCK:

Q. Yes.

A. Most of the time we have two checking accounts. One is escrow for taxes.

Q. Okay. So you believe that might have been why?

A. It could be. I don't know why it doesn't show it in 2012.

Q. I will represent to you that the documents, the checking account ledgers that we did receive from Springfield Prairie Properties clearly has two checking accounts, and not until I believe 2013.

A. Okay.

Q. And these documents that you were just looking at, these were created by someone at your office, correct?

A. I believe so.

Q. All right. I know the E-mail says it came from Susan West. Would she have been someone that would have created these?

A. Yes.

Q. Okay.

(Document marked Group Deposition Exhibit No. 13.)

Page 107

BY MS. HOUCK.

Q. Mr. Egizii, the court reporter put what's marked as Exhibit 13 in front of you, Group Exhibit 13. These are documents I received from the Scott & Scott firm. And my first question is, on the very first page or the second page of the letter why Scott & Scott would be -- why a law firm would be writing a check to E.L. Pruitt for $100,000?

A. That was for the Ridgely Building. I think there should be two checks really because we paid more than that. For the water chiller -- complete water chiller for the 12-story building.

Q. Why would Scott & Scott be paying for that?

A. We didn't have any money left.

MR. SCOTT: This it the trust account. It's not a Scott & Scott account. It's a trust account.

BY MS. HOUCK:

Q. I'm sorry. The Scott & Scott trust account.

(Document marked Group Deposition Exhibit No. 14.)

Q. All right. Mr. Egizii, the court reporter put in front of you Group Exhibit 14, and can you identify these documents for me, please?

A. It's a legal representation letter from Perkins Coie to me.

Q. Dated July 12, 2013?

Page 108

A. July 12, 2013.

Q. And I believe we do have a clean copy of this. It states it was for representation on a guarantee agreement. Somebody gave it to me. Maybe it was Palmen & Dole? And is that your signature on the -- what's marked PC29 on the bottom?

A. Yes, it is.

Q. Okay. And then the next document is, can you identify who that letter is from?

A. That is from Londrigan Potter.

Q. All right. And the date of --

MR. SCOTT: Is that a separate --

BY MS. HOUCK:

Q. -- document?

MR. SCOTT: Is that a separate exhibit?

A. 9 --

BY MS. HOUCK:

Q. No.

A. -- 23/14.

Q. And does your signature -- is that your signature on page 525?

A. Yes, it is.

Q. And do you recall receiving that engagement letter?

A. Yes, I do.

Q. And the first one as well?

27 (Pages 105 to 108)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 109

A. Yes, I do.

Q. And what is the next one?

A. It's another one for Perkins Coie.

Q. Dated?

A. 9/23/14.

Q. Okay. And does your signature appear on this document on page 216?

A. Yes.

Q. And do you recall receiving that engagement letter as well?

A. Yes, I did.

Q. Okay. And the next document?

A. Sgro, Hanrahan, Durr.

Q. And that's dated October 7, 2014?

A. Yes, ma'am.

Q. And is that your signature on page 5? It should be the last page.

A. I ran into a lot of signatures here.

MR. SCOTT: Just look at the top document there.

BY MS. HOUCK:

Q. Yeah. Just the last page of the top document.

A. That's mine.

Q. You acknowledge receipt of that as well?

A. Yes, I do.

Page 110

Q. Okay. And the next document.

A. This is Scott & Scott.

Q. Dated?

A. 23rd.

Q. Of September?

A. Of September 2014.

Q. Okay. And is that your signature on the third page, the last page, rather?

A. Yes, it is.

Q. And you acknowledge receipt of those engagement letters as well?

A. Yes, I do.

Q. Okay.

MR. SCOTT: This one is -- this is Scott & Scott and this one is Londrigan Potter. That's the difference.

MS. HOUCK: Okay.

MR. SCOTT: This is the Scott & Scott one.

BY MS. HOUCK:

Q. Have we reviewed all of them?

A. Yes.

Q. Okay.

A. I'm putting them back in the order you gave them to me.

Q. Okay.

Page 111

MR. SCOTT: Did you give a set to the court reporter already?

MS. HOUCK: I did.

MS. HOUCK: Mr. Egizii, I think that's all I have for now. I typically will lay a foundation for every business record that he testified about, but since I doubt very much he won't be at trial I did not do that. I can do that for each document now or do you want to --

MS. DE SAINT PHALLE: What documents are you referring to?

MS. HOUCK: The operating agreement. The ones that are just his. The business records.

MS. DE SAINT PHALLE: Oh. I think we'll stipulate that they're his business records.

MS. HOUCK: Stipulate to that?

MR. SCOTT: Yeah.

MS. HOUCK: I figured I'd save everybody a lot of time doing that. All right. I'm going to let your counsel ask you some questions. I may have one or two followup, but that's it. I really appreciate your time.

MS. DE SAINT PHALLE: Well, before I ask any questions, I may not have any questions. So I really want to ask you.

MS. HOUCK: Sure.

Page 112

MS. DE SAINT PHALLE: The magistrate indicated at the end of that last conference that we could let him know at the end of this deposition, you know, whether there was anything that we could agree to or find out that's still outstanding, because we've got these motions to quash the lawyers depositions. And I want to make sure that you have had every opportunity to ask Mr. Egizii questions that you have. I have tried during this deposition to volunteer any information regarding the billing or the like.

And because I want to just get on the record, you know, at the end of this deposition it doesn't appear to me that there's any additional information that you need from the lawyers. And, you know, I think that the judge wants us to make a progress report at the end of this deposition because there have, you know, there may have been new information or whatever and I'm just not seeing that there is any additional information that you need from the lawyers that you have not been able to elicit already from Mr. Egizii.

MS. HOUCK: We can discuss that tomorrow if that's okay with you since the deposition just ended. I will go back through my notes and look through everything and see if I have any open questions. If I do I'll address them with each and everyone of you and we'll go from there. How's that?

I just can't -- I just don't want to answer the

28 (Pages 109 to 112)

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

Page 113

question right off of finishing the deposition.

MS. DE SAINT PHALLE: Okay. You, know, that's fine.

MS. HOUCK: You're in a different position. You're sitting --

(Overlapping conversations.)

MS. HOUCK: -- and I'm active. So it's harder for me to just say, oh, yeah, I got everything I need.

MS. DE SAINT PHALLE: Well --

MS. HOUCK: I'm sure you understand.

MS. DE SAINT PHALLE: I do understand but I also, you know, just want to again call it to your attention that, hey, we need to get together.

MS. HOUCK: You are correct. We need to make that decision. You're right. So we can revisit that --

MS. DE SAINT PHALLE: Advise the judge.

MS. HOUCK: -- tomorrow.

MS. DE SAINT PHALLE: Otherwise, I don't think I have any questions. I think you've answered everything that I thought you needed to get out.

MR. SGRO: I don't intend to ask any questions.

MR. SCOTT: I don't think we have any, but I just have a question of you, Greg.

MR. SGRO: Sure.

MR. SCOTT: See if I have a question.

Page 115

REPORTER CERTIFICATION

I, ROBIN L. STRANIMEIER, a Registered Professional Reporter and Certified Shorthand Reporter in the State of Illinois, DO HEREBY CERTIFY that pursuant to agreement between counsel there appeared before me on March 27, 2018, at Londrigan, Potter & Randle, 1227 South Seventh Street, Springfield, Illinois 62703, ROBERT EGIZII, who was first duly sworn by me to tell the whole truth of all knowledge touching upon the matter in controversy aforesaid so far as the witness should be interrogated concerning the same; that the witness was examined and said examination was taken down in shorthand by me and afterwards transcribed, signature having been WAIVED, and said deposition is herewith returned.

Dated this 6th day of April, 2018.

_____
Robin L. Stranimeier, RPR, CSR
CSR #084-004700
RPR #058512

Page 114

(Brief break taken.)

(Back on the record.)

MS. HOUCK: Can we be done with this? Can she go?

COURT REPORTER: Counsel, I need to get your transcript orders on the record.

MS. HOUCK: I'll do a mini with a table of contents.

MS. DE SAINT PHALLE: I'll order a copy. Etran is fine. And I think my E-mail address is on the card.

(Signature waived.)

(Deposition concluded at 3:12 p.m.)

* * * * *

29 (Pages 113 to 115)

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

**A**

**a.m** 2:17
**able** 34:15
  112:18
**account** 35:3,5
  36:1 57:9,12
  72:12 82:13
  89:24 90:2,2,3
  90:16,16,18,22
  90:23 98:23
  99:24 100:10
  100:13 101:15
  101:15 105:5,8
  105:18,22
  106:12 107:14
  107:15,15,17
**Accountant** 36:2
  36:3
**accounting**
  24:22,23 25:2
  25:3 38:15
  62:18,21,23
  76:6
**accounts** 81:15
  82:11 83:22
  90:4,5,20
  105:7,11,21
  106:6,13
**accurate** 71:6
  77:20 85:6,19
**acknowledge**
  109:23 110:10
**acquainted**
  27:18
**acquired** 22:9
**active** 113:6
**actual** 27:6
  28:21 33:10
  38:12 74:14
  83:23
**ad** 105:20
**Adams** 14:19
**add** 89:6 101:1
**added** 105:18
**addition** 97:23
**additional**

112:12,16
**address** 9:14
  13:20 15:13
  69:17,20 80:7
  112:22 114:8
**addressed** 69:23
**administrative**
  18:19 34:3
**admitted** 83:20
**advance** 76:11
  76:13,15 82:7
**advise** 74:19
  113:15
**advised** 63:18
**affiliated** 14:23
**affiliation** 16:2
**afford** 53:2
**aforesaid** 115:9
**agents** 33:5
**ago** 20:17 27:12
  31:9 37:4
  87:24
**agree** 112:4
**agreed** 7:13 52:4
  72:23 90:15
**agreement** 18:20
  18:21 42:21
  44:3,11 45:22
  46:20,21 47:21
  48:5,12,17,22
  49:5 50:2,4
  57:17 60:3
  61:5 108:3
  111:11 115:4
**ahead** 17:9 72:6
  77:11
**air-conditioning**
  96:21
**airline** 32:9
**Airport** 40:17
**Alex** 9:9 88:13
  90:13,14
**alex@lprpc.com**
  3:15
**Alexandra** 3:11
**allegation** 80:24

83:20
**allegations** 78:19
  82:1
**alluded** 73:8
**altogether** 53:4
**amend** 43:8
**amended** 78:20
**amendment**
  42:20,23 43:10
  43:12,15,24
  44:2,4,17,24
  45:7,8,21,22
  45:24 46:3,20
  46:22 47:10
**amendments**
  44:12 46:24
  47:1,2,6 54:9
  85:12
**amends** 43:5
**America** 1:5 6:5
**amount** 74:21
  75:5,6,7,7,10
  76:12 83:23
  89:24 98:13
**amount's** 83:8
**amounts** 74:12
  83:9 100:14,15
  101:1
**annual** 30:10
  31:3,12
**answer** 8:17 9:1
  9:3 79:13
  99:22 112:24
**answered** 55:22
  113:18
**answering** 70:18
  100:21
**answers** 78:22
  97:18
**anticipation**
  11:23 12:3
**anybody** 76:18
  90:5
**anymore** 30:22
**anyway** 76:24
**apart** 26:18

**apologize** 38:16
  49:19 50:7
  78:11
**appear** 102:17
  103:17 109:6
  112:11
**appeared** 101:20
  101:20 115:5
**appears** 39:2
  101:23 104:5
  105:4,22
**applicable** 8:9
**applied** 98:11
**appointment**
  18:8
**appreciate**
  111:20
**apprentice** 64:2
  64:3,6,18,21
**approval** 47:7
**approve** 54:11
  82:21
**approved** 47:1
  47:16,17 52:18
  52:19
**April** 60:7
  115:14
**arbitrated** 18:14
**arbitration**
  18:12
**arbitrations**
  18:7
**area** 88:1,5
**Arizona** 65:24
**articles** 33:11
**asked** 14:8 29:3
  31:18 49:15,19
  50:7 61:17,21
  70:4,5,8 89:4
**asking** 29:3 32:3
  41:1 52:15
  77:7 79:9,12
  88:17,18 90:8
  90:21
**assets** 105:4,16
**assistant** 26:10

34:3 70:17
**Association** 1:3
  1:14 6:3,14
  18:16
**assume** 33:17
  44:1,9 46:11
  61:20 63:22
  75:1
**assuming** 30:22
**attached** 5:20
  47:20
**attend** 29:18
  30:13 31:2,7
**attending** 31:21
**attention** 113:11
**attorney** 9:2
  21:10 31:6,11
  90:8,9
**attorneys** 12:12
  21:9 32:3
  43:19
**Avenue** 9:15
  44:7

**B**

**B-e-i-m-f-o-h-r**
  59:17
**back** 24:16
  29:21 31:9
  37:3,4,4 44:23
  48:20 52:21,21
  62:1,3 63:12
  64:1 69:1,3
  70:5 80:23
  84:11,20 85:15
  91:19 110:22
  112:20 114:2
**background**
  63:21
**backtrack** 84:20
**bad** 12:20 14:7
**balance** 62:12
  84:2 91:6
  105:1,2,5,10
**bank** 1:3,5,7,14
  6:3,5,7,14

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

13:14,20 14:11
51:20 102:17
105:18 106:2
**banker** 104:18
**bankruptcy** 13:1
13:3
**Baptist** 2:4 7:4
**basic** 41:7
**basically** 23:12
37:23 46:14
96:3
**becoming** 58:12
**beginning** 61:13
63:7
**behalf** 2:15 7:14
42:17 49:12
60:16
**Beimfohr** 2:6
7:6 12:19
58:19 59:16,17
**believe** 32:21
38:21 49:21
51:13 54:4
57:16,24 63:5
74:8 79:16
86:11,15 89:6
90:12 106:8,14
106:18 108:2
**belong** 58:8
**belongs** 99:9
**Benedictine**
17:22
**Berkadia** 80:2,4
**best** 50:20 58:22
79:13 88:11
103:2
**better** 22:14
34:12
**bid** 50:24
**big** 68:5,15
**bigger** 83:11
**biggest** 59:9,9
**bill** 79:8 98:5,5
104:20,22,23
**billed** 95:19
**billing** 35:24

98:12 100:14
101:8 112:9
**bills** 36:22 38:4
38:5,20,22
76:22,23 98:21
99:10 101:14
**birth** 9:16
**bit** 103:13
**Blagojevich**
34:14
**Bloomington**
40:17
**board** 29:15
30:5
**Bob** 93:19
**boiler** 92:22
**bond** 74:4,11,14
74:16
**bonds** 74:19
**bonuses** 56:16
**book** 33:11
**bookkeeper**
101:1
**bookkeeping**
99:17 101:13
**books** 33:16,23
34:1 37:10,24
38:1 61:10
62:10,11
**born** 67:20
**borrower** 78:22
**Boston** 1:9 6:9
**bother** 70:18
**bottom** 43:10
45:9 91:24
103:13 108:5
**bought** 59:5
66:2,3,16
67:22,24 68:13
68:16
**bound** 91:4
**Boys** 17:14
**break** 8:19 67:12
67:13,18 68:21
68:24 114:1
**Brenda** 70:16,16

**BRH** 22:18
23:10,11,16
24:19 25:3
27:13,14 28:8
28:9,19 37:17
39:23 40:6,14
40:16,21,22
41:14 59:15
94:15 95:21
**Brief** 68:24
114:1
**broker** 51:2
66:17
**BRUCE** 4:3
**Builders** 22:18
23:10,11,16
25:3 27:14
28:8,9,19
37:17 39:23
40:6,14,16,22
41:14 94:16
95:21
**building** 14:9,12
14:16,18,20,21
14:23 21:16
23:15 24:5,10
24:17,18 36:18
40:19,19 53:24
54:9 55:24
92:9 95:19
107:8,11
**buildings** 43:4
50:13 92:6
95:15
**built** 67:2,2 68:9
**bulk** 39:14
**business** 11:16
18:9,10 23:12
28:9,12 50:10
55:13 58:23
63:23 65:7,8
65:13,15 66:8
66:11,18,20
111:5,12,14
**businesses** 18:1
**busy** 32:16 52:9

**buying** 67:23
68:11,12
**bylaws** 50:2
84:24 85:5,6
85:10,13

———————
**C**
———————
**C** 3:1
**C.S.R** 2:22
**calculation**
72:16
**calculations** 73:7
73:16,17 81:6
**California** 19:18
20:15,19
**call** 13:16 15:2
21:16 103:21
113:11
**called** 15:22
20:10 22:7
55:15 61:8
66:23 67:3
74:3 103:22
104:2
**calling** 78:14
**Canaveral** 68:2
68:4
**CANFIELD** 3:3
**Cap** 1:16 6:16
**Cape** 68:2,4
**capital** 58:4,6
**Cara** 3:4 93:16
**card** 114:8
**care** 52:9 92:15
93:13
**career** 68:19
**careers** 32:10
**Carlinville** 88:9
**Carolina** 87:10
**carpenters** 41:5
**carpet** 96:3
**carried** 17:6
**case** 1:5,7 6:5,7
12:13 13:10
15:7 16:22
19:10 20:19,19

20:20,22 21:18
21:19,22 33:14
39:2 61:17
70:4,9 77:13
78:19 80:24
**cases** 18:14,16
**Cathedral** 17:14
**cease** 45:15
**ceased** 51:6 52:1
52:3 53:4
**Central** 1:2 6:2
59:9 65:21
**CEO** 22:4,5,23
23:1 26:2
32:14
**certain** 61:19
77:14,17 78:19
81:1 97:22
**certainly** 67:14
99:22
**certificate** 28:21
28:23 29:7
32:7
**certificates** 1:11
1:18 6:11,18
32:6
**CERTIFICA...**
115:1
**certifications**
18:3
**Certified** 7:19
115:3
**CERTIFY** 115:4
**chairman** 19:8
**chairmen** 19:7
**chance** 71:12
**change** 31:1
32:10 41:5
43:11 44:8
83:21 97:20
104:1
**changed** 30:14
41:5 85:11
**changes** 96:9
**Chapter** 18:6
**charge** 35:5

Page 2

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

| | | | | |
|---|---|---|---|---|
| 49:16 50:15,17 83:13 | 59:17 | 70:5 | 41:16 69:8 74:3 84:23 | **counting** 68:20 |
| **charges** 101:8 | **Coie** 19:17,18,22 19:24 20:18,21 | **concerning** 115:10 | 85:6,15,19 103:5,7 108:2 | **couple** 59:22 75:23 78:21 |
| **check** 38:10 73:2 76:22 81:23 | 77:16 81:21 82:15 101:19 | **concluded** 114:10 | 114:7 | 79:16 87:22 98:4 |
| 98:6 99:4 100:19,20,23 | 102:9 107:22 109:3 | **concrete** 40:21 **condition** 53:8 | **corner** 14:18 **Corp** 1:10 6:10 | **court** 1:1 6:1 8:9 21:19,19 41:17 |
| 100:24 107:7 | **college** 17:18 | **condo** 15:16 | **corporate** 31:15 | 41:19 79:17,20 |
| **checkbook** 62:6 | 18:4 63:22 | **conducted** 5:3 | 33:10,15 50:2 | 91:3 102:15 |
| **checking** 35:3 | **columns** 93:23 | 32:14 | 50:5 57:14 | 103:10 107:2 |
| 57:9,11 105:4 | **combined** 17:16 | **conference** | 60:9 61:10 | 107:19 111:1 |
| 105:7,7,11,22 | **come** 8:18 20:9 | 112:2 | 62:4 86:1 | 114:4 |
| 106:6,12,13 | 30:21,24 53:3 | **confuse** 94:11 | **corporation** 2:8 | **cousin** 58:18 |
| **checking/savi...** | 91:16 96:4 | **confusing** 82:9 | 2:9 4:1 7:8,9 | **cover** 75:15 |
| 105:16 | **coming** 50:23 | 92:19 99:22 | 84:21 | **Cravens** 72:2 |
| **checks** 38:22 | **commercial** 1:10 | **confusion** 94:13 | **Corps** 63:24 | **created** 44:11 |
| 39:1 40:15 | 1:16,17 6:10 | **conjunction** | **correct** 16:18 | 47:6 51:17,19 |
| 41:2 57:6 62:7 | 6:16,17 66:5 | 19:3 | 18:2 21:19 | 55:15 76:2 |
| 72:4 75:1 92:4 | 68:18 | **construction** | 22:17 25:4 | 106:17,20 |
| 92:5 93:3 | **Communicati...** | 11:16 18:11 | 29:8 32:11 | **credit** 1:8 6:8 |
| 94:15,22 95:8 | 22:9 | 41:7,8 63:23 | 37:17,18 39:2 | 39:8 98:9 |
| 95:11 97:21,22 | **companies** 33:6 | 64:5 | 40:4,5 42:8,9 | **crossed** 43:23,23 |
| 101:20,23 | 33:7,8 86:4,17 | **consultant** 20:5 | 42:18,19 43:3 | **CSR** 115:16,17 |
| 102:11,16 | 86:18 | 104:16 | 43:4 44:18,19 | **curious** 41:3 |
| 107:9 | **company** 1:24 | **contacted** 61:18 | 45:11 46:1,4 | **current** 105:16 |
| **Chicago** 3:6 | 2:11 6:24 7:11 | **contain** 74:9 | 47:4 49:22 | **currently** 22:1 |
| **children** 10:4,23 | 12:9 13:13,18 | **contents** 63:18 | 51:23 52:2 | 23:6 |
| 11:9 | 13:18 22:10,10 | 114:6 | 53:15 55:24 | |
| **chiller** 107:10,10 | 22:11 26:11 | **continue** 67:23 | 58:14,17 60:5 | **D** |
| **CIPS** 65:19,20 | 27:8,9 31:5 | 82:17 | 60:19,22,23 | **D** 5:1 |
| **circulated** 32:22 | 33:21 34:22 | **contract** 24:19 | 66:19 72:9,10 | **D&O** 32:24 |
| **City** 59:18 | 35:9 41:7,8 | 34:6,7,19 56:4 | 73:14,15 76:8 | **dad** 65:14,17 |
| **Civic** 7:15 | 42:11 55:3 | **contractor** 22:11 | 78:7 79:13 | 66:8 |
| **Civil** 8:8 | 59:5,8 65:17 | 34:20 59:18 | 80:1,7,8,9 81:2 | **dad's** 66:7 |
| **clarify** 100:2,7 | 67:2,3,9 68:5 | **Contractors** | 82:19 83:9 | **daily** 38:20 |
| 101:3 | 88:8,19 92:2 | 18:16 | 103:17 106:17 | **dams** 68:2 |
| **Clarkson** 104:20 | **compensation** | **controversy** | 113:13 | **Danny** 96:18 |
| 104:20,22,23 | 56:14 | 115:9 | **correctly** 8:19 | **dark** 93:13 |
| **Clay** 58:19 | **complaint** 78:20 | **conversations** | **corresponded** | **date** 9:16 37:4 |
| **clean** 108:2 | 80:23 81:3 | 84:1 113:5 | 89:8 | 89:7,9,15 |
| **clear** 53:22 | 82:13 83:16 | **convicted** 12:5 | **cost** 28:11 40:10 | 105:6 108:10 |
| **clearly** 106:13 | **complete** 107:10 | **copies** 31:18 | **counsel** 7:13 9:6 | **dated** 42:5 60:7 |
| **climb** 65:4 | **complex** 26:13 | 32:4 61:11 | 9:8 41:21 | 107:24 109:4 |
| **close** 75:16 | **complied** 7:22 | 71:6 85:9 | 51:14 63:15 | 109:14 110:3 |
| **Clyde** 2:6 7:6 | **compliment** 67:8 | 101:19 102:16 | 70:8 111:18 | 115:14 |
| 12:19 59:14,16 | **computers** 38:2 | **copy** 32:6 33:15 | 114:4 115:5 | **dates** 37:9 |

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

**Davis** 96:2
**day** 89:11 92:11
  92:14 96:20
  115:14
**days** 87:22
**de** 3:11 29:5
  48:20,24 77:18
  77:22 78:4,6
  88:15,17,22
  89:3 99:17
  100:2,4,7
  101:9,12
  102:24 103:4
  111:9,13,21
  112:1 113:2,8
  113:10,15,17
  114:7
**deal** 104:18
**dealing** 36:16
**Decatur-Cha...**
  88:1
**December** 45:1
  45:1 91:22
  105:2,4,13
**decided** 20:12
  34:14
**decision** 71:22
  72:20 73:3
  113:14
**decisions** 19:4
  32:18 55:8,9
  84:4
**deduction** 52:6
**deed** 20:3
**default** 51:8,11
  51:15,19 54:15
  54:18 78:24
  79:1,2,4,5,14
  79:17
**defaulted** 78:23
  79:11
**defendant** 12:7
**Defendants** 2:12
  7:12
**degree** 17:22
**demanded** 54:2

**denial** 78:24
**denying** 78:24
**dependent** 39:23
**depending** 65:2
  92:20
**deposed** 8:4
**deposit** 100:23
  101:2
**deposition** 2:14
  7:14,20 8:7,13
  11:13,20,24
  24:2 79:19,21
  80:10 84:19
  89:17 91:2
  98:17 101:16
  102:14,23
  106:24 107:18
  112:3,8,11,14
  112:20 113:1
  114:10 115:13
**depositions** 7:16
  112:6
**deposits** 78:13
  101:7,11
**Deranda** 90:4
**derive** 75:6
**describe** 24:9
**description**
  48:14
**despite** 97:23
**detail** 91:6
**determination**
  29:11
**detriment** 26:8
**Dick** 96:17
**difference** 82:6
  90:1 99:4
  110:15
**different** 26:4
  30:14 35:6
  38:24 48:18
  51:22 70:12
  74:12 77:9
  81:8 85:9
  93:20 94:4
  113:3

**dinner** 37:13
**direct** 35:12
  82:20
**Directing** 73:13
**direction** 90:22
  104:9
**director** 88:11
**directors** 29:15
  32:22
**disbursed** 81:1,4
**disbursements**
  84:6
**discovering** 39:1
**discovery** 89:8
**discuss** 112:19
**discussed** 14:15
  16:13 20:3
  21:17 24:4
  43:6 47:2
  97:13 105:20
**discussing** 32:4
  32:21
**discussion** 61:24
  62:3 91:18
**dispersed** 82:17
**disputed** 72:11
  77:13
**distributed** 75:5
**distribution**
  75:20 82:1
**distributions**
  71:20 72:17,19
  75:19
**DISTRICT** 1:1
  1:2 6:1,2
**dividends** 28:16
  28:17 29:12
**division** 22:20
  22:22 26:22
**divisions** 22:23
  28:4,5,7 87:1
**divorce** 10:8,17
  11:1
**divorces** 11:21
**document** 29:5
  41:20 42:1,20

44:2,23 45:21
  47:20,22,24
  48:2,23 51:13
  57:19,20 69:4
  79:19,22 80:10
  80:11,13 84:19
  85:2 89:17,19
  91:2,6,21 95:8
  98:17,20 99:12
  101:16 102:14
  102:23 106:24
  107:18 108:7
  108:13 109:7
  109:12,19,21
  110:1 111:8
**documents**
  11:23 12:1
  28:12 29:1,3
  33:14 41:18
  50:3,5 57:14
  58:21 60:10
  61:18,19,20,21
  62:5 63:18,19
  69:6 75:23
  88:14,19,23
  91:4,8 104:6
  106:11,16
  107:4,21 111:9
**doing** 22:13
  52:10 62:17
  77:3 111:18
**Dole** 38:7,8,13
  38:14 62:23,24
  69:7 71:23
  72:5,15 74:20
  75:10 76:13,21
  78:8 108:4
**dollars** 28:11
  46:13,14 54:3
  76:18 80:16
**Dorsey** 87:7
**double** 98:6,7
**doubt** 111:6
**downtown** 13:13
  13:22,24 15:20
  21:11,15 36:18

**draft** 43:16 44:3
  45:22
**drafted** 42:23
  43:15 47:24
**draw** 24:5
**Ducarry** 59:23
**duly** 115:7
**Durr** 4:3 109:13

---

**E**

**E** 3:1,1 5:1
**E-g-i-z-i-i** 8:12
**E-mail** 69:12,15
  69:17,23 70:12
  70:22 90:12
  103:12 106:19
  114:8
**E-mails** 70:6,9
  71:6,7,7
**E.L** 87:15 92:2,4
  92:16 96:1
  107:7
**earlier** 11:12
  53:21,22 56:7
  57:23 101:22
  103:13 104:11
  105:21
**early** 31:10
  66:19
**earned** 76:19
**easier** 95:7
**East** 3:20
**education** 17:11
**Edwards** 59:23
**EEI** 2:7 4:1 7:7
  9:13 21:24
  22:7,11,17,19
  22:24 23:6,14
  24:11 25:3,14
  25:16 28:1,3,5
  28:15 29:1,7
  31:12 32:24
  36:8 37:10,16
  39:5,11,18,21
  39:22 40:3
  46:1 49:15

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

56:19 57:7,9
70:1,3 73:18
77:15 84:9,16
84:20 85:5,7
85:17 86:8,10
86:20 87:1,18
88:19 89:15
**eei.com** 69:20
**effect** 7:21
**Egizii** 1:24 2:1,2
  2:3,9,14 4:1
  6:24 7:1,2,3,9
  7:14 8:2,10,12
  12:19 13:19
  14:1,3,8 22:8
  22:18 23:10,15
  24:11 25:3
  28:8 33:22
  34:24 35:2,7
  36:5,6,8,9,11
  37:8,10,16,23
  38:19 39:20,22
  40:4,15,16,20
  40:21 42:4,8
  43:3 44:6
  46:15,18 49:12
  49:16,20 50:1
  50:8,10,15
  51:6,9,22 53:4
  53:12,14,23,24
  54:5,8,13,19
  54:19 57:2,4,6
  57:8 58:18
  62:6 67:4,5,15
  67:20 69:5
  70:1 76:22
  77:14,19,24
  78:2,9 79:20
  81:23 84:4,10
  84:10,15 86:10
  89:19 91:3
  93:4,11 94:22
  94:24 95:9,12
  96:10,15,22
  97:1,5 98:19
  99:8,9 100:15

100:17,19,20
100:24,24
101:12,14,18
101:23 102:4,8
103:10 107:2
107:19 111:4
112:7,18 115:7
**EGIZZI** 5:2
**eight** 11:4 64:17
  64:18
**either** 21:13,21
  21:22 31:16,22
  58:14 71:15
  73:21 87:10
  101:23
**electric** 13:19
  14:3 18:15
  22:8,18 23:10
  23:15 24:11
  28:8 33:22
  36:5,6,8,9,11
  37:8,11,17
  38:19 39:22
  40:4,15,16,20
  40:21 42:4,8
  43:3 44:6
  46:16,18 49:16
  51:6,9,22 53:4
  53:9,13,14
  54:5,8,19 57:2
  57:4,6,8 67:4
  67:15,20 70:1
  76:23 77:14,19
  78:1,2,9 81:23
  84:10,15 86:10
  88:4 93:4,11
  95:9,12 96:10
  99:9 100:19,20
  100:24,24
  101:14,24
  102:4,6
**Electric's** 67:5
**electrical** 18:11
  59:18 64:4,6
  65:16,17,18,19
  66:1,8,10

**electrician** 66:24
**electricians**
  24:14
**elicit** 112:18
**elicits** 8:17
**Email** 3:8,15,23
  4:8
**employed** 9:10
  21:24 35:18
  37:8
**employee** 38:12
  38:14
**employees** 23:6
  37:22 38:18
  50:8 69:19
**empty** 34:15
**EMT** 102:6
**enclosing** 101:19
**ended** 22:14
  112:20
**engagement**
  108:22 109:9
  110:10
**engineer** 65:19
**entered** 63:12
**entire** 45:3,13
**entities** 33:24
  36:4,11 84:9
  97:18
**entitled** 44:2
**entity** 14:4,22
  16:2 55:15
  56:14
**entries** 98:22,23
  99:24
**EPM** 34:23
  56:15,20 84:13
  85:17
**equal** 16:4
**escrow** 81:15
  106:7
**Esq** 3:4,11,18,19
  4:4
**estate** 66:18
**estimate** 23:22
**estimators** 24:16

**ethic** 65:2
**Etran** 114:7
**event** 8:23
**eventually** 88:12
**everybody** 73:2
  111:17
**everyday** 23:4
**exact** 75:7
**exactly** 50:10
  75:14,16 101:9
**examination** 8:5
  115:11
**examined** 8:3
  115:11
**Excel** 93:22 94:6
**exhibit** 5:6,7,8,9
  5:10,11,12,13
  5:14,15,16,17
  5:18,19 41:17
  41:18,19 47:21
  57:19,21 69:4
  69:6 79:19,21
  80:10,12 84:19
  84:22 89:17,20
  91:2,5 94:19
  98:17,20
  101:16,18
  102:14,15,23
  103:11 106:24
  107:3,3,18,20
  108:14
**exhibits** 5:4,20
  5:20 75:22
**expectation**
  16:24
**explain** 18:12
  93:16 98:8
  102:24
**explained** 74:24
**expressly** 7:23
**extended** 45:1

---
**F**
---

**facilitate** 20:6
**facility** 23:16,17
**fact** 41:8 48:16

49:9 59:5 71:6
  79:10 91:15
  97:23
**fair** 32:2 39:18
  58:11 73:3
  77:16 89:14
  97:14 102:1
**Fairington** 71:3
**family** 21:4,5
  58:16 65:24
**famous** 68:6
**far** 16:13 62:18
  63:22 115:9
**Fargo** 1:7 6:7
**fashion** 53:7
**fault** 94:12,12
**FBI** 40:19
**federal** 7:15 8:8
  21:19
**fee** 49:6
**feel** 75:13
**fees** 82:14
**feet** 50:24 92:12
  95:16
**felony** 12:5
**Fifty-six** 14:2
**figure** 21:14
  99:23
**figured** 64:14
  111:17
**filed** 13:1 16:16
  80:24
**filing** 13:3
**fill** 55:12
**filters** 92:22
**final** 82:22
**finances** 74:1
**financial** 103:15
**financials** 36:19
  38:6
**find** 34:9,10 51:3
  95:15 96:2
  112:4
**finding** 28:19
  50:19
**fine** 77:23 113:2

Page 5

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

| | | | | |
|---|---|---|---|---|
| 114:8 | 16:16 20:3 | 77:24 78:10 | greg@casevist... | **head** 22:11 27:3 |
| **finish** 8:24 67:14 | **foreman** 65:2,3 | 93:16,19 94:2 | 4:8 | **hear** 12:21 |
| 67:17 | **form** 55:12 72:4 | 94:6,12 98:4 | **Gregory** 4:4 | **heard** 20:10 90:4 |
| **finished** 64:2 | **formal** 30:5,9 | 98:10,15 104:2 | **ground** 8:16 | **hearing** 17:6 |
| **finishing** 113:1 | 31:21 32:13,15 | **getting** 27:20,20 | **group** 5:6,8,13 | **heart** 31:1 |
| **firm** 19:11,11,12 | 44:10,13 60:14 | 67:11 79:7 | 5:17,18,19 | **heat** 92:14 |
| 19:13 20:24 | **formally** 60:13 | 88:23 100:21 | 41:17,18,19 | **heating** 22:10 |
| 21:4 30:16,21 | **Fort** 15:18 | **girl's** 17:17 | 47:20 63:3,4 | 59:8 92:15 |
| 38:15 39:17 | **forth** 57:11 | **girls** 37:13 99:6 | 69:4,6 75:22 | **held** 30:9 32:24 |
| 88:14 89:2 | 84:11 | **give** 11:20 38:7 | 91:2,5,11 | 61:24 91:18 |
| 92:10 99:15 | **Forty** 30:18 | 89:15 111:1 | 102:23 103:11 | **help** 20:5 63:15 |
| 107:4,6 | **foundation** | **given** 8:13 11:12 | 106:24 107:3 | 66:20 |
| **firms** 19:9,11,14 | 111:5 | **giving** 90:21 | 107:18,20 | **helpful** 51:14 |
| 21:3 38:3 40:1 | **four** 18:8,18 | **go** 8:16 17:18 | **groups** 24:21 | **helping** 56:8 |
| 62:19 76:20 | 19:7 21:3 | 23:4 24:12,15 | **guarantee** 108:3 | **herewith** 115:13 |
| 77:9,16,19 | 47:14 62:19 | 24:16,16 31:9 | **guess** 22:14 32:3 | **hey** 113:11 |
| 81:5,8,14,15 | 65:1 77:9 81:8 | 41:24 48:20 | 59:15 88:20 | **high** 17:12,14,17 |
| **first** 1:9 6:9 9:24 | 96:3 102:16 | 50:19 51:2 | 103:15 | **higher** 55:2 |
| 10:4,17 21:17 | **friends** 58:22 | 63:22 70:5 | **guy** 20:7 27:12 | 83:13 |
| 37:8 43:5,8,10 | 59:20,22 | 77:11,21,23 | 96:3,20,20 | **hire** 19:24 20:5 |
| 43:14,15,16,22 | **front** 60:3 79:20 | 78:17 93:14 | **guys** 92:15 | 40:21 51:2 |
| 52:12 54:2 | 91:3,4 98:19 | 99:9 112:20,23 | | **hired** 41:13 |
| 66:3 67:22 | 101:18 102:15 | 114:3 | **H** | 104:11,16 |
| 68:1,8 69:12 | 103:10 107:3 | **go-to** 40:1 | **half** 12:2 17:19 | **history** 17:12 |
| 74:22,23 77:5 | 107:20 | **goes** 93:13 | **hand** 80:11 | 19:10 |
| 98:22,24 | **froze** 53:19 | 103:15 | 103:24 | **hold** 60:12 |
| 103:14 107:4,5 | **full** 8:10 34:13 | **going** 29:21 | **handed** 97:16 | **Holders** 1:8,15 |
| 108:24 115:7 | 46:8 | 33:18 34:14 | **handled** 19:22 | 6:8,15 |
| **fit** 93:23 | **fund** 28:5 | 35:11 41:16 | **handling** 50:11 | **holding** 2:7 4:1 |
| **Fitzgerald** 76:10 | **funds** 56:16 | 50:23 54:22 | **hands** 76:21 | 7:7 9:13 21:24 |
| 76:11 | 77:14 81:14,20 | 63:12 67:9 | **handwriting** | 22:7,12,18,24 |
| **five** 19:5 37:4 | 81:22,24,24 | 72:22 74:21,22 | 71:12,14 | 23:7,14 25:3 |
| 52:12 64:23 | 82:7,16 84:11 | 78:20 79:17 | **handwritten** | 25:15,16 28:1 |
| **fixture** 38:8 | 84:15 | 80:11 82:24 | 71:11 | 28:3,5,15 29:1 |
| **floor** 92:9,12 | **furnished** 101:2 | 84:20 88:13 | **hang** 34:15 | 29:7 31:13 |
| **floors** 96:21 | | 111:18 | **Hanrahan** 4:3 | 32:24 36:8 |
| **Florida** 15:16,17 | **G** | **good** 14:11 | 83:3 109:13 | 37:10,16 39:5 |
| 86:5 | **gals** 56:8 | 16:12,14 24:3 | **happen** 50:24 | 39:11,18,21,22 |
| **folks** 27:24 | **gas** 53:9 | 53:8 59:20,21 | 74:24 78:6 | 40:3 46:1 |
| **followed** 49:8 | **general** 22:10 | 93:5,6 | 101:10 | 49:16 56:19 |
| 53:5 | 27:11 30:3,8 | **gotten** 103:24 | **happened** 11:16 | 57:7,9 70:2,3 |
| **follows** 8:4 | 55:7 65:3 | **governor** 18:6 | 50:21 98:16,16 | 73:18 77:15 |
| **followup** 88:14 | 69:11 84:3 | 34:14 | **harder** 113:6 | 84:9,16,21 |
| 111:19 | **gentlemen** 39:16 | **Granite** 59:18 | **Harrington** | 85:5,7 86:9,10 |
| **force** 7:21 | **Germeraad** 3:18 | **Greg** 21:11 | 35:18 | 86:20 87:1,18 |
| **foreclosure** | 49:1 69:8 | 88:22 113:22 | **hate** 43:1 | 88:19 97:24 |

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

**home** 12:20 15:10,11 24:12 66:4
**homes** 15:15
**Honorable** 1:9 6:9
**honorary** 17:22
**hope** 17:2 39:4
**hotel** 15:19
**Houck** 3:4 5:3 5:20 8:6 17:8 17:10 27:15 29:6,8,10 45:5 48:21 49:3 62:2 63:9,11 67:13,19 68:21 69:2,9 70:18 70:21,23 71:1 71:8,10 72:14 77:12,21,23 78:3,5,7,11,14 78:18 79:15 82:6,12,18 83:10,14,17,20 83:24 84:3,6,8 85:1 88:13,16 88:20 89:2,4 89:10,13,16,18 90:11 91:20 93:18 94:1,5,9 94:14,20 98:3 98:8,18 99:19 100:3,6 101:17 103:2,6,9 104:4,21 106:4 107:1,16 108:12,16 109:20 110:16 110:18 111:3,4 111:11,15,17 111:24 112:19 113:3,6,9,13 113:16 114:3,6
**houck@miller...** 3:8
**house** 59:19

**How's** 112:23
**Husconich** 27:10
**HVAC** 59:5 92:18,24

**I**

**IBW** 18:15
**idea** 24:24 28:24 72:15,16 81:7
**identify** 42:3 71:17 84:21 89:22 98:20 107:20 108:8
**II** 106:3
**IL** 3:6,13,21 4:6
**Illinois** 1:2,23 2:8,10 6:2,23 7:8,10,18,20 14:16,21 15:2 17:16 18:6 36:18 59:10 65:21 88:4,9 115:4,7
**implemented** 46:22
**improvements** 95:14 96:9
**include** 23:9,10
**included** 100:14 101:11
**income** 71:20 72:8,20,24 74:15
**incorporation** 33:11
**incorrect** 83:14
**independent** 34:20
**indicated** 112:1
**indirectly** 32:3
**individual** 2:1,2 2:3,4,5,6,7 7:1 7:2,3,4,5,6,7 39:15 76:18
**individuals** 58:16

**industry** 18:5
**information** 62:13 100:9 112:8,12,15,17
**informing** 73:14
**input** 62:13
**inside** 38:5
**installment** 43:11 45:9
**instance** 86:4
**instructs** 9:2
**insulted** 64:22
**insurance** 33:1,3 33:6,7,8
**intend** 113:20
**intentions** 13:3
**interest** 13:8 14:14 15:19 16:1 21:7,12 58:7
**Interesting** 19:2
**interject** 83:8
**international** 18:7
**interposed** 83:9
**interrogated** 115:10
**introduced** 37:13
**invited** 58:8,8
**invoices** 97:23
**involved** 19:9 52:22 73:24
**IRS** 40:19 72:5
**issue** 13:9
**issued** 99:4
**items** 99:5

**J**

**Jackson** 96:18
**Jason** 3:18 104:1
**Jill** 10:15 11:3,6 11:7,10
**Jim** 88:2,3
**job** 17:11 40:17
**jobs** 68:5

**Jodi** 2:4 7:4 10:7 12:23
**John** 2:5 7:5 12:19 27:12 58:18
**journeyman** 65:1
**jtg@scottnsco...** 3:23
**judge** 18:19 89:10 112:13 113:15
**judges** 21:21
**judgments** 79:10
**Julie** 35:18,22 35:23 36:4 62:15 70:24 71:2,15 73:22 76:7,9
**July** 107:24 108:1
**jumping** 68:1 72:6

**K**

**keep** 53:8
**Ken** 87:23,24
**kept** 31:15 33:10 37:10 47:12 52:15 61:15 62:6,10 67:8
**Kerry** 87:14,15
**Kevin** 88:10,11
**kicked** 53:12
**kids** 12:22
**kind** 16:21 34:8 41:1 51:8 59:4 73:7 92:8
**knew** 39:24 50:23 75:14,14 100:1 104:19 104:23
**know** 8:20,21 17:4,5,24 21:21 26:24 32:7,24 33:10

34:1 35:17 37:14 39:24 40:10 43:8,15 43:20,24 46:9 46:21,23,24 47:24 48:5,8 48:10,11,15 49:8,15,20 50:1 51:8,12 53:16,20 57:13 57:16 60:9,11 61:4,6,7,11,19 63:21 64:21 68:16 71:5,14 71:18 72:6 73:17,20 74:16 74:17 83:19 86:1 88:24 90:6 94:4 95:19 98:15 99:4 100:3,3,5 100:18,21 101:4,13 102:20 103:5,7 103:8 105:24 106:9,19 112:2 112:3,11,13,15 113:2,11
**knowledge** 85:7 85:20 115:8
**known** 32:1
**knows** 34:12 84:2

**L**

**L** 2:22 4:11 7:18 115:2,16
**L&L** 24:18 25:5 25:6 27:10 39:23 59:5,7
**L.L.P** 4:3
**labor** 56:6
**laborers** 41:6
**lady** 24:3 39:16
**landscape** 93:24
**large** 88:8 96:8

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

**Larinda** 76:11
**Larry** 20:7
  103:12 104:6
**Larson** 70:16,16
**late** 17:6 100:12
**Lauderdale**
  15:18
**Laurel** 15:14
**law** 19:9 30:16
  30:21 76:20
  77:9,16,19
  81:5,8,14,15
  92:10 107:6
**laws** 8:9
**lawsuit** 12:8
  20:15
**lawyer's** 32:21
  61:19
**lawyers** 112:5,13
  112:17
**lay** 111:5
**layout** 24:4,9
**Lead** 1:5 6:5
**lease** 34:9,10
  40:4 42:7,10
  42:13,21 43:5
  43:8,14,16
  44:3,3,11,11
  44:24 45:13,22
  45:24 46:3,7
  46:20,21,22
  47:6 66:14
**leased** 51:22
**leases** 34:8,16
  41:16,17 54:10
  55:21 56:22
**leasing** 50:12,15
  50:17
**ledgers** 106:12
**left** 76:17 81:24
  92:2 107:13
**legal** 39:11 62:18
  63:1,15 70:17
  79:12 82:14
  107:22
**lender** 47:1,3,5,5

47:7 52:17
  54:11,20 79:16
**lessee** 42:17 45:4
  45:6
**lessor** 42:8,17
  43:2 44:7 45:2
  45:4
**let's** 27:16 41:24
  105:3
**letter** 53:6 54:2
  54:4 72:23
  73:7,11,13
  80:15 101:19
  103:7 107:6,22
  108:8,22 109:9
**letters** 79:17
  110:11
**level** 24:11,13,15
  24:16
**liability** 1:23
  2:11 6:23 7:11
**life** 52:9
**lights** 93:12
**limited** 1:23 2:10
  6:23 7:10
  89:10
**Linda** 33:19
  42:15 62:14,16
  71:15 73:21
  76:7 87:20
**line** 60:21
**lines** 39:8
**listed** 81:6
**Little** 68:2
**lived** 87:11 88:9
**lives** 85:24
**LLC** 1:23 2:10
  3:16 4:1 6:23
  7:10 15:2,3
  16:3,8 44:7,9
  44:13 46:1
  57:15 60:4
  63:14
**LLCs** 36:15,17
**loan** 52:12 54:5
  61:14 63:12,15

63:18,18 79:1
  79:11
**loans** 78:23
  84:12
**locate** 51:14
**located** 13:14
  17:15 49:21
  55:23
**lock** 68:2
**Londrigan** 3:10
  7:16 19:11,12
  19:13 21:4
  77:15 81:6,18
  89:23 90:18
  97:12 98:21
  99:15 100:14
  102:19 105:16
  105:20 108:9
  110:15 115:6
**Londrigan's**
  106:2
**long** 10:2,21
  14:8 19:12
  21:1 33:8
  35:22,23 37:5
  64:16 67:5,9
  69:11 70:24
**longer** 20:14
**look** 60:24 70:5
  93:20 94:5
  98:1,12 99:14
  101:22 105:14
  109:19 112:21
**looked** 17:24
  24:5 94:4
**looking** 21:14
  24:12 45:7
  48:18,19,22
  49:4 71:11
  91:21 95:2
  105:1,1,10
  106:16
**looks** 41:20 42:4
  42:20 60:16
  70:12 71:16
  73:13 85:16

93:3 95:8
  97:11 101:21
  103:14,18
**loss** 62:12 75:24
**lost** 28:20
**lot** 31:9 33:17
  34:2,2 39:1
  40:10,15 49:15
  52:13 66:16
  109:18 111:17
**Louis** 85:24
  87:12 88:9
**lowered** 52:4

─────────
**M**
─────────
**M** 3:4
**ma'am** 9:5 11:14
  12:4,6,11 13:2
  15:4 20:4,23
  21:6,20,23
  23:3,5,17
  25:23 32:5,19
  35:1 39:6,9
  40:13 44:13
  46:2,5,17 48:3
  49:14,18 51:7
  55:1,4,10,18
  56:1,12,24
  58:18 60:6,8
  60:20 61:3,9
  63:20 69:16,21
  71:21 82:23
  83:1 89:21
  94:17 99:1
  102:2,12 104:8
  104:10 109:15
**MacArthur**
  23:15 37:17
  44:7,18,20
  49:21 55:24
  60:16
**machine** 91:16
**magistrate** 112:1
**main** 26:6,18
  35:7
**maintenance**

92:6,7,8,15,18
  93:10,13 96:6
  96:20
**major** 32:17
  55:9
**majority** 54:24
  62:8
**making** 19:4
  76:15 79:10
  83:2
**manage** 97:3
**managed** 50:14
**management**
  47:21 48:5,17
  49:6 53:17
  97:9
**manager** 48:15
  48:22 49:4,9
  55:7 96:17
**Managers** 2:10
  4:1 7:10 34:24
  35:3,7 37:23
  49:12,20 50:1
  50:8,11,15
  53:23 54:13,19
  84:10 94:22,24
  96:15,22 97:1
  97:6
**managing** 50:13
  53:17
**manufacturing**
  88:12
**March** 2:16 7:16
  82:14 115:5
**Marietta** 68:2
**Marine** 63:24
**Marion** 88:4
**mark** 41:17
  79:18
**marked** 41:18
  41:19 57:19,20
  69:4,6 79:19
  79:21 80:10,12
  84:19,21 89:17
  89:20 91:2,4
  98:17,19

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

101:16 102:14
102:23 106:24
107:2,18 108:5
**marriage** 9:20
9:22 10:8 11:1
**married** 9:18,24
10:2,10,16,21
11:3,7 20:14
**Martin** 68:2
**match** 101:7
103:8
**matched** 33:9
**matter** 77:15
79:10 115:9
**matters** 100:16
**mean** 9:1 18:6
18:10 19:21
34:10,20 36:24
38:2 46:15
52:7 53:12
64:22 74:1
77:20,24,24
82:19 86:10
92:21 96:19
99:23
**means** 18:11
**meant** 78:9 98:7
**mechanical**
24:19
**meeting** 30:13
31:14 32:4,15
61:8
**meetings** 29:15
29:18 30:1,3,6
30:8,10 31:3,7
31:12,18,21,24
32:13 60:13,14
**Melanie** 10:20
10:21,23 11:5
**member** 1:7 6:7
15:3 44:20
58:12 64:8,14
64:16
**members** 3:9
20:10 21:3
36:14,15 58:6

58:17 61:7
72:8 73:8,14
**membership**
16:2,9 21:7,12
**memory** 37:15
42:24
**mentioned** 11:9
11:12 20:15
57:23 77:4
**met** 20:8
**Mezz** 1:16 6:16
**Michael** 2:2 7:2
10:7 12:23
**middle** 24:16
**Mike** 27:10
**MILLER** 3:3
**million** 28:11
46:13,14,18
54:3 80:16,19
**million-one** 79:6
**Mills** 1:9 6:9
**mine** 70:23 81:9
109:22
**mini** 114:6
**Minor** 88:10,11
**minuses** 98:14
**minute** 8:15
31:14 33:15
**minutes** 31:15
31:18 32:4,20
44:10,15
**missed** 17:3
**Missouri** 59:19
86:6
**mistake** 41:12
41:13,14
**moment** 8:24
84:20
**money** 28:3,17
28:20 40:10
41:9 53:10
55:20 71:24
72:17,18 74:15
75:5 76:17
81:7 82:24
107:13

**Monroe** 3:20
**month** 38:10
43:11 45:19
53:10 62:11
**monthly** 43:10
45:2,9 46:3
**months** 46:9
66:23 74:23
98:4
**morning** 18:17
18:18
**mortgage** 1:9,11
1:16,17 6:9,11
6:16,17 79:1
**motions** 112:5
**mouth** 22:17
**move** 20:3 84:7
**moved** 52:14
65:24
**moving** 52:14
**multitude** 13:17
26:4 62:16
72:21

### N

**N** 3:1 5:1
**N.A** 1:5,7 6:5,7
**name** 8:10 10:14
13:15 14:20
16:17 20:7,9
23:13 26:8
27:4,6,8,9
35:22 39:3
41:2 42:10
58:20 70:15
80:2 104:18
**named** 12:10
**names** 10:6
33:18 71:12
**narrow** 27:16
**national** 1:3,14
6:3,14 18:15
59:21
**nationally** 59:20
**nauseam** 105:20
**near** 67:11

**NECA** 18:15
**necessarily** 51:2
**need** 8:17,19 9:3
112:12,17
113:7,12,13
114:4
**needed** 31:10
40:21 50:24
113:19
**negotiable** 16:15
**negotiate** 20:1
**negotiating**
16:19,21
**never** 11:20 20:8
38:12 51:4
52:17 68:7
84:13,14,15
**new** 33:6 41:4
52:22 96:4,7
112:15
**Newbody** 27:12
**nice** 24:5
**Nicholson** 88:7,8
**nine** 10:13,16,22
**nine-month**
66:23
**nonpayment**
53:24
**noon** 67:12
**north** 13:21,21
13:22 23:14
24:18 44:7,18
44:20 55:24
60:16
**notary** 42:15
**notation** 98:24
**notations** 99:3
**notes** 21:14
61:11 112:21
**notice** 32:15
42:7 43:22
44:6 46:21
51:8,11,15,19
54:15,18 98:22
99:2
**noticed** 94:18

105:5
**number** 33:5
41:20 44:3
86:23 87:24
**numbers** 71:12
71:17,23
**Numeral** 106:3
**nursing** 12:20

### O

**o'clock** 18:17
**object** 77:10
**objection** 8:24
9:1
**obviously** 73:16
77:8,20 85:16
100:8,11
**occupied** 92:10
**occurred** 79:1
**October** 109:14
**office** 14:18 23:4
23:18,20,21
24:20 26:6,12
26:16,18 27:21
27:23 31:16,17
33:7,13 35:6
37:19 38:2
43:21 48:1
49:21 61:18
62:9 72:8,13
73:18 93:21
99:6,12 100:10
100:13,17,23
101:1,3 106:17
**officer** 18:7
25:18 59:21
**officers** 23:21
24:13 25:15
29:19,20 30:14
32:22 86:4
**offices** 24:6
26:19,20,21
30:15 32:21
55:23 61:16
86:5,6,6
**oh** 27:6 51:21

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

56:24 64:6,9
70:18 73:10
84:23 90:9
103:23 104:22
111:13 113:7
**okay** 8:15 9:6
10:12,14,19
11:3,5,7,9,23
12:5 13:22
14:7,11,14,17
15:1,17,22,24
16:8,12,16,19
16:22 17:5
18:3,22 19:6,9
20:5,12,15,18
20:21,24 21:17
21:24 22:16,20
22:23 23:4,9
23:14,19,23
24:9 25:6,14
26:6,12,14,18
26:21,23 27:9
27:24 28:3,10
28:15 29:9,14
29:18 30:9,24
31:23 32:6,13
32:20 33:3
34:22 35:11,23
36:3,10,23
37:16,22 38:1
38:11 39:5,10
40:3,14,18
41:13,16,24
42:13 43:2,14
43:18,20 44:2
44:6 45:15,21
46:9 47:10,13
47:20 48:11
49:11 50:1
51:5 53:20
54:4,7,8,22
56:10,21 57:1
57:6,9 59:24
60:3,12,15
61:7,10,15,22
62:10 63:4,10

63:17 64:8,16
64:24 65:6,22
66:10,13,15
67:5,20,22
68:11,14,21,23
69:3 70:4,11
70:18,21 71:3
71:9 72:3,6,15
73:1,6,13,16
73:20,23 74:3
74:8,18 75:12
75:22 76:10
77:2,6,22 78:3
78:22 79:16
80:2,4,7,21
81:10 83:2,7
84:18 85:15,19
85:22 86:11,15
86:22,24 87:2
87:7,14,23
88:16 89:2,5
89:16 90:19,21
91:1,14,23
92:1,13,24
93:2,15 94:1,9
95:10,21 96:1
96:10,14 97:5
97:11,16,20
98:3 100:4,6
102:10,13,22
103:23 104:11
104:14 105:1
106:1,8,15,23
108:7 109:6,12
110:1,7,13,16
110:21,24
112:20 113:2
**okayed** 83:6
**Olsen** 86:19
**on-site** 96:18
**once** 30:11 98:16
**ones** 13:9 14:15
86:3 102:19
111:11
**Onion's** 91:11
**onward** 89:13

**open** 112:22
**opened** 33:6
105:8,22,23
**operated** 37:23
**operating** 50:2,4
57:17 60:3
61:5 111:11
**opinion** 79:12,13
**opportunity**
112:7
**opposed** 42:11
**order** 38:7
110:22 114:7
**orders** 114:5
**organizational**
88:18
**ought** 74:24
99:10
**outlets** 93:12
**outlined** 78:20
**outright** 14:22
**outside** 38:3
66:4
**outstanding**
112:4
**Overlapping**
84:1 113:5
**overlooked** 34:2
**owe** 72:22 74:21
74:22 75:11
**owed** 75:7 79:6
**owned** 14:3,8
25:19 42:12
58:10,12,14
59:22 65:18
68:19 86:5,5,6
86:20
**owner** 54:14
**owners** 55:14
57:24 58:3,4
**ownership** 14:1
14:14,14 15:5
15:19 16:1,9
58:4,7
**owning** 65:22
**owns** 13:13,18

15:1 32:11

_____
**P**
_____
**P** 3:1,1 4:4
**P.C** 3:10,17
**P.L.C** 3:3
**p.m** 114:10
**PADDOCK** 3:3
**page** 5:2 41:21
41:24 42:13
43:22 48:2,14
48:18,19,20
49:4,11 60:15
60:16,17 61:2
69:12 70:11
71:5,11,16,17
80:18 91:21,24
93:2,6,7 94:15
94:18,24 95:8
97:11,21 98:23
98:24 99:2,3
103:14 107:5,5
108:20 109:7
109:16,17,21
110:7,8
**pages** 20:2
102:16
**paid** 28:17 29:12
34:22,22,23
35:11 38:5
40:24 45:3,10
46:9 48:15,16
49:6,9 52:20
53:7,9 56:10
56:13,15 57:1
57:4 77:1 97:2
98:2,5,11,11
102:3,4,7,8
104:14 107:9
**painters** 41:6
**Painting** 96:2
**Palmen** 38:7,8
38:13,14 62:23
62:24 69:7
71:23 72:5,15
74:20 75:10

76:13,21 78:8
108:4
**Pana** 34:18
**paperwork**
44:16
**paragraph** 48:14
48:19 49:5
80:24 81:2,3
82:12
**pardon** 9:21
59:12 99:22
**part** 8:3 19:19
19:20 22:19,20
50:9 58:15
59:24 65:12
92:14 97:13
**particular** 13:15
85:12
**parties** 18:22,23
52:4
**partnered** 59:17
59:19
**partners** 12:14
12:15,16,17
16:11 36:12,13
74:24 75:6
**partnership**
14:24 15:1,2
16:3,4 76:19
76:24
**Pass-Through**
1:11,18 6:11
6:18
**passed** 16:11
27:12
**pay** 28:16 36:22
38:4,19,22
40:6,12 53:8
57:10 71:20
72:1,8,20
74:13,15 75:3
76:17 79:8
82:14 96:22,24
99:4,7,8,10
**payable** 97:22
**paycheck** 33:21

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

36:6
**paying** 45:15,18
    51:6 52:1,3
    53:4 76:23
    79:5 107:12
**payment** 56:19
    56:20 76:12,13
    76:15 79:7
    82:7 97:12
    98:6
**payments** 46:6
    71:22 78:13
    79:1 83:2 93:9
    94:23 96:5,10
    96:16 97:5,6
    98:13 101:11
**PC29** 108:5
**pending** 16:22
    21:18,19
**people** 19:3
    23:17,19,21
    24:11,13,19,20
    24:22,23 25:2
    26:6,8,19
    27:22 31:9
    35:6 38:19,24
    62:16 67:1
    68:16 72:21
    85:23 86:6
    92:14 93:10,11
    93:14
**percent** 14:2,8
    15:6,6 16:10
    16:10 18:21
    21:13 25:19,22
    32:11
**percentage** 14:1
    14:4,5 15:5
    16:9 58:10
    97:2
**percentages**
    48:16 49:8
    71:19 73:14
    97:7
**performed** 20:2
**period** 27:17

**Perkins** 19:17,18
    19:22,24 20:18
    20:21 21:4
    77:16 81:5,21
    82:15 83:11,15
    101:19 102:9
    107:22 109:3
**person** 10:16
    34:6,7,19 35:7
    52:22 55:2
    63:17 92:16
**personal** 11:18
**personally** 12:10
    21:21 42:11
    44:8 56:23
**pertaining** 7:16
**Phalle** 3:11 29:5
    48:20,24 77:18
    77:22 78:4,6
    88:15,17,22
    89:3 99:17
    100:2,4,7
    101:9,12
    102:24 103:4
    111:9,13,21
    112:1 113:2,8
    113:10,15,17
    114:7
**phases** 26:5
**phonetically**
    27:10 59:23
**phrased** 57:24
**physical** 33:11
**picked** 95:15,16
**picture** 24:6
**piece** 13:13,18
    16:15 29:6
    58:9,10 66:2
**pieces** 59:22
**pilot** 32:9
**Pinnacle** 16:3,7
    16:8
**pipes** 53:19
**place** 33:7 38:9
    52:15 53:8
**places** 59:20

**plaintiff** 12:7
**plaintiff's** 82:12
**plaintiffs** 1:20
    2:15 3:2 5:5
    6:20 7:15 8:4
    61:17 62:4
**plant** 68:1 88:12
**plants** 68:4
**please** 8:10,21
    42:3 89:22
    107:21
**plumbing** 22:10
    27:3
**plus** 53:9 98:14
**PNC** 13:14,16
    13:20 21:16
    92:9
**point** 10:10 14:5
    20:12 39:18
    51:5 52:1
    54:10 59:6
    65:22 78:15
**pointing** 78:4
**portfolio** 39:8
**position** 35:23
    79:7 113:3
**possession** 48:5
**possible** 45:23
**post** 18:4
**Potter** 3:10 7:17
    81:17,18 89:23
    97:12 98:21
    100:14 102:20
    105:17 108:9
    110:15 115:6
**Potter's** 31:16
    90:18
**poured** 40:21
**power** 25:7,9
    26:24 27:5,6
    33:17 39:23
    59:19 68:1,4
**Prairie** 1:22 3:16
    6:22 19:23
    37:2,7,19
    38:13,17,23

40:22 46:1
    49:12 51:23
    53:23 54:14,18
    54:23 55:6,8
    55:11,13,15,17
    55:19,23 56:2
    56:10,15,17
    57:13 58:13
    59:1 60:2,4,12
    61:12 62:7,22
    63:1,14 69:22
    73:9 75:23
    76:6 78:9,23
    80:8 81:4,8
    84:11 91:5,9
    96:24 101:24
    102:4,10,17,19
    103:16 104:6
    104:17 105:8
    106:13
**preceding** 89:9
**prepare** 38:6
**prepared** 41:21
    91:9,11
**president** 18:6
    22:4,5,24 23:1
    26:1,2,3,11,23
    27:11 88:1,3
**presidents** 26:4
    26:22 86:17
**presume** 62:23
**pretty** 12:20
    18:5,20 50:22
    99:7
**previous** 86:3
**print** 38:10
    62:11,12
**printed** 93:21,22
    94:2,3,7
**prior** 28:19
    50:21 89:7
**probably** 12:14
    14:7 24:24
    27:22 29:24
    34:12 48:23
    96:2 97:13

103:2
**problem** 19:23
    39:15,24 88:21
    100:20
**problems** 52:13
**Procedure** 7:15
    8:8
**proceed** 17:9
    77:11
**produce** 32:2,3
**produced** 8:3
    62:4 89:1
    99:15,16
**production** 62:5
**profession** 65:23
**Professional**
    4:10 7:19
    115:2
**profit** 62:12
    75:24
**progress** 112:14
**projects** 88:5
**properties** 1:22
    3:16 6:22 13:8
    13:9,14 14:15
    15:9 16:13
    17:3 21:8,9,11
    34:13 36:18
    37:2,7,20
    38:13,17,23
    40:23 46:1
    49:13 50:21,22
    51:23 53:23
    54:14,18,23
    55:6,9,12,13
    55:15,17,19,23
    56:2,11,15,17
    57:13 58:2,3,5
    58:13 59:2
    60:2,4,12
    61:12 62:7,22
    63:2,13,14
    66:16 67:23
    68:12,12,15,18
    69:22 73:9
    75:24 76:7

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

78:9,23 80:8
81:5,8 84:11
91:6,9 96:24
101:24 102:5
102:11,19
103:16 104:6
104:17 105:9
106:13
**property** 2:9 4:1
7:9 13:15,16
13:20 16:15
19:23 21:10,15
34:24 35:3,7
37:23 39:5
45:17 47:21
48:4,11,15,17
48:22 49:4,9
49:12,20 50:1
50:8,10,15
52:14 53:18,23
54:5,13,14,19
55:14,16,16
57:23 58:9,10
58:12,14,15
59:22 65:23
66:2,3,5,10,13
66:14 67:22,24
84:10 94:22,24
96:15,22 97:1
97:5
**Pruitt** 2:5 7:5
12:19 58:18,20
58:23 87:15
92:2,4,16 96:1
107:7
**Pruitt's** 60:22,24
**Public** 65:21
**purpose** 22:13
55:11 74:11,16
76:15 81:12
**pursuant** 7:15
8:8 115:4
**put** 22:11,17
50:18 53:1
58:4,5,6 71:19
76:20 79:7,20

89:15 91:3,4
98:19 101:14
101:18 102:15
103:3,10 107:2
107:19
**putting** 110:22

——————
**Q**
——————
**quarters** 74:23
75:21
**quash** 112:5
**question** 8:17,20
8:22 9:2,3 14:7
38:16 43:9
49:1 53:21,22
55:22 81:7
84:3 101:5
102:3,18
105:23 107:5
113:1,22,24
**questions** 8:6
9:3 49:15
54:22 69:11
78:21 97:17
111:19,22,22
112:7,22
113:18,20
**quiet** 8:24
**quit** 79:5

——————
**R**
——————
**R** 3:1,19
**R.P.R** 2:22
**RABIN** 4:3
**ran** 18:16 35:9
109:18
**Randle** 3:10
7:17 115:6
**Randle's** 100:14
**ranks** 65:4
**rate** 47:8
**rates** 52:15
83:13
**re@eeiholding...**
69:17
**read** 12:3

**reading** 12:1
**real** 55:16 66:18
96:20
**really** 31:10
37:14 42:24
45:20 52:9
75:13 100:21
107:9 111:20
111:22
**reason** 74:14
92:17
**reasons** 11:18
**recall** 27:24 30:9
31:20,24 32:13
32:17,20,23
33:4,6 37:9
42:23 43:14,24
44:10 45:2,18
46:6 47:7,10
47:15 63:14
76:12 79:24
80:15,21 83:2
84:9 85:13
87:21 91:7
93:8 100:11
104:14 108:22
109:9
**receipt** 109:23
110:10
**receive** 106:12
**received** 18:3
31:19 69:6
76:11 77:7
79:24 80:21
100:23 103:12
107:4
**receiver** 53:10
53:15 91:12,13
**receiving** 80:15
108:22 109:9
**recognize** 41:20
41:24 47:22
57:20 69:13
79:21 80:2,12
85:2 89:19
**recognizes** 93:20

**record** 8:7,11
42:3 53:22
61:23,24 62:1
62:3 69:1,3
89:5,6 91:17
91:18,19 100:8
111:6 112:10
114:2,5
**records** 61:15
62:4 99:18
111:12,14
**redone** 91:15
**reduce** 47:7
**reduced** 52:23
53:1 54:11
**reduces** 46:3
**reduction** 52:15
**reductions** 52:18
**refer** 82:4 86:12
**referring** 12:18
47:2 54:4,8
80:23 86:8
90:12 106:2
111:10
**refunding** 74:4
74:11,14,16,19
**regard** 70:9
78:21 97:6
**regarding** 112:9
**Registered** 1:8
1:15 6:8,15
7:18 115:2
**rehabbed** 95:17
**relations** 21:5
**relationship**
58:21
**remember** 17:24
37:3 77:3
104:18
**remind** 8:16
**remitter** 102:18
102:19
**rent** 40:6 42:4
43:11 45:2,3,9
47:8 51:6 52:1
52:3,4,18,23

53:1,4 54:1,11
**rental** 46:4
**rents** 52:6
**repeat** 49:1
**rephrase** 8:21,22
**report** 112:14
**Reported** 2:22
**reporter** 4:10
7:19,19 41:17
41:19 79:17,20
91:4 102:15
103:10 107:2
107:19 111:1
114:4 115:1,3
115:3
**represent** 31:19
69:5 76:10
103:11 106:11
**representation**
107:22 108:3
**represented** 3:2
3:9,16 4:2 9:6
9:8
**representing**
19:13 20:22
**reputation** 68:9
**request** 62:5
82:21 83:4
89:23 90:24
**requested** 33:14
51:13 90:14,14
**requirements**
7:22
**resolution** 85:16
85:17,20
**resolutions** 86:2
86:13,15 87:3
**resolved** 16:24
**response** 19:16
41:23 51:18
57:5 101:5
**rest** 73:6 74:20
76:20
**result** 44:11
**ret** 99:24
**retained** 5:20

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

retainer 82:6
  83:2 90:2,3,3,5
  90:23 98:2,5
  98:11,23 100:9
  100:10,13
retainers 82:5,7
  82:7 90:8,9
  97:24
retired 26:24
  85:23 87:7,24
  88:6
returned 115:13
reversed 83:18
review 11:23
reviewed 110:19
revisit 113:14
Richard 1:9 6:9
Ridgely 107:8
right 16:15
  19:23 21:17
  24:7 27:20
  32:2 35:24
  36:16 39:17
  41:13,22 43:22
  45:18 46:19
  47:15 59:16
  61:4 63:23
  66:5 68:21
  71:2,16 75:4
  75:16,18 77:4
  78:16 80:11,23
  81:2 83:17
  88:13 89:12
  92:10 93:2
  94:5 97:4
  101:9,12 103:4
  106:19 107:19
  108:10 111:18
  113:1,14
Robert 1:24 2:14
  5:2 6:24 7:14
  8:2,12 39:20
  99:8 115:7
Robin 2:22 4:11
  7:18 115:2,16
rode 33:8

Rodney 2:3 7:3
  10:7 12:23
  25:21 32:7
Roman 106:3
room 8:23 39:17
  72:22
rough 104:3
RPR 115:16,17
rubber 39:3
  101:21
Rule 7:15
rules 8:8,9,16
run 23:2
running 41:10
  62:17 66:7

—— S ——

S 3:1
S-o-r-l-i-n-g
  30:20
safety 88:11
Saint 3:11 29:5
  48:20,24 77:18
  77:22 78:4,6
  88:15,17,22
  89:3 99:17
  100:2,4,7
  101:9,12
  102:24 103:4
  111:9,13,21
  112:1 113:2,8
  113:10,15,17
  114:7
salary 56:23
  57:3,4
sat 74:20
save 111:17
saw 20:2 38:9
  41:2 80:16
saying 53:6 67:8
  67:9 72:22,23
  77:18 93:19
says 43:10 44:24
  71:3 80:17
  82:16 85:17
  91:21 92:2

105:2,3,15,16
  105:16 106:19
scaled 93:23
scanned 94:3,7
school 17:12,13
  17:14,17
Scott 3:17,17,19
  17:6,9 19:15
  19:15,22,22
  21:4 27:13
  29:7,9 45:4
  61:23 63:5,8
  63:10 67:11,17
  68:23 70:17,20
  70:22 71:7,9
  72:1,12,23
  73:8,8 77:10
  77:15,16 78:2
  78:12,16 79:12
  81:5,5,17,17
  82:3,3,4,9,13
  82:13,16,20,20
  83:13,22 84:2
  84:5,23 90:7
  90:10 91:17
  94:19 97:22,22
  98:2,9 101:7
  101:10 103:5,7
  104:3,20
  105:17,17,21
  105:21 106:2
  107:4,4,6,6,12
  107:12,14,15
  107:15,17,17
  108:11,14
  109:19 110:2,2
  110:14,14,14
  110:17,17,17
  111:1,16
  113:21,24
Scott's 72:8
search 70:8
season 66:22,23
second 10:19
  44:23,24 70:11
  92:9,11 99:2

105:7,22 107:5
Secretary 57:10
  76:17
Securities 1:10
  6:10
see 28:12 38:10
  40:14 48:24
  71:11 92:2
  95:7 96:8
  98:12,13,24
  112:21 113:24
seeing 112:16
seeking 47:7
seen 28:13 29:4
  39:1 58:20
  79:23 80:14
  104:3
sell 68:17
selling 68:11
send 32:15
  100:19,20
send-out-a-no...
  30:5
sending 76:13
sense 100:8
sent 51:9 71:24
  72:5 73:2 75:1
  76:20 79:16
  89:1 94:3,8
  98:5 100:18
  103:15 104:5
separate 35:3
  39:15 69:22
  108:11,14
September
  105:3,6,15
  110:5,6
Series 1:12,19
  6:12,19
served 51:15
  54:15 96:21
service 65:21
  93:10,11,11
serviceman
  23:11
servicer 80:6

servicers 53:11
services 39:11
  62:18 63:1
  76:12
set 85:12 100:10
  100:13 111:1
sets 24:21
settled 20:20
settlement 16:20
  16:21 17:1
  20:1,6
seven 55:14
  57:23 58:2,3
Seventh 7:17
  115:6
Sgro 4:3,4 20:24
  21:4,11 77:15
  83:3,8,11,15
  83:18 89:1,6
  89:12,14
  109:13 113:20
  113:23
Sgro's 31:17
share 76:24
shareholder
  25:14 28:15
  54:24
She'd 62:17
sheet 62:12
  93:24 105:3,5
  105:6,10
sheets 103:18,20
  103:22 105:1
shop 65:18
shorthand 4:10
  7:19 115:3,11
show 23:2 41:10
  83:23 106:9
shows 105:10,14
side 19:5 92:2
sign 35:13
signature 7:23
  42:13,15 44:17
  48:2 60:15,18
  60:21,24 61:2
  74:6,9 85:17

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

85:18 108:5,19 108:19 109:6 109:16 110:7 114:9 115:12
**signatures** 49:11 101:22 109:18
**signed** 42:17 46:21 101:21
**similar** 99:6
**Singer** 9:15
**site** 96:17
**sitting** 18:19 39:16 52:5 62:19 72:21 113:4
**situation** 82:10
**six** 20:17 24:14 86:6
**Sixteen** 15:6
**SJC** 17:21
**slip** 100:23 101:2
**smaller** 45:16,16 45:16 83:12
**sold** 50:22 59:11 59:13 66:16 67:24 68:13
**sole** 25:14 44:20
**solidify** 34:9,11
**somebody** 91:15 96:18 108:4
**son** 25:18,20 28:1
**Sorling** 30:15,20 31:6 39:14 63:6 87:4,5 88:14 89:2,3 92:11
**Sorling's** 43:21 48:1 61:16,18
**sorry** 12:21 16:6 17:6 27:8 45:6 45:8 51:21 64:21 93:8 96:24 103:19 104:22 107:17
**sound** 24:7

**sounds** 27:9
**source** 94:13
**sources** 101:11
**south** 3:12 4:5 7:17 87:10,10 115:6
**Southern** 22:9
**space** 40:12 51:22 95:16
**spaces** 50:16,17
**spec** 98:23 99:24 100:9
**special** 32:13 61:8 88:5
**specific** 100:9,12
**specifically** 89:7
**spell** 8:11 25:12
**spelled** 27:10 59:23
**spells** 49:5
**spent** 18:7 64:1
**split** 99:10
**spoken** 12:12
**SPP** 19:19,20 20:19,20,22 36:14,23 58:6 74:2 76:16 77:24 84:13,15 99:7,8,24 100:15,19,19 100:24 101:8 101:14,15
**spread** 24:15
**Springfield** 1:22 3:13,16,21 4:6 6:22 7:17 13:23,24 15:11 17:16 19:23 34:13,15 37:2 37:7,19 38:12 38:17,23 40:22 45:24 49:12 50:21 51:23 53:23 54:14,18 54:23 55:6,8 55:11,13,15,17

55:19,23 56:2 56:10,15,17 57:13 58:12 59:1 60:2,4,12 61:12 62:6,22 63:1,13,14 69:22 73:9 75:23 76:6 78:9,23 80:7 81:4,8 84:10 86:5 87:11 91:5,8 96:24 101:24 102:4 102:10,18 103:16 104:6 104:16 105:8 105:19 106:3 106:12 115:7
**Square** 13:21,22
**St** 85:24 87:12 88:9
**stamp** 39:3 101:21
**stand** 38:16
**standing** 14:11 16:12,14
**start** 17:21 18:17 76:19 88:3 95:9
**started** 17:7 46:12 61:17 65:22 66:8 70:4
**state** 7:20 8:10 21:18 57:10 76:17 79:5 102:17 115:3
**stated** 31:20,23 38:21 54:11 104:11
**statement** 68:6 75:24 77:17 78:22 82:13 97:14 102:1
**statements** 81:3 97:16 98:13

103:15
**states** 1:1 6:1 18:14 19:1 24:14 45:8 108:3
**stating** 32:15
**stature** 99:6
**statutory** 7:21
**stayed** 66:1
**steam** 92:22
**Stephen** 3:19
**Steve** 30:15 31:2 31:5,7 33:13 71:24,24 88:7 88:8,23 89:3 89:14
**stipulate** 111:13 111:15
**STIPULATED** 7:13
**stock** 28:21,23 29:6,6,7 32:6,7 39:7
**stone** 3:3 68:1
**stopped** 45:18
**Storling** 30:19
**story** 67:14
**Stranimeier** 2:22 4:11 7:18 115:2,16
**Street** 3:12,20 4:5 7:17 115:6
**strike** 26:14 81:1
**stuff** 34:2
**subcontractors** 40:20
**subpoena** 100:22 101:3
**subsidiary** 22:21
**successor-in-i...** 1:4,6 6:4,6
**Suisse** 1:9 6:9
**Suite** 3:5,20
**Sullivan** 20:7 86:21 88:4 103:12,13,15

104:7,12,23
**sums** 81:1
**suppose** 82:2
**Supreme** 8:9
**sure** 28:12 32:9 35:4,16 37:3 38:19 39:4 49:4 53:21 57:11 58:19 64:9 66:21 76:16 77:19 83:4 88:15 89:10 92:19 93:18 95:24 96:13,21 97:15 99:16,21 100:18,22 101:13 104:1 111:24 112:6 113:9,23
**Susan** 23:23 31:20 103:14 104:5 106:19
**suspect** 85:11
**Swain** 96:17
**switch** 95:6,7
**sworn** 8:3 115:8
**synonymously** 78:12
**systems** 92:24

**T**

**T.H** 3:18
**table** 114:6
**Taft** 87:14,15
**Tagge** 30:15 31:2 63:6,16 63:17 88:23 89:3,14
**Tagge's** 33:13
**take** 18:1 31:8 56:16,23 67:13 67:18 68:21 69:11 92:15,21 93:13
**taken** 2:15 7:14

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

| | | | | |
|---|---|---|---|---|
| 7:21 8:7 68:24 | 92:23 95:7 | 85:23 91:4 | **top** 41:21 109:19 | 67:8 99:23 |
| 114:1 115:11 | **things** 51:22 | 95:15 102:16 | 109:21 | **turn** 40:9 46:20 |
| **talk** 56:7 | 52:10 68:3 | **throw** 33:18 | **total** 75:5,7 | **turned** 17:21 |
| **talked** 49:20 | 73:24 74:1 | 53:24 | **touched** 103:13 | 72:4 |
| 54:10 70:16 | 89:8 98:8 | **Tim** 71:23 72:1 | **touching** 115:8 | **Twenty-one** |
| 71:2 77:9 | **think** 17:5 21:13 | **time** 8:19 13:6 | **tough** 99:7 | 10:3 |
| 88:22 94:16 | 23:1,8 32:16 | 25:1 27:16,17 | **town** 51:1 59:9 | **twice** 98:16 |
| **talking** 36:13,15 | 38:8 43:12 | 27:21 30:14 | **trade** 19:1 | **two** 17:19 19:7 |
| 51:21 72:7,19 | 44:22 45:10 | 31:23 34:14 | **trades** 96:8 | 24:21 36:15,17 |
| 90:7 92:11 | 50:11 51:21 | 37:24 38:9 | **transcribed** 7:22 | 37:13 51:21 |
| 101:22 | 52:3,6 54:2 | 44:9 45:3,3 | 115:12 | 52:4 64:1,2 |
| **taxes** 71:20 72:9 | 56:5 63:9 66:1 | 46:7,8 47:6 | **transcript** 8:19 | 74:23,23 75:18 |
| 72:20,22,24 | 70:15 71:2 | 48:16 50:9,20 | 114:5 | 75:20 76:20,20 |
| 74:13,15,21,22 | 72:11,21 73:7 | 52:9,15 53:3,7 | **transfer** 77:11 | 81:13,14,15,16 |
| 75:3,8,9 106:7 | 73:21 76:16 | 54:13 59:6,21 | 78:8 81:7,20 | 83:9 85:23 |
| **Taylor** 87:7 | 77:13 82:9 | 63:16,24 67:6 | 81:24 89:23 | 86:5 90:20 |
| **technology** | 83:9,11,15,22 | 67:9,11 75:13 | 90:15,22 97:13 | 92:19 98:13 |
| 104:2 | 84:6 89:10 | 76:16 77:5 | **transferred** | 105:6,10,19 |
| **tell** 11:15 17:12 | 90:7 91:10,10 | 85:21 89:10 | 81:13,14,22 | 106:6,13 107:9 |
| 74:18 83:19 | 93:22 94:13,16 | 100:10,14 | 82:14,17 84:11 | 111:19 |
| 91:8 94:22 | 95:14 97:12 | 106:6 111:18 | 84:15 | **two-man** 65:18 |
| 105:7 115:8 | 98:16 100:2,11 | 111:20 | **transfers** 72:7,12 | **two-year** 18:8 |
| **tenant** 41:4 54:6 | 100:12,17 | **timeframe** 29:23 | 72:19 73:4 | **type** 16:19 18:19 |
| 54:9 95:14 | 103:2,8,12 | **timely** 53:7 | 77:8,14,17,18 | 30:5 60:10,13 |
| 96:4,7,9 | 105:20 107:8 | **times** 11:17 30:2 | 78:12 81:4 | 61:10 98:24 |
| **tenants** 13:17 | 111:4,13 | 98:15 | 82:10 | **typewriting** 7:23 |
| 50:19 51:3 | 112:13 113:17 | **title** 16:17 22:3 | **traveled** 34:2 | **typewritten** |
| 96:12,13,14 | 113:18,21 | 25:24 34:5,6 | **tri-level** 24:12 | 71:17 73:17 |
| **term** 44:24 | 114:8 | 47:22 55:5,5 | **trial** 111:7 | **typically** 111:5 |
| 45:13 77:10 | **thinking** 80:18 | 91:5 | **tried** 53:24 | |
| 82:10 | **third** 16:10 91:7 | **today** 9:6 11:24 | 88:23,24 112:8 | **U** |
| **terminated** | 99:3 110:7 | 12:3 19:11 | **true** 41:8 71:6 | **U.S** 1:3,14 6:3 |
| 48:12 61:5 | **Thirty-five** 95:5 | 35:13 52:13 | 85:6,19 | 6:14 |
| **terminology** | **Thirty-four** 95:3 | 62:20 64:12,23 | **trust** 1:17 6:17 | **uh-huh** 8:18 |
| 54:1 | **Thirty-one** 93:8 | 75:13 77:9 | 72:12 81:6 | **uh-uh** 8:18 |
| **terms** 80:18 | **Thomas** 2:1 7:1 | 103:13 | 82:7,11,13 | **underneath** |
| **terrific** 37:15 | **thought** 20:1 | **told** 53:6 72:1,2 | 83:22 89:24 | 105:15 |
| **test** 42:24 | 22:14 27:8 | 75:10 89:7 | 90:2,16,20,22 | **understand** 8:21 |
| **testified** 8:4 | 50:20 72:1 | 90:14 | 102:17 105:17 | 8:22 16:16 |
| 76:11 101:13 | 80:16 83:19 | **Tom** 12:19 58:18 | 105:21 107:14 | 19:9 21:18 |
| 111:6 | 98:10 99:20 | **tomorrow** | 107:15,17 | 23:23 36:24 |
| **Thank** 78:5 | 113:19 | 112:19 113:16 | **Trustee** 1:4,5,7 | 40:1 52:7,11 |
| **Thanks** 67:7 | **three** 10:5 12:1 | **Toolin** 34:5,19 | 1:15 6:4,5,7,15 | 52:19,23 72:15 |
| **theirselves** 50:23 | 23:16 27:11,12 | 35:11 49:23 | **truth** 115:8 | 74:15 79:9,9 |
| **they'd** 100:18 | 29:24 30:2 | 50:9 56:3 76:3 | **try** 77:11 | 88:18 113:9,10 |
| **thing** 34:9 75:2 | 45:7 47:14 | 76:4 | **trying** 21:14 | **understanding** |

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

20:21 22:16
23:15 24:6
25:2 33:23
40:3 51:5
52:17 54:23
80:4 90:1
**Understood** 60:2
89:16
**Unfortunately**
69:10
union 64:8,10,12
64:13,16
**United** 1:1 6:1
18:14 19:1
units 76:18
upstairs 24:7
use 38:7 39:11
45:17 54:1
77:10

**V**

various 72:8
77:19 81:5
96:12,13 97:17
97:21
vendor 91:6
ventilating
22:10 59:8
92:7,16
verbal 19:16
41:23 51:18
57:5
verbally 52:19
vice 26:1,2,4
88:1
**Vince** 34:5,19
38:9 49:23
50:9,14 56:3
62:11 76:3,4,7
76:9
**Vince's** 34:6
**Vogler-West**
23:23 31:20
38:21 103:14
volunteer 112:8
voted 32:17

voucher 35:14
vs 1:21 6:21

**W**

**W** 1:24 6:24
waived 7:24
114:9 115:12
walked 37:13
walls 41:4,5
want 17:11
19:10 22:16
37:6 41:4 49:1
53:21 67:14
68:22 76:22
78:6 82:8
93:16,18 95:7
100:22 102:24
111:8,22 112:6
112:10,24
113:11
wanted 32:15
94:7
wants 112:13
**Warner** 87:23
87:24
wash 28:11 98:1
washing 28:9
**Washington** 3:5
18:8
wasn't 67:9 79:5
85:14 98:7,11
99:15
water 107:10,10
way 24:17 33:15
57:24 63:12
66:20 73:10
91:16 99:10
we'll 67:17 77:23
89:4 111:13
112:23
we're 16:21
19:11 27:20,20
30:23 32:4,20
36:15 46:19
51:21 52:12
62:3 72:7,19

101:4
we've 16:13
54:10 77:9
88:11 92:10
97:13 105:20
112:5
week 30:2 37:12
87:22
weeks 18:8,18
**Wells** 1:6 6:6
33:19 87:20
**Wells'** 42:15
went 17:12
27:11 44:1
46:13,15 54:9
65:8,13 88:8
88:12
weren't 30:5
38:14 58:8
68:15
**West** 3:5 15:14
88:2,3 103:14
104:5 106:20
whereabouts
87:3
wife 10:4,19
11:5,6 12:14
15:18
wife's 10:14
**William** 8:12
witness 5:2 7:23
27:14 63:7
67:16 78:17
90:9 94:10
98:14 100:5
115:9,10
wondering 92:5
95:12
words 22:17
32:14
work 19:18
20:12 26:5
33:19 36:4,10
37:1,1,14
39:14,18 40:8
40:15,22 41:1

53:8 59:1,4,19
63:22 64:18
65:2 66:22
68:7 81:23
83:4 87:18
88:8,12 92:18
96:12,13
100:19,20
102:6
worked 20:14,24
23:23 26:5
27:24 40:16
49:23 50:14
56:2,3 65:8,19
69:19 95:22,23
96:21
workers 23:20
23:21
working 19:12
20:18 23:6
30:21 31:5
34:20 35:15
38:2 66:24
92:21 101:5
works 33:20
36:5 87:15,16
wouldn't 32:1
44:13 81:24
88:20 91:10
101:14
write 69:15
72:23
writing 47:19
53:1 103:3
107:7
written 92:4
93:3 95:8,11
97:22 102:17
wrong 22:17
39:2 94:24
wrote 35:2 38:22
62:7 90:13
**Wyndham** 15:23
15:24

**X**

**X** 5:1

**Y**

yeah 38:16
53:19 56:5
59:16 63:9
68:6 83:11
86:17 90:10
93:7 94:5
98:10 109:21
111:16 113:7
year 18:8,18
30:11,12 46:13
46:14,18 96:11
years 10:3,13,16
10:22 11:4,17
12:2 14:10
17:19,22 18:7
18:12 19:2,8
19:14,15 20:17
21:2 22:9
27:12 30:16,17
31:9 35:14
37:4,6 39:13
50:22 52:12
59:6 64:1,2,17
64:19,23 65:1
85:11 87:24
88:4 96:6

**Z**

**Z-e-k** 25:13
**Zek** 25:7,9,10,11
26:24 27:5,6
39:23
zero 95:1,1
**Zurich** 33:5

**0**

**058512** 115:17
**084-004700**
115:17

**1**

**1** 5:6 13:21,22
18:17 41:17,18
41:20 42:21

Keefe Reporting Company

U.S. Bank National Association, et al. v. Springfield Prairie Properties, et al.
Robert Egizil 3/27/2018

**10** 5:15 13:21 14:10 24:24 37:6 101:16,19
**10:20** 2:17
**100** 18:20 83:15
**100,000** 107:7
**101** 5:15
**102** 5:16,17
**106** 5:18
**107** 5:19
**11** 5:16 60:7 102:14,16
**1119** 4:5
**113** 80:24 81:3
**113(e)** 82:12
**12** 5:17 66:23 68:20 94:21 102:23 103:11 107:24 108:1
**12-story** 107:11
**120** 20:2
**1227** 3:12 7:17 115:6
**13** 5:18 18:7,12 19:2 28:11 74:22 106:24 107:3,3
**130,000** 97:12
**14** 5:19 74:23 107:18,20
**15** 21:13 24:24 27:22 68:20
**15-cv-03195** 1:5 6:5
**15-cv-3199** 1:7 6:7
**15-story** 14:18
**15,000** 76:12 77:1 90:4
**150** 83:15
**150,000** 82:2 83:5,14
**16** 46:19
**1645** 15:14
**18** 27:22 60:15 60:17

**19** 61:2
**193** 64:11
**1963** 10:1
**1968** 22:6 65:8 67:21
**1970s** 67:20
**1978** 66:1
**1998** 42:5,12

### 2

**2** 5:7 18:17 41:24 44:3,17 45:8 48:14,19 49:4 57:19,21
**20** 19:14,15 21:2 21:13 54:3 80:16,19 105:3 105:6,15
**20,000** 82:14
**200** 3:20
**2000s** 31:10
**2007** 47:5 52:5 60:7 61:13 79:2
**2007-C4** 1:12 6:12
**2007-C5** 1:19 6:19
**2007-CS** 1:17 6:17
**2008** 45:1
**2009** 46:11,12,12 46:13 52:5 89:13
**2011** 52:5
**2012** 29:21,22 79:2,4,4 91:6 91:15,22 95:19 105:2,4,13,17 105:18,19 106:10
**2012-2014** 27:16
**2012/'13** 103:16
**2013** 29:21,22 91:7 95:6,8,11 95:18,20 96:11

105:3,6,15 106:14 107:24 108:1
**2014** 75:19 82:14 91:7 97:16,21 109:14 110:6
**2015** 100:12
**2016** 45:1
**2018** 2:16 7:16 115:5,14
**21** 80:17
**216** 109:7
**217)544-9823** 3:14
**217)753-8200** 3:22
**217)789-1200** 4:7
**22** 15:6
**22,000** 46:4,6,10 52:8
**225** 3:5
**23/14** 108:18
**23rd** 110:4
**25** 46:14,18
**26** 88:4
**26,000** 92:12
**2600** 3:5
**27** 2:16 7:16 115:5
**27,000** 52:8
**27,100** 43:11 45:2,3,19
**28** 91:21,24
**29,305** 43:22

### 3

**3** 5:8 45:21 48:14,19 49:5 69:4,6 80:18
**3:12** 114:10
**30** 7:15
**300,000** 79:6
**3009** 9:15
**31** 45:1 91:22

93:2,6 105:2,4 105:13
**312)460-4239** 3:7
**33** 16:10 94:18
**34** 94:21
**35** 94:21 95:2,4
**36** 95:8

### 4

**4** 5:9 42:13 46:20 79:19,21
**40** 11:17 30:16
**40,000** 95:16
**41** 5:6 93:7
**46** 85:17

### 5

**5** 5:10 80:10,12 82:14 109:16
**50** 11:17 23:17 23:19 26:8
**50,000** 89:24 90:15,15,22
**500** 24:14
**52** 97:11
**525** 108:20
**56** 14:8
**57** 5:7

### 6

**6** 5:11 84:19,22
**60** 23:8,9
**60606** 3:6
**611** 3:20
**62701** 3:21
**62703** 4:6 7:18 9:15 115:7
**62705** 3:13
**68** 97:21
**69** 5:8
**6th** 4:5 14:19 115:14

### 7

**7** 5:12 25:19,22 32:11 48:2

49:11 89:17,20 109:14
**70** 65:24
**700** 23:14 37:17 44:7,18,20 49:21 55:23 60:16
**70s** 66:19
**7500** 53:10
**78** 66:3 67:24
**79** 5:9
**7the** 3:12

### 8

**8** 5:3,13 91:2,5
**80** 5:10
**84** 5:11
**89** 5:12 16:10

### 9

**9** 5:14 94:15 98:17,20 108:15
**9/23/14** 109:5
**9/28/38** 9:17
**90** 46:13
**90s** 31:10
**91** 5:13
**98** 5:14

Keefe Reporting Company

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD, DIVISION

CSMC 2007-C4 EGIZII            )
PORTFOLIO LLC,                 )
          and                  )
U.S. BANK NATIONAL ASSOCIATION, )
as Trustee for the Registered  )
Holders of the MEZZ CAP        )
COMMERCIAL MORTGAGE TRUST       )
2007-C5,COMMERCIAL MORTGAGE    )
PASS-THROUGH CERTIFICATES,     )
SERIES 2007-C5,                )
                               )
          PLAINTIFFS,          )
                               )
          vs.                  ) CASE NO. 15-3195
                               ) (Consolidated)
SPRINGFIELD PRAIRIE PROPERTIES, )
LLC, an Illinois limited liability ) BENCH TRIAL
company; ROBERT W. EGIZII, an  )
individual; THOMAS EGIZII, an  ) VOLUME 4
individual; MICHAEL EGIZII,    )
an individual; RODNEY EGIZII,  )
an individual; JODI BAPTIST, an )
individual; JOHN PRUITT, an    )
individual; PAMELA JOHNSON,    )
EXECUTOR OF THE ESTATE OF CLYDE )
BEIMFOHR; EEI HOLDING CORPORATION, )
an Illinois corporation; EGIZII )
PROPERTY MANAGERS, LLC, an     )
Illinois limited liability     )
company,                       )
                               )
          DEFENDANTS.          )


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RICHARD MILLS
UNITED STATES DISTRICT JUDGE


MAY 8, 2019

any of that?

A.  No.  The unit was just several years old. It was beyond its usable life.

Q.  And although there were vacating spaces and Pana Warehouse, someone leaving, and although this was all happening, Egizii Electric or you or Mr. Egizii never bothered to hire a broker?

To help fill these voids?  To help fill these buildings, fill the space?  You never hired a professional broker?

A.  Are you talking about 2012, 2013, or --

Q.  Yeah.

A.  I mean the market was in complete free-fall. I mean Lehman Brothers went out of business.

Q.  That is -- I'm gonna ask that the comments be stricken from the record.  My question was did you ever hire a broker?

A.  No.

Q.  Okay.  And it was your understanding that Mr. Egizii made the decision to stop paying the mortgage interest rent because he was trying to negotiation with the lender; correct?

A.  Correct.

Q.  And it was also your understanding that Springfield Prairie Properties put its available

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD, DIVISION


CSMC 2007-C4 EGIZII                         )
PORTFOLIO LLC,                              )
          and                              )
U.S. BANK NATIONAL ASSOCIATION,            )
as Trustee for the Registered              )
Holders of the MEZZ CAP                     )
COMMERCIAL MORTGAGE TRUST                   )
2007-C5,COMMERCIAL MORTGAGE                 )
PASS-THROUGH CERTIFICATES,                  )
SERIES 2007-C5,                            )
                                           )
                    PLAINTIFFS,            )
                                           )
          vs.                              ) CASE NO. 15-3195
                                           ) (Consolidated)
SPRINGFIELD PRAIRIE PROPERTIES,            )
LLC, an Illinois limited liability ) BENCH TRIAL
company; ROBERT W. EGIZII, an              )
individual; THOMAS EGIZII, an              ) VOLUME 5
individual; MICHAEL EGIZII,                )
an individual; RODNEY EGIZII,              )
an individual; JODI BAPTIST, an            )
individual; JOHN PRUITT, an                )
individual; PAMELA JOHNSON,                )
EXECUTOR OF THE ESTATE OF CLYDE            )
BEIMFOHR; EEI HOLDING CORPORATION, )
an Illinois corporation; EGIZII            )
PROPERTY MANAGERS, LLC, an                 )
Illinois limited liability                 )
company,                                   )
                                           )
                    DEFENDANTS.            )


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RICHARD MILLS
UNITED STATES DISTRICT JUDGE


MAY 9, 2019


KATHY J. SULLIVAN, CSR, RPR, CRR
OFFICIAL COURT REPORTER

standing.

THE COURT:  Oh, I see.

Q.  So like when you research Secretary of State for a company, it will say it's in good standing or it's not.  If you don't pay your annual fee, it will go up, it won't be in good standing anymore.  And then pursuant to that, you ultimately wind up suing the individual if they're not in good standing.

THE COURT:  I understand.  Thank you.

Q.  And, Mr. Toolen, given your role as the 30(b)(6) witness in this case, it's your understanding that Mr. Egizii transferred over $3.5 million to four different law firms because he was worried about the lender seizing the account; is that not correct?

A.  That was my statement; yes.  The lender had already seized over $997,000.

Q.  Your testimony is what?

A.  I said I agreed with your first statement, and I added, the lender had already seized $997,000.

Q.  Of $3.5 million?

A.  No.  Of Springfield Prairie Properties' funds.

Q.  How is that?

A.  Immediately upon notification of default and